IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VOTE!, JOSEPHINE POPE,
GABRIELLE ADEKUNLE,
and VICTOR VALENTIN,

 *Plaintiffs*,

v.             Case No. 6:25-cv-1980

CITY OF DAYTONA BEACH and
LISA LEWIS, in her official capacity as
Volusia County Supervisor of Elections,

 *Defendants*.

_____/

# COMPLAINT

**Preliminary and Permanent Injunctive Relief Requested;
Declaratory Relief Requested**

  Plaintiffs bring this action to challenge City Commission Zones 5 and 6 in the redistricting plan the Daytona Beach City Commission recently adopted (the "Enacted Plan") as racially gerrymandered in violation of the Fourteenth Amendment. In crafting Zones 5 and 6, the Commission set an arbitrary and unjustified racial target: that they should have at least 50% Black residents. When the government redistricts predominantly based on racial considerations, the Equal Protection Clause requires the government's use of race to satisfy strict scrutiny. But here, the City's use of race was not narrowly tailored to serve a compelling interest. And far from advancing fair representation, the enacted zones do the opposite. The City engaged in racial gerrymandering that unconstitutionally abridges Plaintiffs' rights to the equal protection of the laws. Plaintiffs bring suit to vindicate those rights, and allege:

1

## PARTIES

1. Plaintiff VOTE! is an unincorporated association based in Daytona Beach, organized as a local Volusia countywide political committee in May 2022. VOTE!'s purpose is to educate voters and engage in local elections by supporting social justice, activating more community members to local politics, electing better leaders, and promoting access to voting. VOTE!'s members are predominantly politically engaged Daytonans and include residents and registered voters from throughout the city, including Commission Zones 5 and 6.

2. Plaintiff Josephine Pope is a Black elector in Commission Zone 6 and a VOTE! member.

3. Plaintiff Gabrielle Adekunle is a Black elector in Commission Zone 5 and a VOTE! member.

4. Plaintiff Victor Valentin is a Hispanic elector in Commission Zone 6 and a VOTE! member.

5. The Enacted Plan harms Plaintiffs because, among other reasons, it splits up their communities along racial lines, subordinates respect for genuine communities of interest to racial goals, and classifies them into voting districts simply because of their race.

6. If the Enacted Plan is not enjoined, Plaintiffs will continue to be harmed by living and voting in unconstitutionally racially gerrymandered districts.

7. Defendant City of Daytona Beach is a Florida municipality. As a Florida municipal corporation, Daytona Beach has the authority to regulate and conducts its

elections, including establishing its Commission zone boundaries.

8. Defendant Lisa Lewis is the Volusia County Supervisor of Elections and is sued in her official capacity. She administers Daytona Beach City Commission elections, including implementing the City's redistricting plans.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201–02, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

10. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

## FACTS

### A. Background and 2023 Plan

11. The Daytona Beach City Commission is made up of six commissioners each elected from a "zone" or district, and a mayor elected citywide.

12. Since the 2024 elections, the commissioners have been as follows:

| Zone | Commissioner | Last Election | Next Election |
|---|---|---|---|
| 1 | Monica Paris | 2022 | 2026 |
| 2 | Ken Strickland | 2024 | 2028 |
| 3 | Quanita May | 2022 | 2026 |
| 4 | Stacy Cantu | 2024 | 2028 |
| 5 | Dannette Henry | 2022 | 2026 |
| 6 | Paula Reed | 2024 | 2028 |
| Mayor Derrick Henry | | 2024 | 2028 |

13. Commission elections are held in August and November of even years.

14. Commissioners from Zones 1, 3, and 5 are elected in gubernatorial years.

3

The mayor and commissioners from Zones 2, 4, 6 are elected in presidential years.

15. The Equal Protection Clause requires election districts to be substantially equal in population. *Avery v. Midland Cnty.*, 390 U.S. 474, 485–86 (1968). This is known as the "one person, one vote" doctrine.

16. The 2020 Census revealed that the existing Commission zones were unequal in population in violation of "one person, one vote." The City thus embarked on the redistricting process.

17. On July 5, 2023, the Commission adopted a redistricting plan as Ordinance 2023-268 (the "2023 Plan"). The 2023 Plan was implemented in the 2024 municipal elections.

18. Five city residents challenged the 2023 Plan in state court under Florida's Sunshine Law, Fla. Stat. § 286.011(1), and a state statute that prohibits cities from drawing districts with the intent to favor incumbents based on their home addresses, Fla. Stat. § 166.0321.

