IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VOTE!, *et al.*,

    *Plaintiffs*,

v.

CITY OF DAYTONA BEACH, *et al.*,

    *Defendants*.

                                     /

Case No. 6:25-cv-1980-PGB-RMN

## PLAINTIFFS' RESPONSE TO MOTION TO DISMISS

The City of Daytona Beach violated the Fourteenth Amendment by using race as the predominant factor in enacting its district map without sufficient justification. Because Plaintiffs' Complaint (ECF No. 1) easily clears the plausibility threshold, the Court should deny the City's Motion to Dismiss (ECF No. 26).

## STANDARD OF REVIEW

To overcome a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint "does not need detailed factual allegations'"; the allegations must only "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A court evaluating a motion to dismiss takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008); *Singleton v. Allen*, 740 F.Supp.3d 1138, 1155 (N.D. Ala. 2024) (three-judge court).

1

# ARGUMENT

## I.  Plaintiffs properly state a plausible racial-gerrymandering claim.

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans [and] prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017)) (alteration omitted). A racial-gerrymandering plaintiff carries their prima facie burden by showing that race served as the "predominant factor" motivating district line-drawing. *Id.* (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

A plaintiff may allege that race predominated "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916. "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines," for instance by "admit[ting] to considering race for the purpose of satisfying . . . the Voting Rights Act of 1965." *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 8 (2024). While proving racial predominance "entails demonstrating that the legislature subordinated other factors . . . to racial considerations," *Cooper*, 581 U.S. at 291, "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition" of the claim, *Bethune-Hill*, 580 U.S. at 190; *see also GRACE, Inc. v. City of Miami* (*GRACE I*), 702 F.Supp.3d 1263, 1280 (S.D. Fla. 2023).

When mapmakers "purposefully establish[] a racial target," race predominates. *Cooper*, 581 U.S. at 299; *see also Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 267 (2015) ("[E]xpressly adopt[ing] and appl[ying] a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines[.]"). Plaintiffs allege exactly this—"In crafting Zones 5 and 6, the Commission set an arbitrary and unjustified racial target: that they should have at least 50% Black residents." Compl. at 1. That allegation is hurled far past the plausibility threshold through the extensive statements of commissioners and their attorney, who "were not coy in expressing that goal," and the City's mapmaking consultant Kurt Spitzer, who "followed those directions to the letter, such that the 50%-plus racial target 'had a direct and significant impact'" on [Zone 5 and 6's] configuration." *Cooper*, 581 U.S. at 299–300.

Specifically:

- Spitzer presented map options that both did and did not feature two minority-majority zones. Compl. ¶¶ 25–28, 34, 36, 38, 47–49. The fact that certain maps *lacked* two minority-majority zones was a "fault" that Spitzer said he would need to "correct" if the Commission wished to pursue those options. *Id.* ¶ 37; *see also* ¶ 50 ("We attempted to get to a plan where you would maintain two minority-majority districts.").

- Spitzer expressed his goal to maintain the majority-minority status of existing districts, which City Attorney Ben Gross advised was one of the three most important "criteria" for mapmaking (alongside population equality and complying with state law banning gerrymandering based on incumbent or candidate addresses), and that those three criteria should be "give[n] preference" in the event of a conflict with other considerations. *Id.* ¶¶ 30–32; *see also* ¶¶ 57, 67, 68 (Gross: "[F]rom the standpoint of preserving majority-minority member districts, which we have to do . . . ."), 76 (Gross: "[W]e're actually required by law to preserve the majority-minority status.").

3

- Commissioners explicitly stated that they agreed Zones 5 and 6 must conform to the 50% Black majority-minority population target, and were sensitive to avoid disrupting that goal. *Id.* ¶¶ 40 (Cantu: "Zone 5, ever since I was a kid, has always been a minority district."), 42, 44, 60 (Mayor Henry: "[My] main thing is minority voting."), 61, 66 (Reed: "I think we still kept our major[ity] African American zones with that move."), 70 (Mayor Henry: "[T]he rationale for me is it increases the minority-majority district, ever how slightly. That is perhaps, you know, one of the most important factors that we should be considering."), 75.

