IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VOTE!, et al.,

     *Plaintiffs*,

v.                                   Case No. 6:25-cv-1980

CITY OF DAYTONA BEACH, et al.,

     *Defendants*.

_____/

**CITY OF DAYTONA BEACH'S**
**RESPONSE IN OPPOSITION TO MOTION FOR**
**PRELIMINARY INJUNCTION**

## Introduction

**I.** The City of Daytona Beach's redistricting plan complies with the Fourteenth Amendment's Equal Protection Clause. The City weighed several factors when drawing the plan. No one factor predominated. Certainly not race.

True, the result was the preservation of two compact, majority-black City Commission districts. That result doesn't make race the predominant factor in the City's redistricting decision. Not even the intentional creation of a majority-minority district makes race the predominant factor. Predominance becomes still more difficult to prove because of the evidentiary presumption of good faith, which acts as an anvil on the evidentiary scale, tilting the balance in the City's favor and against Plaintiffs.

**II.** The City also had good reason to draw the plan as it did: avoiding liability under section 2 of the Voting Rights Act. Diluting the voting strength of a large, compact minority community violates the Act. Plaintiffs' own expert shows that the City's black voters tend to vote as a bloc, and white voters have recently voted as a bloc to defeat the black candidate of choice. Undoing the two existing majority-minority districts might have thus diluted black voting strength within the City.

**III.** What's more, given the City's shape and demographics, the City would have arrived at substantially the same plan regardless of any racial considerations. As the City's expert explains, the City's population is denser at the coast (in the east) and becomes less dense heading inland (towards the west). Because of the City's irregular shape, a bottleneck develops between east and west, right where the City's black voters

are clustered. To comply with the federal constitution's near-equal population requirement, the district lines must pass through the bottleneck with districts like the ones that the City enacted and that Plaintiffs now challenge.

A simulation of 50,000 race-neutral plans for the City proves as much. When compared to the simulated plans, the City's enacted plan fits snuggly among the simulations. Said another way, the City's enacted plan falls within the expected range of race-neutral plans. It's what a race-neutral map drawer would be expected to draw. It's what the City would have arrived at regardless of the stray statements in the record that Plaintiffs use to build their case for predominance.

**IV.** The other stay factors also favor a stay. The public interest and the equities favor deference to the choices made by the City's elected representatives. Enjoining the actions of these elected representatives would irreparably harm the City.

## Background

**A.** The City Charter requires that the City Commission divide the City into six zones, or districts, after each decennial census. Doc.7-1 at 1. The City Commission did just that after the 2020 decennial census. The City was then sued in state circuit court for favoring incumbents, and it redrew the districts once more. Doc.7-1 at 1-2.

The new plan became effective on December 8, 2025 "to help ensure compliance with Fla. Stat. s. 166.0231." Doc.7-2 at 2. The plan maintains districts 5 and 6 as majority black districts. Doc.7-1 at 6. It's the plan Plaintiffs challenge.

**B.** The City itself is majority white. Doc.7-1 at 6 (38,644/71,478). About a third of the total population is black. Doc.7-1 at 6 (24,578/71,478). Approximately a tenth of the total population is Hispanic. Doc.7-1 at 6 (6,618/71,478). Of the voting age population, 30.5% is black. **Attachment 1** (Dr. Trende Report) at 8.

The City also has an irregular shape and is non-contiguous. **Attachment 1** at 5. For example, the rectangle near the airport isn't part of the City. **Attachment 1** at 5.

The City's population isn't evenly distributed either. **Attachment 1** at 5-6. Blue areas have higher population density compared to green. **Attachment 1** at 6. Yellow (in district 4's tail) has little population. **Attachment 1** at 6. The white has no population; it's rural or commercial. **Attachment 1** at 6. In short, the population is centered in the east and becomes less dense moving east to west. **Attachment 1** at 6.



3

When looking at the black voting age population—BVAP—it's also clear that the black population is clustered in the narrower portion of the City between the barrier island to the east and the more rural areas to the west. **Attachment 1** at 9, 10. To equalize population as much as possible, the City's districts must "naturally pass" through this "bottleneck" where the black population resides. **Attachment 1** at 9, 10.



Indeed, when the enacted plan's boundaries are superimposed on a map showing percentages of black voting age population, it's clear that several districts pass

through the area. **Attachment 1** at 10. Specifically, districts 1, 6, 3, 2, and 5 all pass through the bottleneck between east and west. **Attachment 1** at 10.