19. To resolve that suit, the City agreed in January 2025 to repeal the 2023 Plan and re-start the redistricting process.

**B. 2025 Redistricting Process and Enacted Plan**

20. The City repealed the 2023 Plan on January 8, 2025, reverting to the zone boundaries adopted under the 2010 Census (the "2012 Plan").

21. On April 2, 2025, the City hired Kurt Spitzer & Associates as its redistricting consultant for a new remapping process.

4

### *1.  July 17, 2025 Spitzer Memorandum*

22. On July 17, 2025, Kurt Spitzer sent a memorandum to the Commission explaining eight redistricting plans he had drafted.

23. The memorandum explained that the plans "generally begin with one of two alternative approaches:" (1) "Two districts covering the barrier island" and (2) "Three districts covering the barrier island."

24. The memorandum's discussion of the eight options focused almost exclusively on their approach's impact on whether it was possible to draw two majority-Black zones.

25. Five of the eight options (Alternatives 2, 3, 3A, 3B, and 3B1) followed the first approach, splitting the city's Beachside neighborhood (the barrier island between the Halifax River and the Atlantic Ocean) between just two zones.

26. The memorandum stated of these five alternatives, "In each of these plans, we were unable to maintain Zones 5 and 6 as minority majority districts."

27. The memorandum continued, "Among the various plans providing for two barrier zone districts, Alternative 3B1 came closest to maintaining Zone 5 as a majority minority district. However, that alternative would still result in a decrease in Zone 5's African American population from 54.95% to 49.37%, while increasing Zone 6's African American population from 55.48% to 58.36%."

28. In contrast, the memorandum praised the plans that followed the second approach (Alternatives 1, 1A, and 1B) because they included two majority-Black districts, and moreover, managed to increase the Black share of Zone 3 compared to

its current makeup: "In each of these alternative plans, the African American population of Zone 6 remains constant. Depending on the Plan, the African American population of Zone 5 decreases to 51% or 52% but is still a minority majority district, and Zone 3 becomes a minority influence district with an African American population of 41% or 42%."

### 2. *August 6, 2025 Commission Workshop*

29. On August 6, 2025, the Commission held a workshop, at which Spitzer presented the proposed redistricting plans.

30. Spitzer began his presentation by outlining the criteria that guided his proposals, and which the Commission could consider. The first three criteria were (1) equal population, (2) not diluting minority voting strength, and (3) complying with the state law regarding favoring or disfavoring candidates or incumbents based on residential address.

31. As to the second criterion, Spitzer explained, "If there's a minority-majority district or two in the jurisdiction, we'll adopt a plan that seeks to preserve that criteria."

32. City Attorney Ben Gross interjected, stating, "when you look at the bullet point list of criteria, legally speaking, the first three listed are, in my view, the most important criteria. And to the extent that sometimes the application of the criteria to specific circumstances in a local jurisdiction create conflicts, the criteria that you want to give preference to are the first three of them."

33. Before Spitzer walked through the draft proposals, he noted that in the

existing map (the 2012 Plan) "there are two minority-majority districts, and there's another district which has an African American population of a little bit over 30%. So, just keep that in the back of your head."

34. Introducing Alternatives 1, 1A, and 1B, Spitzer noted that each of them split the barrier island into three zones, and that this allowed the map to maintain the two minority-majority districts (Zones 5 and 6) and created a minority-influence district (Zone 3).

35. Gross again interjected, asking about whether different options "increases slightly the majority-minority percentages in the two majority-minority districts," yielding "slight improvement . . . in the majority-minority percentages in 5, 6" and whether the Black concentration was "a little bit higher also in Zone 3."

36. Just as he discussed in his July 17 memorandum, Spitzer explained that, in contrast to Alternatives 1, 1A, and 1B, "the alternatives that split the barrier island amongst just two districts"—Alternatives 2, 3, 3A, 3B, and 3B1—did *not* maintain two majority-minority zones. Even though certain of those plans were close to attaining 50% Black population in both Zones 5 and 6, none of them reached that target.

37. Spitzer commented that, if the Commission's "direction is to try to work on one of these plans, to try to correct these faults, we can try to do that."