- Even when the Commission directed Spitzer to adjust his drafts, they instructed him to "still maintain the majority-minority numbers . . . ." *Id.* ¶ 55; *see also* ¶ 72 (unanimous motion to "make any other related changes that need to be made . . . to preserve the majority-minority zones of influence").

- City Attorney Gross also repeatedly expressed that Zones 5 and 6 must be majority-minority. *Id.* ¶¶ 41, 43 ("[P]reserving majority-minority voting district[s]" is "one of the more traditionally more important criteria for redistricting."), 45 ("[Y]ou have to weigh that against . . . the fact that two of the three zones adjacent to that are historically majority-minority zones. There's only so many different ways that you're going to be able to redraw your map to preserve those majority-minority voting districts."), 62.

- The Commission rejected alternative maps *because* they lacked two majority-minority zones, even when those alternatives were less than a percentage point under the 50% Black population target. *Id.* ¶¶ 25–27, 52–54.

These specific, detailed allegations present a plausible case that "race was the criterion that, in the [City's] view, could not be compromised" when it drew Zones 5 and 6. *Bethune-Hill*, 580 U.S. at 189–90 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)); *cf. Cooper*, 581 U.S. at 299 (race predominated when mapmakers "purposefully established a racial target: African-Americans should make up no less than a majority of the voting-age population" and where two key legislators "repeatedly told their colleagues that [the district] had to be majority-minority, so as to comply with the VRA"); *Abbott v. Perez*, 585 U.S. 579, 620 (2018) (finding district was a racial

4

gerrymander where legislature intentionally drew it to be 50% Latino); *GRACE, Inc. v. City of Miami* (*GRACE II*), 730 F.Supp.3d 1245, 1252, 1280 (S.D. Fla. 2024) (race predominated where commission "intentionally designed [maps] to ensure [they] would have three majority Hispanic districts" and where "Commissioners frequently expressed their intent that [a district] would remain a majority-Black district"), *appeal dismissed*, No. 24-11550 (11th Cir. July 17, 2024).

As Commissioner Paris acknowledged before voting for the map, "traditional race-neutral districting principles, including . . . respect for political subdivisions or communities defined by actual shared interests," were "subordinated" "to racial considerations." *Miller*, 515 U.S. at 916; *compare* Compl. ¶ 77 (Paris: "I'm a little disappointed that Beachside had to be broken up and communities of interest weren't kept together.") *with* ¶¶ 45–49 (discussion of tradeoff between preserving communities of interest and racial goals, with Spitzer explaining, "[a]ll of the plans that split the beach into only two districts would lose at least one minority-majority district").

## II. The City seeks to improperly consider material beyond the Complaint.

At the motion-to-dismiss stage, "it is generally true that the scope of the review must be limited to the four corners of the complaint." *Speaker v. U.S. Dep't of Health*, 623 F.3d 1371, 1378 (11th Cir. 2010) (quotation omitted). A document may be incorporated into the complaint by reference only if (1) it is central to the plaintiff's claim, and (2) its authenticity is undisputed. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). The incorporation-by-reference doctrine "is not a tool for defendants to

5

short-circuit the resolution of a well-pleaded claim" or to circumvent the reasonable inferences from plaintiffs' allegations. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (explaining "what inferences a court may draw from an incorporated document should also be approached with caution"). "If a plaintiff's claim could succeed without a document, the document is not central to the claim." *Comer v. Gerdau Ameristeel US, Inc.*, No. 8:14-cv-607, 2016 WL 4702425, at *1 (M.D. Fla. Sept. 8, 2016). "A document is not 'central' merely because it is directly responsive to a factual allegation." *Adamson v. Poorter*, No. 06-15941, 2007 WL 2900576, at *3 (11th Cir. Oct. 4, 2007).