Districts 5 and 6 become majority-black districts in the enacted plan with BVAPs of 50.9% and 50.4% respectively. **Attachment 1** at 10-11. Though it's clear from the map that other densely black areas are included in districts 2 and 3 as well— these black voters aren't all packed into districts 5 and 6. **Attachment 1** at 10.

**C.** The process for developing the enacted plan began with the hiring of Kurt Spitzer of Kurt Spitzer and Associates. **Attachment 2** (Mr. Spitzer Retention Package). Prior to his most recent work with the City, Mr. Spitzer had "served as the redistricting consultant and facilitator for more than 35 local redistricting projects in Florida," in a career spanning "over 40 years." **Attachment 2** at 12. He was assisted in the "data collection and mapping" part of the work by Dr. Bertram Melix of Florida State University. **Attachment 2** at 12.

Importantly, the "suggested approach and work plan" for Mr. Spitzer (and Dr. Melix) called for "[u]sing the Existing Districts map as a base" and utilizing "common redistricting criteria." **Attachment 2** at 21. Using race as the predominant factor—the one factor that couldn't be compromised—was never mentioned.

Later, on May 28, 2025, Mr. Spitzer sent a memorandum to the City outlining "common redistricting criteria," and his concerns with the City's then-existing plan. **Attachment 3** (Mr. Spitzer's May 28, 2025, Memorandum). The common criteria were these: (1) "equal (almost) in population," (2) "do not dilute minority voting

strength," (3) "do not 'favor or disfavor' an incumbent or candidate," (4) "use census blocks," (5) "compact and contiguous," (6) follow "significant natural and man-made boundaries," (7) "retain existing district boundaries," (8) "avoid splitting communities of interest" such as "neighborhoods" or "HOAs," and (9) ignore the "party affiliation" of voters. **Attachment 3** at 2-4 (capitalization removed). Mr. Spitzer then focused on the severely malapportioned nature of the City's then-existing plan, noting that there was a 46.9% population spread between the districts. **Attachment 3** at 4.

The use of race as a predominant factor in redistricting was never mentioned in the May 28, 2025, memorandum. Mr. Spitzer did say that he was providing data on voting age population because "VAP is an important statistic when seeking to avoid dilution of minority voting strength per the Voting Rights Act." **Attachment 3** at 4.

Mr. Spitzer provided other memoranda to the City on July 17, 2025, Doc.7-3, and September 8, 2025, **Attachment 4** (Mr. Spitzer's Sept. 8, 2025, Memorandum). Both memoranda follow the same format as his first memorandum. Both note the common redistricting criteria being used. Neither states that one criterion (race or anything else) predominates over another.

The September 8, 2025, memorandum discusses race in greater detail than the prior memoranda. In it, Mr. Spitzer explains that the City's then-existing map had two majority-black districts, districts 5 and 6. **Attachment 4** at 2. "Alternative 1B-1" provided with the September 8, 2025, memorandum, included versions of districts 5 and 6 where the BVAPs were about or just under fifty percent, at 47.3% and 50.4%,

and a "minority-influence district" where the BVAP was 39%. **Attachment 4** at 2-3. The memorandum termed these changes "nominal." **Attachment 4** at 3.

The September 8, 2025, memorandum makes a few things clearer. First, its mention of "minority-influence district." **Attachment 4** at 3. In redistricting parlance:

- The Supreme Court has held that section 2 of the Voting Rights Act can require the creation of a *majority-minority* district, one where a minority group constitutes a numerical, working majority of the voting age population—where the BVAP exceeds fifty percent. *Voinovich v. Quilter*, 507 U.S. 146, 154-55 (1993) ("Placing black voters in a district in which they constitute a sizeable and therefore 'safe' majority ensures that they are able to elect their candidate of choice.").

- "At the other end of the spectrum are *influence* districts, in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (emphasis added).

- In the middle are *crossover* or *coalitional* districts. These are districts where some portion of the majority group crosses over, or a coalition of different minority groups work together to elect a candidate. *Id.*

To determine whether a particular district is an influence district, there must be some district-specific assessment of the voting tendencies of the minority (black) and majority (white) voters, such that minorities can influence elections within the district.

Second, and relatedly, Mr. Spitzer used the word "nominal" to describe the changes to districts 5 and 6. This again means that there was some district-specific assessment for saying that a close-to majority-minority population would allow for the election of the black candidate of choice.