38. Summarizing the plans, Spitzer concluded: "I'll just give you some of the criteria here . . . . Some – the 1, 1A, 1B – all preserve the minority-majority districts, whereas the other plans – 2 and the series beginning with 3 – do not."

39. Commissioners shared Spitzer's view that Zones 5 and 6 must have at

7

least 50% Black population.

40.     Commissioner Cantu stated: "Zone 5, ever since I was a kid, has always been a minority district." She asked about where the Zone 4/5 border was in Alterative 1, and Spitzer reassured here that, even though Zone 5 shifted to add areas of majority-white Zone 4, Alternative 1 "maintains minority-majority districts in both 5 and 6."

41.     As commissioners asked about the changes in Alternative 1, Gross explained how the perceived need to draw Zones 5 and 6 as majority-Black, combined with the large population growth in Zone 4, constrained the mapdrawing choices:

> You have to underpopulate Zone 4. And so we have a little bit of a situation where you have to compare the geometry of the city versus where we have minority voters. If you look at the eastern edge of Zone 4 as it currently exists, it's adjacent to three zones, 5, 6, and 1. [] And of those [] three [], 5 and 6 are majority-minority zones. And so as you expand westward – and this is what I think Spitzer found out in drafting his maps, you lose that concentration. So your choices can be somewhat limited in attempting to reach two objectives that are equally important from a legal basis.

42.     Commissioner Cantu agreed it was important to maintain Zones 5 and 6 as majority-Black while equalizing population: "And that's why I brought up Zone 5. I grew up in Zone 5. I don't think any residents will want to see Zone 5 disappear."

43.     Gross explained further that "preserving majority-minority voting district[s]" is "one of the more traditionally more important criteria for redistricting." 16:11–12. And he reassured the Commission that, notwithstanding a recent Florida Supreme Court decision that discussed racial gerrymandering, the fact that "we do have a history in our community of having Zones 5 and 6 as majority-minority zoning districts, benefited by [] that composition, which gives us continued support in spite of

the recent Florida Supreme Court decision."

44. Commissioner Cantu, again, agreed.

45. In discussing whether it was possible to divide Beachside into fewer than three zones, Gross opined on the perceived tension between dividing Beachside less and reaching the Commission's racial targets:

> [W]hile that's an important consideration, you have to weigh that against the need to underpopulate Zone 4, because that's where the growth has been; the fact that two of the three zones adjacent to that are historically majority-minority zones. There's only so many different ways that you're going to be able to redraw your map to preserve those majority-minority voting districts.

46. Spitzer agreed.

47. Walking through Alternatives 2, 3, and 3B1 in more detail, Spitzer again counseled: "But remember that these plans result in – and especially Alternative 2 – both 5 and 6 are no longer majority-minority districts. [] Not only that, they're diluted significantly. And Zone 3 is, some would argue, packed with African American folks."

48. Commissioner Cantu agreed, summarizing what happens in the options "where the beach is split amongst two zones": "So you lose minority seats."

49. Spitzer summed up the tradeoff: "All of the plans that split the beach into only two districts would lose at least one minority-majority district."

50. Reviewing his final plan (3B1), Spitzer explained:

> We attempted to get to a plan where you would maintain two minority-majority districts. And we got close in 3B1. And in 3B1, Zone 6 is 58% African American and 49.4% African American in Zone 5. But it still is not a majority, and the African American

population in Zone 5 is, some would say, is diluted down.

51. The commissioners arrived at a consensus around Alternative 1.

52. As Commissioner Cantu said, Alternative 1 was preferrable because in the other options, "You would lose a lot of minorities."

53. When Commissioner Paris expressed support for Alternative 3B1, Commissioner Cantu explained that was a non-starter because it would reduce the Black population in Zones 5 and 6: "Because you would be separating Zone 5 . . . [a]nd actually 6 as well. And those are minority districts, and they've always been minority districts."

54. Concluding the workshop, Mayor Henry agreed, explaining he preferred Alternative 1 because "[t]he other maps, those other maps that we were considering, they diluted minority interests."

55. Based on the Commission's discussion, Spitzer and the City Attorney prepared an ordinance incorporating Alternative 1, with direction to explore moving non-residential properties on Main Street along the Zone 2/3 border, "and still maintain the majority-minority numbers and the margins."