The City seeks to incorporate five preliminary-injunction motion exhibits: transcripts of four Commission meetings and Spitzer's memorandum (but not Gross's memorandum quoted at ¶¶ 57–58) containing statements that, according to the City, present inferences that undermine the quotes in the Complaint. The documents are not "central" to Plaintiffs' claim because Plaintiffs' claim can succeed without them: the officials' public statements can be quoted regardless of whether transcripts exist. Plaintiffs do not incorporate a transcript of a meeting into the Complaint simply by quoting specific statements made during that meeting, nor do they incorporate the entirety of a consultant's memorandum by citing language in it. A complaint challenging a piece of legislation does not, merely by quoting from the legislative process, incorporate by reference the entire record from the bill's inception through final enactment; the City unsurprisingly cites no case supporting such a far-reaching principle. *Cf. Howe v. City of Enterprise*, No. 1:15-cv-113, 2018 WL 8545947, at *9 (M.D.

6

Ala. Sept. 17, 2018) (finding transcript of plaintiffs' criminal trial was not incorporated by reference into malicious-prosecution complaint), *report and recommendation adopted*, 2019 WL 8723922 (M.D. Ala. Mar. 12, 2019).

Finally, the City's attempt to compare this case to a contract dispute is nonsensical. Unlike someone alleging breach of contract, Plaintiffs are not suing "on the transcripts" or "on the memorandum." Plaintiffs' claims arise from the racial classification the Enacted Plan imposes, not from legal rights stemming from transcripts or memoranda themselves.

### III. Even considering documents outside the Complaint, Plaintiffs state a plausible claim.

Even if the Court considers the PI motion exhibits now, the Motion to Dismiss is still due to be denied. The City's argument centers on the claim that the Commission considered "various criteria" in developing its map. Mot. at 9. That is not close to enough to render Plaintiffs' allegations implausible. The Supreme Court has long held that race may predominate even if non-racial criteria were "actively at work in the districting process." *Hunt*, 517 U.S. at 907 ("That the legislature addressed these interests does not in any way refute the fact that race was the legislature's predominant consideration."). "The fact that other considerations may have played a role in the [City's] redistricting does not mean that race did not predominate." *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002).

What the City's motion overlooks is that the City's racial goals were not just one factor among many but were *elevated* over the others. *E.g.*, Compl. ¶¶ 32, 43 (Gross:

7

"[P]reserving majority-minority voting district[s]" is "one of the more traditionally more important criteria for redistricting" and along with equal population and complying with Florida's anti-gerrymandering law, "the most important criteria").[1] At the very least, the entire legislative record reveals "relevant state actor[]s['] express acknowledgment that race played a role in the drawing of district lines" "for the purpose of satisfying . . . the Voting Rights Act[.]" *Alexander*, 602 U.S. at 8. That is more than sufficient to state a claim.

Moreover, courts evaluating racial-gerrymandering claims must engage in a "holistic analysis" of the evidence to afford each piece of evidence "its proper weight." *Bethune-Hill*, 580 U.S. at 192. Even considering the totality of the Commission transcripts and Spitzer's memorandum together with the Complaint's allegations, there is ample evidence of race-based districting to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### IV. The City's other arguments are unavailing.

The City's remaining critiques are meritless. The City suggests that quotations from its mapping consultant, its city attorney, its mayor, and three of its six commissioners can't support a claim. Mot. at 9. But "relevant, contemporaneous

---

[1] Pointing to an equal-population criterion does nothing to rebut racial predominance, because "an equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.' Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met." *ALBC*, 575 U.S. at 272.
 Likewise, Florida's ban on redistricting based on incumbent or candidate addresses is a prohibition on the City considering a criterion. Thus, all that is left as "the most important criteria" is the City's racial goal.

statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes[.]" *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022); *see also GRACE I*, 702 F.Supp.3d at 1277 (denying motion to dismiss and noting that "[t]he notion that a racial gerrymandering claim may proceed based upon alleged motives and statements of legislators is hardly a novel concept" (quotation omitted)). The Supreme Court has found racial predominance *after a full trial* on far less. *See, e.g.*, *Cooper*, 581 U.S. at 299–300 (statements of just 2 of 170 North Carolina legislators and their mapmaker supported predominance finding).