**D.** But Mr. Spitzer didn't get a vote on the enacted plan. That was reserved for the City Commission. Commissioners met in public meetings to discuss and then vote on the plan, as required by chapter 286 of the Florida Statutes.

There was a public workshop on August 6, 2025. *See* Doc.7-4. At that workshop, Mr. Spitzer discussed the criteria to be used. Doc.7-4 at 4-5. He didn't say that any one criterion was more important than the others. Doc.7-4 at 4-5. He said that race could be a consideration, just not "the dominant criteria." Doc.7-4 at 8. And he included the following admonition: "It's difficult, often, to attain all of these criteria at the same time. In fact, there isn't a plan in existence now that attains all of these criteria at 100% for each criteria. It's just impossible to do that." Doc.7-4 at 5.

At that workshop, the City Attorney, Mr. Gross, said that "in [his] view," "the first three [criteria] listed" in Mr. Spitzer's presentation, one of which was avoiding minority vote dilution, are "the most important." Doc.7-4 at 5. But, again, race by itself was never singled out. Mr. Spitzer never said that race was the one criterion that would dominate. Nor did any of the commissioners say that at the workshop.

Setting race aside, the August 6, 2025, transcript includes a discussion of various considerations. The one-person, one-vote concept is discussed in detail given the wide spread in population from district to district. *E.g.*, Doc.7-4 at 4, 15, 18. Compactness is discussed. *E.g.*, Doc.7-4 at 5, 10. Avoiding the intent to favor or disfavor an incumbent is discussed. *E.g.*, Doc.7-4 at 8. Also discussed were how best to "deal with" "Bethune-Cookman," Doc.7-4 at 26; "Main Street," Doc.7-4 at 25, 26, 28, including "both sides of the street," Doc.7-4 at 26; "Cypress Park," Doc.7-4 at 21; and other

places of interest like the beaches, Doc.7-4 at 17. For the beaches, Mr. Spitzer explained that all the alternatives presented to the City "preserve[d] the practice of having the beach split by three districts." Doc.7-4 at 17. Based on Mr. Spitzer's experience, "it's sort of a policy there that the beach is a community-wide asset and that it should be represented by as many people as is possible." Doc.7-4 at 17.

Race was discussed. There was a discussion about the preservation of majority-minority districts. *E.g.*, Doc.7-4 at 9-12, 15, 18, 22-24. Mr. Spitzer differentiated between majority-minority districts and influence districts. Doc.7-4 at 9. Commissioner Cantu led the discussion on making the least possible changes to district 5. She "grew up" in the City, Doc.7-4 at 17, specifically in district 5, Doc.7-4 at 15. She "[did]n't think any residents will want to see [district] 5 disappear." Doc.7-4 at 15. Though much of the racial discussion happened in the context of weighing all other criteria. *E.g.*, Doc.7-4 at 11-12. And, crucially, at no point in that discussion did Commissioner Cantu or anyone else say that the preservation of the majority-minority districts would preserve a racial gerrymander from earlier redistricting cycles. *Cf. Jacksonville Branch of NAACP v. City of Jacksonville*, No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416, at *2 (M.D. Fla. Dec. 19, 2022) (noting in the remedial phase an earlier finding concerning "Jacksonville's decades-long history of racial gerrymandering").

There was another meeting on August 20, 2025. Doc.7-5. There was page after page of discussion about Main Street, Doc.7-5 at 3-4, Cypress Park, Doc.7-5 at 4-6, and Bethune Point Park, Doc.7-5 at 5-6. Seemingly frustrated with the park-related discussion, Mayor Henry said that "a park is a park," and shifted the discussion to

"minority voting" by saying "[t]hat's [his] number one thing." Doc.7-5 at 7. Read in isolation, Mayor Henry's statement suggests that race was his predominant criterion; however, viewed in context, it could just as easily have been a frustration-induced means to shift the discussion from parks. *See* Doc.7-5 at 2-7. District 3's status as a minority-influence district was also discussed. Doc.7-5 at 7.

At the September 3, 2025, meeting there was more discussion of where to draw district lines along Main Street. Doc.7-6 at 4-5, 7-8, 13, 15. And parks. *E.g.*, Doc.7-6 at 8, 14. And discrete places like "Cherry Center," which "has a historical and sentimental value," Doc.7-6 at 6, and "Scarlett-Golden Center," Doc.7-6 at 11.