### 3. *August 20, 2025 Commission Meeting*

56. The ordinance incorporating Alternative 1 was formally introduced at the Commission's August 20, 2025 meeting.

57. Ahead of that meeting, Gross submitted a memorandum regarding the redistricting ordinance. Echoing his advice at the workshop, the City Attorney counseled that the criteria of (1) equal population, (2) "Do not Dilute Minority Voting

Strength," and (3) not favoring or disfavoring incumbents and candidates "are particularly significant;" "other policy considerations . . . are secondary in nature."

58. He continued: "The draft ordinance is intended to be consistent with these three enumerated requirements, while being consistent to the extent practicable with the additional policy considerations illustrated above and discussed at the workshop."

59. On August 20, commissioners debated whether to choose one of the other "1" maps (1A or 1B) to move two parks between zones.

60. Mayor Henry expressed his priority: "my main thing is minority voting."

61. Commissioners Henry and Reed concurred.

62. In response to Mayor Henry's point, Gross asked Spitzer to compare Alternatives 1, 1A, and 1B: "how are those three maps different in terms of majority-minority status in 5 and 6 and their impact in making Zone 3 . . . a minority zone of influence."

63. Spitzer confirmed that all three options made Zone 3 a "minority influence district with a African American population of between 41 and 42%," and that all three options have "similar effects to each other in terms of Zone 5 and Zone 6," although, "to a small extent, 1B maintains the [ ] voting-age African American population in Zone 6 *higher* than 1 or 1A. And the voting-age African American population in Zone 5 in plan 1B is the same as that in 1A."

64. The Commission agreed to revisit the proposed ordinance, incorporating Alternative 1, at its next meeting.

### *4. September 3, 2025 Commission Meeting*

65. At its September 3, 2025 meeting, the Commission discussed advancing Alternative 1A or 1B (which differed from Alternative 1 in that they restored one or two parks, respectively, to the zones those parks were assigned to in the 2012 Plan), and making additional, relatively minor adjustments. Throughout the debate, the Commission was keenly sensitive that these tweaks would not disrupt their desired racial balance of Zones 5 and 6.

66. For example, advocating for a change to keep a community center in Zone 6, Commissioner Reed assuaged her colleagues by stating, "I don't know how much it affected [Zone] 5, but I think we still kept our major African American zones with that move." Mayor Henry agreed with her.

67. Explaining the options then under consideration (Alternatives 1, 1A, and 1B), Spitzer reiterated: "All of the plans maintain minority-majority districts in 5 and 6."

68. As a consensus grew for Alternative 1B, City Attorney Gross emphasized what he perceived as one of its positive attributes:

> [T]here would be an incremental increase in the majority-minority population in Zone 5 . . . . It's a very minor increase, but it would be an increase. And Mr. Spitzer, I think what you said during the workshop is from the standpoint of preserving majority-minority member districts, which we have to do because we have had those as majority-minority districts and they have impacted the voting that those districts have consistently elected minority commissioners. So from the standpoint of preserving that majority-minority influence, all three of 1, 1A, and 1B, do that. 1A and 1B, because they move a small amount of people back into 5, increase that percentage."

69. Mayor Henry and Spitzer agreed.

70. After Commissioner Reed proposed advancing Alternative 1B, Mayor Henry expressed why 1B aligned with his priorities: "I will say that the rationale for me is it increases the minority-majority district, ever how slightly. That is perhaps, you know, one of the most important factors that we should be considering."

71. The Commission directed Spitzer to take Alternative 1B, make one minor change along the Zone 2/3 border, and bring that newly adjusted map back at the next meeting.

72. Summarizing the Commission's instructions for Spitzer, City Attorney Gross stressed how the Commission's racial goals were to remain front of mind:

> I think the motion would be to continue this to allow the consultant to change the map exhibit to map 1B, plus [the minor change]. And then when he presents that, he'd also have to . . . make any other related changes that need to be made to stay within the 10 percent margin and to preserve the majority-minority zones of influence.

73. The Commission adopted that motion unanimously.

### 5. October 1, 2025 Commission Meeting

74. The Commission took up the redistricting ordinance for a final vote on October 1, 2025, considering "Alternative 1B-1," which was Alternative 1B adjusted to include the minor change the Commission directed on September 3.

75. During the open public comment portion of the meeting, Mayor Henry responded to one member of the public who asked, "Why do we have to have everything based on race?" Mayor Henry responded: "we follow the state

requirements, and what the state encourages us to do, which is protect minority-majority districts. That's what we did."