The City next cites *Alexander* to fault Plaintiffs for not producing an alternative map. Mot. at 10. The Southern District dispatched the same argument earlier this year:

> Defendants contend *Alexander* mandates that Plaintiffs include alternative maps in their Complaint to adequately plead their claim. Not so. The existence of an alternative map is not a substantive requirement of a racial-gerrymandering claim, because the courts do not force "plaintiffs to submit one particular form of proof to prevail" in equal protection cases. *Cooper*, 581 U.S. at 319. In *Alexander*, the Court instead concluded that alternative maps are *helpful* "when the State raises a partisan-gerrymandering defense." 602 U.S. at 9. In that situation, Plaintiffs' production of an alternative map would "show[ ] that a rational legislature sincerely driven by its professed partisan goals would have drawn a map with greater racial balance." *Id.* at 10. We have no occasion to evaluate either the strength of Defendants' affirmative defenses or Defendants' burden on strict scrutiny given that we consider this case under a motion-to-dismiss standard. And even if we did, *Alexander*'s use of alternative maps as an evidentiary bar is easily distinguishable. The Court in *Alexander* considered a "circumstantial-evidence-only" racial-gerrymandering case where an alternative map would be necessary to rebut countervailing inferences that partisan gerrymandering motivated the South Carolina legislature. *Id.* at 9. Here, Plaintiffs present both direct and

9

> circumstantial evidence for their claim without Defendants having raised a partisan gerrymandering defense.

*Cubanos Pa'lante v. Fla. House of Reps.*, 766 F.Supp.3d 1204, 1211 n.6 (S.D. Fla. 2025) (three-judge court). The same reasoning applies here.

Even so, the Complaint *does* cite alternative maps: the five alternatives the Commission rejected because they "were unable to maintain Zones 5 and 6 as minority majority districts." Compl. ¶ 26. The fact that the Commission rejected those options *because* they failed to meet racial goals supports racial predominance. *GRACE II*, 730 F.Supp.3d at 1283 (rejected alternative plans constitute evidence of predominance).

Finally, the City suggests the "presumption of good faith" compels dismissal. But this longstanding presumption does not impose an insurmountable barrier to adequately pleading or proving a racial-gerrymandering claim. *See, e.g.*, *id.* at 1293 ("Though the Court presumes the good faith of the Commission, Plaintiffs have met their demanding burden of proving that race predominated[.]"); *Singleton*, 740 F.Supp. 3d at 1152 ("Although the legislature enjoys a good faith presumption that its map was driven by non-racial goals, the facts pleaded by the Singleton Plaintiffs asserting that racial concerns propelled the development of the Alabama map are enough at the motion-to-dismiss stage to overcome this good faith presumption.").

Last week, the Supreme Court stayed a preliminary injunction that discounted multiple legislators' in-court testimony "that race played no role in the 2025 redistricting process"[2] and faulted the district court for "fail[ing] to honor the

---

[2] *LULAC v. Abbott*, No. EP-21-cv-259, 2025 WL 3215715, at *33 (W.D. Tex. Nov. 18, 2025).

presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature." *Abbott v. LULAC*, No. 25A608, 2025 WL 3484863, at *1 (U.S. Dec. 4, 2025) (mem.). There is nothing "ambiguous" about the direct quotes from Daytona Beach's commissioners, their attorney, and their mapmaker. Together with Plaintiffs' other allegations, they support a plausible claim that the City applied a mechanical 50% Black target to draw Zones 5 and 6. *See GRACE I*, 702 F.Supp.3d at 1277 (denying motion to dismiss because "[t]he Operative Complaint contains extensive allegations that multiple Commissioners, over the course of six public meetings, expressed their intent that Districts 1, 3 and 4 be designed such that they would remain 'Hispanic districts'").

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion to Dismiss.

Respectfully submitted December 8, 2025,

 /s/ Nicholas L.V. Warren
Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
dtilley@aclufl.org

*Counsel for Plaintiffs*

11