Though the consequences of proposed changes on the racial composition of districts were discussed, Doc.7-6 at 11-12, if anything, the September 3, 2025, meeting focused on where along Main Street to draw district lines.

Finally, there was a meeting on October 1, 2025, which included public comment. Doc.7-7. As part of the back and forth between the participants, the City Attorney, Mr. Gross, said that "there's a tension between the Equal Protection Clause of the Constitution and the Voting Rights Act, and the way that you reconcile those two," in Mr. Gross's view, "is where you have a district that is historically majority-minority, and where that historical status has benefitted minorities in terms of their vote, as we have, and the district is not in that sort of salamander shape." Doc.7-7 at 11. That's generally right. *See Thornburg v. Gingles*, 478 U.S. 30, 51 (1986).

**E.** Plaintiffs nevertheless sued, alleging that the City's plan constitutes a racial gerrymander. Doc.1. They moved for a preliminary injunction on October 20, 2025.

Doc.7. As part of their request for preliminary relief, Plaintiffs ask this Court to enjoin the City from using its plan *and* to change the residency deadline for candidates. Doc.7 at 21-22. They seek a prohibitory injunction (enjoining the use of the plan) and a mandatory injunction (mandating deadlines for candidate qualifications).

## Legal Standard

To obtain a preliminary injunction, Plaintiffs must demonstrate "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014). A preliminary injunction can prohibit a litigant from taking an action, mandate a litigant to take an action, or do some combination of both. "Nevertheless, when a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (quoting *Mia. Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)).

## Argument

Plaintiffs are unlikely to succeed on the merits. They can't show and haven't shown that race predominated in the City's decision to draw its plan as a whole or districts 5 and 6 more specifically. Even if they could, the City had a good reason to

11

draw the plan as it did: to avoid liability under section 2 of the Voting Rights Act. And even if race predominated, and the City didn't have a good reason for drawing its plan, the result would have been the same given the City's shape and demography. The other preliminary injunction factors also favor denial of the preliminary injunction.

## I. The standards that govern racial gerrymandering cases.

**A.** Racial predominance is a critical component of any racial gerrymandering claim. "The Equal Protection Clause prohibits a State," or in this case a city, "without sufficient justification, from 'seperat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (alteration in original) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). This requires a two-step analysis: (1) race must be the predominant factor used to draw the district, and (2), if race predominated, then the city's race-based actions must satisfy strict scrutiny. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 291-92 (2017).

Race predominates when it's "the criterion that" "could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996), *subordinating* race-neutral districting criteria like "compactness, contiguity, and core preservation," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024). Plaintiffs must carry their burden of proving racial predominance through direct evidence, such as explicit legislative language making race predominant, *id.* at 8; circumstantial evidence, such as a district's bizarre shape explained by race alone, *id.* at 8-9; or circumstantial evidence presented through an assessment of the *Arlington Heights* factors, *see Jacksonville Branch of NAACP v. City of*

*Jacksonville*, 635 F. Supp. 3d 1229, 1244-45 (M.D. Fla. 2022) (collecting cases, including *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

The racial predominance standard is "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). It's not enough to show that the redistricting body was "aware of racial demographics," or used race as a criterion. *Miller*, 515 U.S. at 916. This demanding standard makes sense. After all, race consciousness is allowed. And the intentional creation of majority-minority districts isn't necessarily impermissible. *See Allen v. Milligan*, 599 U.S. 1, 31-32 (2023); *Bush v. Vera*, 517 U.S. 952, 958-62 (plurality).

**B.** In addition, given the "sensitive nature of redistricting," *Miller*, 515 U.S. at 916, a "presumption that the legislature acted in good faith" attaches, meaning that there's a presumption race was *not* a predominant motive, *Alexander*, 602 U.S. at 6. This presumption applies at every stage of litigation from the pleadings through trial. *Miller*, 515 U.S. at 916-17. This "especially stringent" presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10-11; *see also League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373-74 (11th Cir. 2022) (requiring same when assessing snippets from the record).

At its core, the presumption of good faith "ensures that 'race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" *Alexander*, 602 U.S. at 10 (quoting *Miller*, 515

U.S. at 913). Importantly, the presumption avoids having the judicial branch be "quick to hurl" race-based "accusations at the political branches." *Id.* at 11.