76. City Attorney Gross further explained:

> [W]here you have a district that is historically majority-minority, and where that historical status has benefitted minorities in terms of their vote, as we have, and the district is not in that sort of salamander shape that our consultant discussed, then under those circumstances, in my view, we're actually required by law to preserve the majority-minority status.

77. Before voting in favor of the redistricting ordinance, Commissioner Paris lamented that communities of interest like Beachside had to be sacrificed for other (*i.e.*, racial) goals, remarking, "I'm a little disappointed that Beachside had to be broken up and communities of interest weren't kept together."

78. The Commission adopted the Enacted Plan by a 6-0 vote, with Commissioner Reed absent.

**C. Race predominated in the drawing of the Challenged Zones.**

79. As recounted above, the Commission's predominant goal in drawing Zones 5 and 6 was to purposefully reach a racial target: Black residents should make up no less than 50% of the zones' population.

80. "Maintain[ing] Zones 5 and 6 as minority majority districts" was a central, non-negotiable criterion from the start of the process.

81. It was a criterion the City Attorney advised "giv[ing] preference to" because it was "one of the more traditionally more important criteria for redistricting" and "equally important" to the paramount mandate of equal population.

82. Indeed, when directing its consultant to explore tweaks to Alternative 1, the Commission explicitly instructed him to "still maintain the majority-minority numbers."

83. These race-based decisions resulted in a map that splits communities and subordinates traditional redistricting criteria like "respect for . . . communities defined by actual shared interests." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

84. The Commission explicitly rejected alternative plans that adhered better to traditional criteria because they did not meet the Commission's desired racial targets. The fact that certain alternatives lacked two majority-minority zones was, in the Commission's view, "faults" that its consultant would need to "correct" if the Commission preferred one of those options.

85. Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are subordinated to racial considerations, race predominates. Unless the use of race is *necessary* to ensure fair and equal opportunity for minority voters to participate in the electoral process, its use is constitutionally suspect.

**D. The use of race was not narrowly tailored to a compelling interest.**

86. When race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 173, 193 (2017)).

15

87. Traditionally, compliance with Section 2 of the Voting Rights Act has served as the primary justification for the predominant consideration of race. But the Commission's use of race was not narrowly tailored to any compelling governmental interest, including compliance with Section 2.

88. To narrowly tailor their use of race to comply with Section 2, the Commission was obligated to ensure that the threshold conditions for proving vote dilution under Section 2 were met, including that the city's white majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate ("white bloc voting").

89. But to the contrary, in Daytona Beach, electoral history demonstrates robust and commendable Black electoral success in citywide elections, not white bloc voting.

90. Even if that were not the case, the City was obligated to assess the level of Black registered voters or voting-age population necessary for Black voters to have the opportunity to usually elect their preferred candidates.

91. The Commission took no steps to meaningfully assess VRA compliance. A proper analysis suggests that candidates preferred by Black voters would usually be elected in districts with Black populations much lower than the 50% target the Commission set.

## CLAIM FOR RELIEF

### Racial Gerrymandering
### in Violation of the Fourteenth Amendment
### (42 U.S.C. § 1983)

92. Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

93. Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

94. As alleged in detail above, race was the predominant factor in the design of Zones 5 and 6 in the Enacted Plan. Race predominated over all other redistricting criteria when they were drawn, rendering the Enacted Plan a racial classification subject to strict scrutiny.

95. The use of race as the predominant factor in creating Zones 5 and 6 was not narrowly tailored to advance any compelling governmental interests.

96. Consequently, the Enacted Plan does not survive strict scrutiny.

97. Therefore, the Enacted Plan violates Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A. Declare the Enacted Plan to be unconstitutional in violation of the Fourteenth Amendment as a racial gerrymander;

B.    Preliminarily and permanently enjoin Defendants and their agents from calling, conducting, supervising, or certifying any elections under the Enacted Plan;

C.    Enter a remedial decree that ensures Plaintiffs live and vote in constitutional districts that comply with all applicable legal requirements;

D.    Order Defendants to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regular election;

E.    Award Plaintiffs nominal damages of one dollar each;

F.    Award Plaintiffs reasonable attorneys' fees and costs of suit; and

G.    Grant any other relief the Court deems just and proper.

Respectfully submitted October 14, 2025,

/s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
   *Designated Lead Counsel*
Caroline A. McNamara (FBN 1038312)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
dtilley@aclufl.org

*Counsel for Plaintiffs*