**C.** Another proposition that stands out from *Alexander* is this: the party challenging a map must disentangle permissible from impermissible considerations and the way to do that is to submit a viable, alternative map. *Id.* at 34-35. Only by disentangling the permissible from the impermissible can the challenger show that a rational legislature had the ability to draw a compliant map. *Id.* The Florida Supreme Court adopted much the same standard for Florida's redistricting provisions albeit in a case only about race, not partisanship. *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 198 (Fla. 2025).

**D.** If a challenger establishes racial predominance, then strict scrutiny is triggered with its requisite showing of narrow tailoring and compelling interest. The Supreme Court has "assume[d], without deciding, that the State's interest in complying with the Voting Rights Act was compelling." *Bethune-Hill*, 580 U.S. at 193. But, given the complexities inherent in redistricting, narrow tailoring doesn't require the least restrictive means to achieve a compelling interest. Only "a strong basis in evidence" is necessary. *Cooper*, 581 U.S. at 292. That "strong basis," or "good reasons" standard, then gives the State "breathing room" "to adopt reasonable compliance measures." *Id.* at 293. The reasonable compliance measures should be upheld even if they prove, "in perfect hindsight, not to have been needed." *Id.*

14

When it comes to redistricting, compelling interest and narrow tailoring don't require the City to hit specific targets for BVAP, compactness, or adherence to geographic and political boundaries. *See id.* They don't require an ironclad assessment of liability under the Voting Rights Act. What's required is something more than "uncritical" assumptions and "generalizations," untethered to "evidence or analysis." *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 403-04 (2022).

## II.     Race didn't predominate in the City's decision to draw the plan.

In this case, Plaintiffs can't get past racial predominance. They provide no alternative plans *of their own* to disentangle permissible from impermissible criteria. They never take issue with the compactness of the districts. They never point to the creation of a "strangely irregular twenty-eight-sided" district. *Alexander*, 602 U.S. at 35 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960)). They never provide an expert analysis showing that the City's district boundaries follow the black census blocks with surgical precision, or an expert analysis showing that the City failed to preserve cores as it claimed. They never point to a single statement that makes a majority-minority district *the* singular criterion to which all other criteria must yield.

The closest Plaintiffs get to direct evidence of racial predominance are statements taken out of context. They say that the City had an explicit target of at least fifty percent for districts 5 and 6. Doc.7 at 6, 9. But, as support, they never cite a single statement that actually makes the fifty percent threshold for districts 5 and 6 *the* criterion at the forefront of the City's efforts. For that matter, they never point to an

explicit statement making the fifty percent threshold *a* criterion here; the City always focused on not diluting minority voting strength as *a* criterion. *Supra*.

Regardless, for now, even the intentional creation of a majority-minority district—a district where fifty percent of the population is of one minority race—doesn't mean that race predominated and strict scrutiny is triggered. *Compare Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 275 (2015) (declining to express a view on "whether the intentional use of race in redistricting" "triggers strict scrutiny"), *with League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in judgment in part and dissenting in part) ("[W]hen a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation and strict scrutiny is therefore triggered.").

Compare Plaintiffs' scant evidence with the City's evidence. First and foremost is the record read in context. That record isn't filled with commissioners' repeat platitudes and talking points. There's a genuine back and forth focusing on the struggle to balance criteria. Taken as a whole, that record shows that race didn't predominate. *Supra*. True, some statements, like the one mentioned above from Mayor Henry, cut against the City. But that's where the presumption of good faith comes into play and requires this Court to infer the best, not the worst, on Mayor Henry's part. *See Alexander*, 602 U.S. at 10-11; *League*, 32 F.4th at 1373-74.

Next consider the expert report from Dr. Trende. **Attachment 1**. In assessing the enacted plan, he looked at the City's shape, it's demographics, location of the black

population, common boundaries, compactness, and core retention. **Attachment 1** at 4-25. He walked through each district. **Attachment 1** at 12-21. He also simulated 50,000 race-neutral maps and then assessed whether the enacted plan falls within the range of such race-neutral maps. **Attachment 1** at 25-33. It does. **Attachment 1** at 29.

"The simple fact is that because the Black population in Daytona Beach is concentrated in a 'chokepoint' in the map, the natural effect will be to draw multiple Black majority districts, even when drawing without respect to race." **Attachment 1** at 33. Plaintiffs have failed to prove otherwise.

### III.    The City had a good reason to draw districts 5 and 6 as it did.

Even if Plaintiffs could establish racial predominance, they still lose. Again, the Supreme Court has "assume[d], without deciding, that the State's interest in complying with the Voting Rights Act was compelling." *Bethune-Hill*, 580 U.S. at 193. So, if the City has "a strong basis in evidence" for drawing the plan as it did to avoid liability under section 2 of the Voting Rights Act, *Cooper*, 581 U.S. at 292, meaning something more than "uncritical" assumptions and "generalizations," *Wis. Legis.*, 595 U.S. at 403-04, then it satisfies strict scrutiny.

The City had more than uncritical assumptions and generalizations. It's undisputed that there was already a large and geographically compact black community in the City that formed two majority-black districts. *Supra*. That's the first *Gingles* precondition. 478 U.S. at 50-51. There were also multiple references in the record to the functional effect of BVAPs in specific districts, meaning there was some

assessment of the political cohesiveness of the black community and the white community's bloc voting against the black candidate of choice. *Supra.* That's the next two *Gingles* preconditions. 478 U.S. at 51.

Admittedly, there's no formal document titled *Gingles* two and three, but that isn't required. By way of example, the three-judge panel in *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), discussed strict scrutiny in its order on remand from the Supreme Court. *Id.* at 1063-64, 1106-10, 1241-44. Writing for the panel, now Chief-Judge Pryor summarized the discussion as follows:

> We conclude that Alabama has satisfied strict scrutiny in two of the districts where race predominated. Alabama asserts an interest in complying with the Voting Rights Act, and it relies primarily on statements by two incumbent members of the Black Caucus at public meetings of the redistricting committee. This evidence is sufficient in those members' districts. As we explain, the Supreme Court does not require that the legislature conduct studies. It instead requires only that the legislature had a strong basis in evidence for its use of race. The statement of Senator Hank Sanders in particular is detailed and based on his experience as an influential longtime incumbent. This kind of testimony constitutes a "strong basis in evidence."

*Id.* at 1033. If the statements of two legislators can provide enough of a basis in evidence to satisfy strict scrutiny, then so too can the statements made in this record.

Plaintiffs' argument to the contrary rests on the assessment of their expert Dr. Moy. But even Dr. Moy concedes that white voters have recently voted against the black candidate of choice—in six of the last eleven elections beginning in 2022. *See* **Attachment 1** at 33-34 (critiquing Dr. Moy's report on *Gingles* II and III).

## IV.    The City would have drawn the same plan regardless of race.

Though redistricting is a specialized subset of equal protection jurisprudence, the same-decision defense remains untouched by its specialized rules. In this equal protection context, like all others, the government can still prevail where animus has been proven if the government can show that it would have made the same decision anyway, without regard to the animus. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *Thompson v. Alabama*, 65 F.4th 1288, 1297 (11th Cir. 2023).

Here, if Plaintiffs can show racial predominance *and* the City fails strict scrutiny, then Plaintiffs still lose, because of the same-decision defense. As Dr. Trende explains, "the racial makeup of the districts falls within the expected range for a race-neutral map at every step." **Attachment 1** at 29. This "suggests that whatever statements were made, the map drawer did not rely heavily upon racial data," and "if, at a remedial phase, a map drawer were employed to draw maps without respect to race, they would likely produce a map that looks like the Enacted Map." **Attachment 1** at 29.

## V.    The other preliminary injunction factors favor the City.

Finally, the remaining preliminary injunction factors favor the City. The City's elected representatives enacted the challenged plan. It reflects the deliberations and choices made by the representatives. The City would suffer irreparable harm if its choices are enjoined. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[a]ny time [the] State is enjoined by a court from effectuating" its

19

laws, "it suffers a form of irreparable injury" (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))).

## Conclusion

For these reasons, this Court should deny the motion for preliminary injunction.

Dated: December 12, 2025           Respectfully submitted by:

<u>/s/ Mohammad O. Jazil</u>
Mohammad O. Jazil (FBN 72556)
Valerie L. Chartier-Hogancamp (FBN 1011269)
Randall M. Raban (FBN 1055100)
HOLTZMAN VOGEL PLLC
119 S. Monroe Street, Suite 500
Tallahassee, Florida 32301
(850) 270-5938
mjazil@holtzmanvogel.com
vhogancamp@holtzmanvogel.com
rraban@holtzmanvogel.com
zbennington@holtzmanvogel.com

*Counsel for the City of Daytona Beach*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 12, 2025, I filed a copy of the foregoing using the

Court's CM/ECF system, which will serve a copy on all counsel who have entered an

appearance in this matter.

<u>/s/ Mohammad O. Jazil</u>
Mohammad O. Jazil