# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| **VOTE!, JOSEPHINE POPE, GABRIELLE ADEKUNLE** and **VICTOR VALENTIN**,<br><br>      Plaintiffs,<br><br>  v.<br><br>**CITY OF DAYTONA BEACH** and **LISA LEWIS**,<br><br>      Defendants. | Case No: 6:25-cv-1980-PGB-RMN |

# EXPERT REPORT OF SEAN P. TRENDE, Ph.D.[1]

_____

[1] In the course of preparing my document production, I noticed a few scrivener's errors in my report. Those have been corrected here.

# Table of Contents

**1  Introduction**                                                                    **1**

**2  Qualifications**                                                                   **1**

   2.1  Professional Experience . . . . . . . . . . . . . . . . . . . . . . . . . .    1

   2.2  Publications and Speaking Engagements  . . . . . . . . . . . . . . . . .    2

   2.3  Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

   2.4  Prior Expert Engagements . . . . . . . . . . . . . . . . . . . . . . . . .    4

**3  Background Information**                                                           **4**

   3.1  Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

   3.2  Daytona Beach Maps . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

**4  Analysis of the Enacted Map**                                                      **11**

   4.1  Crafting the lines . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

   4.2  Compactness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

   4.3  Core retention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

**5  Simulation Analysis**                                                              **25**

   5.1  Technique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

   5.2  Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

**6  *Gingles II & III* Analysis**                                                      **33**

**7  Exhibit 1 – Sean Trende C.V.**                                                     **35**

# List of Figures

Figure 1:    Daytona Beach, Florida, Boundaries . . . . . . . . . . . . . . . . .    5

Figure 2:    Daytona Beach, census blocks by population density . . . . . . .    6

Figure 3:    Blocks in Daytona Beach, greater than 595 residents . . . . . . .    7

Figure 4:    Blocks in Daytona Beach, greater than 1% deviation . . . . . . .    8

Figure 5:    Blocks in Daytona Beach, by BVAP . . . . . . . . . . . . . . . . .    9

Figure 6:    Previous Daytona Beach Map, layered over blocks by BVAP . . .    10

Figure 7:    Current Daytona Beach Map, layered over blocks by BVAP . . .    11

Figure 8:    Enacted (black) and Benchmark Plan (blue) boundaries . . . . .    13

Figure 9:    Enacted (black) and Benchmark Plan (blue) boundaries, District 2    14

Figure 10:   Enacted (black) and Benchmark Plan (blue) boundaries, District 3    16

Figure 11:   Enacted (black) and Benchmark Plan (blue) boundaries, District 1    17

Figure 12:   Enacted (black) and Benchmark Plan (blue) boundaries, District 4    19

Figure 13:   Enacted (black) and Benchmark Plan (blue) boundaries, District 5    20

Figure 14:   Enacted (black) and Benchmark Plan (blue) boundaries, District 6    21

Figure 15:   Example of two potential spanning trees in 7-precinct set . . . . .    26

Figure 16:   7-precinct set with one additional spanning tree removed (left),
             resulting "districts" (right) . . . . . . . . . . . . . . . . . . . . . .    27

Figure 17:   Dotplots, base simulations . . . . . . . . . . . . . . . . . . . . . .    28

Figure 18:   Number of Black Majority Districts, Base Simulations . . . . . .    30

Figure 19:   Dotplots, vtd constraint . . . . . . . . . . . . . . . . . . . . . . .    31

Figure 20:   Dotplots, vtd constraint . . . . . . . . . . . . . . . . . . . . . . .    31

Figure 21:   Dotplots, vtd constraint . . . . . . . . . . . . . . . . . . . . . . .    32

Figure 22:   Dotplots, vtd constraint . . . . . . . . . . . . . . . . . . . . . . .    32

# 1   Introduction

My name is Sean P. Trende. I am over 18 years of age and I hold a Ph.D. in Political Science. I have been retained by Holtzman Vogel Baran Torchinsky & Josefiak PLLC on behalf of their clients, the City of Daytona Beach, in the above-captioned matter, VOTE! v. City of Daytona Beach, Case No. 6:25-cv-1980 (M.D. Fla.). I have been asked to examine the Enacted Map for evidence of racial gerrymandering and to respond, to the extent appropriate, to the Expert Report of Bryant J. Moy, Ph.D., dated Oct. 17, 2025 ("Moy Report"). I am being compensated at a rate of $500/hr. My compensation is in no way dependent upon the conclusions I reach. All opinions are offered to a reasonable degree of scientific certainty.

# 2   Qualifications

## 2.1   Professional Experience

I serve as Senior Elections Analyst for Real Clear Politics. I joined Real Clear Politics in January of 2009 and assumed a fulltime position in March of 2010. Real Clear Politics is a company of approximately 50 employees, with its main offices in Washington D.C. It produces one of the most heavily trafficked political websites in the world, which serves as a one-stop shop for political analysis from all sides of the political spectrum and is recognized as a pioneer in the field of poll aggregation. Real Clear Politics produces original content, including both data analysis and traditional reporting.

My main responsibilities with Real Clear Politics consist of tracking, analyzing, and writing about elections. I collaborate in rating the competitiveness of Presidential, Senate, House, and gubernatorial races. As a part of carrying out these responsibilities, I have studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior. In particular, understanding the way that districts are drawn and how geography and demographics interact is crucial to predicting United States House of

Representatives races, so much of my time is dedicated to that task.

I am currently a Visiting Scholar at the American Enterprise Institute, where my publications focus on the demographic and coalitional aspects of American Politics.

I am also a Lecturer at The Ohio State University. My course load is detailed in my C.V., attached as Exhibit 1.

## 2.2   Publications and Speaking Engagements

I am the author of the 2012 book The Lost Majority: Why the Future of Government is up For Grabs and Who Will Take It. In this book, I explore realignment theory. It argues that realignments are a poor concept that should be abandoned. As part of this analysis, I conducted a thorough analysis of demographic and political trends beginning in the 1920s and continuing through modern times, noting the fluidity and fragility of the coalitions built by the major political parties and their candidates.

I also co-authored the 2014 Almanac of American Politics. The Almanac is considered the foundational text for understanding congressional districts and the representatives of those districts, as well as the dynamics in play behind the elections. My focus was researching the history of and writing descriptions for many of the 2012 districts, including tracing the history of how and why they were drawn the way that they were drawn. Because the 2014 Almanac covers the 2012 elections, analyzing how redistricting was done was crucial to my work. I have also authored a chapter in Dr. Larry Sabato's post-election compendium after every election dating back to 2012.

I have spoken on these subjects before audiences from across the political spectrum, including at the Heritage Foundation, the American Enterprise Institute, the CATO Institute, the Bipartisan Policy Center, and the Brookings Institution. In 2012, I was invited to Brussels to speak about American elections to the European External Action Service, which is the European Union's diplomatic corps. I was selected by the United States Embassy in Sweden to discuss the 2016 elections to a series of audiences there and was selected by the United States Embassy in Spain to fulfill a similar mission in 2018.

I was invited to present by the United States Embassy in Italy, but was unable to do so because of my teaching schedule.

## 2.3   Education

I received my Ph.D. in political science at The Ohio State University in 2023. I passed comprehensive examinations in both Methodology and American Politics. My dissertation applied historical and spatial statistical approaches to analyzing American political institutions, including (1) an analysis of Supreme Court voting patterns from 1900 to 1945; (2) methodological development in the use of integrated nested LaPlace approximations (INLA) to incorporate spatial statistics into election analysis; and (3) simulation-based evaluation of "communities of interest" in redistricting. In pursuit of this degree, I also earned a Master's Degree in Applied Statistics. My coursework for my Ph.D. and M.A.S. included, among other things, classes on G.I.S., spatial statistics, issues in contemporary redistricting, machine learning, non-parametric hypothesis tests and probability theory. I also earned a B.A. from Yale University in history and political science in 1995, a Juris Doctor from Duke University in 2001, and a Master's Degree in political science from Duke University in 2001.

In the winter of 2018, I taught American Politics and the Mass Media at Ohio Wesleyan University. I taught Introduction to American Politics at The Ohio State University for three semesters from Fall of 2018 to Fall of 2019, and again in Fall of 2021. In the Spring semesters of 2020, 2021, 2022, and 2023, I taught Political Participation and Voting Behavior at The Ohio State University. This course spent several weeks covering all facets of redistricting: how maps are drawn, debates over what constitutes a fair map, measures of redistricting quality, and similar topics. It also covers the Voting Rights Act and racial gerrymandering claims. I also taught survey methodology in Fall of 2022 and Spring of 2024. In Spring of 2025, I taught Introduction to the Policy Process. In Spring of 2026, I will teach American Government Culture and Behavior.

## 2.4   Prior Expert Engagements

A full copy of all cases in which I have testified or been deposed is included on my C.V., attached as Exhibit 1. In 2021, I served as one of two special masters appointed by the Supreme Court of Virginia to redraw the districts that will elect the Commonwealth's representatives to the House of Delegates, state Senate, and U.S. Congress in the following decade. The Supreme Court of Virginia accepted those maps, which were praised by observers from across the political spectrum. *See, e.g.*, *New Voting Maps, and a New Day, for Virginia*, The Washington Post (Jan. 2, 2022), *available at* `https://www.washingtonpost.com/opinions/2022/01/02/virginia-redistricting-voting-maps-gerrymander`; Henry Olsen, *Maryland Shows How to do Redistricting Wrong. Virginia Shows How to Do it Right*, The Washington Post (Dec. 9, 2021), *available at* `https://www.washingtonpost.com/opinions/2021/12/09/maryland-virginia-redistricting`; Richard Pildes, *Has VA Created a New Model for a Reasonably Non-Partisan Redistricting Process*, Election Law Blog (Dec. 9, 2021), *available at* `https://electionlawblog.org/?p=126216`.

In 2019, I was appointed as the court's expert by the Supreme Court of Belize. In that case I was asked to identify international standards of democracy as they relate to malapportionment claims, to determine whether Belize's electoral divisions (similar to our congressional districts) conformed with those standards, and to draw alternative maps that would remedy any existing malapportionment.

I served as a Voting Rights Act expert to counsel for the Arizona Independent Redistricting Commission in 2021 and 2022.

# 3   Background Information

## 3.1   Overview

The Complaint, injunction motion, and Moy Report offer little context regarding the City of Daytona Beach, its racial configuration, or the districts. I first provide some

of that context.

The City of Daytona Beach is an irregularly shaped, non-contiguous jurisdiction located along the Atlantic Coast. Its boundaries are as follows.

Figure 1: Daytona Beach, Florida, Boundaries



In several locations the city's boundaries do not line up cleanly with census block boundaries. The city is separated by the Halifax River from a barrier island on which around 12,000 residents are located; the river is traversed by five bridges clustered toward the northern city boundary.

The city's population is not evenly distributed across the city area. Instead, it is clustered to the east of I-95. Much of the area is either undeveloped, particularly in the western portion of the district, or commercial land. The following map displays the

number of persons per acre in each census block; it is placed on a log scale to avoid outliers overwhelming the color scheme. Each shaded unit represents a census block. Empty blocks are in white. The upshot of this map is that districts will not be evenly sized even without any malapportionment.

Figure 2: Daytona Beach, census blocks by population density



© OpenStreetMap contributors

Moreover, the small population of districts acts as a constraint upon a mapmaker. The 5% population deviation is 595 residents. There are 12 blocks that exceed that deviation. These blocks often contain other blocks, meaning that adding these blocks to a district necessarily means that additional blocks must also be added.

Figure 3: Blocks in Daytona Beach, greater than 595 residents



The city also contains 110 blocks that contain more than 1% of an allowable deviation. These often contain other blocks within their boundaries. These can combined with the city's irregular shape to constrain a mapmaker's discretion.

Figure 4: Blocks in Daytona Beach, greater than 1% deviation



The Voting Age Population of the city is approximately 30.5% Black. However, this population is not evenly spread throughout the city. Instead, it is concentrated in the north-central portion of the city, to the west of US-1. The following map depicts census blocks shaded by the Black percentage of the Voting Age Population. The color scale is truncated at 20% and 80% to prevent outliers from overwhelming the color scheme. White blocks are unpopulated.

Figure 5: Blocks in Daytona Beach, by BVAP



© OpenStreetMap contributors

This narrowing of the city boundary creates what is known as a "bottleneck." This is an area where, because of geography, districts must naturally pass. Given the light population footprint to the west, and the barrier island to the east, districts will tend to center here. Since the Black population is clustered here, that will tend to naturally cluster Black residents.

## 3.2   Daytona Beach Maps

Daytona Beach elects its city commission from six districts, called "zones;" I will use the more common "districts" throughout this report. A mayor is elected citywide. The previous boundaries, layered over the city's BVAP, were as follows:

Figure 6: Previous Daytona Beach Map, layered over blocks by BVAP



© OpenStreetMap contributors

I will refer to this as the Benchmark Plan. In this map, Zone 5 had a Black Voting

Figure 7: Current Daytona Beach Map, layered over blocks by BVAP



© OpenStreetMap contributors

Age Population of 50.9%, while Zone 6 had a BVAP of 50.4%.

A new map was passed after the 2020 census. The city, however, agreed to redraw that map under threat of litigation. It passed the following boundaries, which form the basis of this litigation.

I will refer to this as the "Enacted Map." Analysis of the maps and redistricting process follows:

# 4    Analysis of the Enacted Map

## 4.1   Crafting the lines

After the 2020 census, it was apparent that the Benchmark Map was badly malapportioned.

Table 1: Population Deviations, Benchmark Map

| District | Population | Deviation |
|:---:|:---:|:---:|
| 1 | 11,424 | -4.1% |
| 2 | 9,958 | -16.4% |
| 3 | 9,708 | -18.5% |
| 4 | 15,304 | 28.5% |
| 5 | 13,442 | 12.8% |
| 6 | 11,642 | -2.3% |

In particular, Zone 4 and Zone 5, in the western half of the city, grew at a relatively rapid clip, while zones 2 and 3, on the barrier island and just inland from it, both lost substantial population. Thus, the western zones, generally speaking, had to lose geographic footprint, while the eastern ones had to gain.

This is what happened. The following map shows the Benchmark and Enacted maps, with the Enacted Map boundary illustrated with dashed blue lines and the Benchmark in black.

Figure 8: Enacted (black) and Benchmark Plan (blue) boundaries



© OpenStreetMap contributors

To see the development of the lines, it may be helpful to zoom in and walk through the map district-by-district. In each of these maps, the old district lines are outlined in blue dashed lines and the new district lines are in black solid lines. The easiest way to interpret these maps is as follows: Areas bounded by solid black lines were moved out of the old district and into a new one (labeled); areas bounded by dashed lines were moved into the new district.

We begin, perhaps counterintuitively, with District 2. It was substantially under-

populated. It needed to expand its footprint. At the same time, it was an oddly shaped
string of precincts and blocks.

Figure 9: Enacted (black) and Benchmark Plan (blue) boundaries, District 2



© OpenStreetMap contributors

It adds population while regularizing its boundaries. The Benchmark Plan had two substantial "indents" that are filled in by taking 2,427 residents out of District 3, who are 17.2% BVAP, and an additional 632 out of District 5, who are 41.3% BVAP (recall District 5 needed to shed population). It continues normalizing the boundary line by cutting off a portion of the Benchmark District 2 and placing it in District 3, dividing the area along North St. This portion has 1,317 residents and is 83.6% BVAP. Notably, the district does not dig deeper into the heavily White barrier island, nor does it give up heavily Black blocks to the north of North Street to District 3; either action would increase the BVAP in District 3, or make District 2 even Whiter, but would come at the expense of boundary adherence and compactness.

District 3 likewise needed to gain population. Compounding this, District 2 to the north was hemmed in by the northern edge of the city and needed to gain population. To do so, it would have to mostly take population from 3; we have already seen the population taken by District 2 as well as the portion District 2 gave to District 3. District 3 further gained population by eliminating a jagged boundary to the south and pushing further into District 1 on the barrier island. It takes another piece of District 1 on the mainland, described below. On balance, District 1 donates 1,766 residents to District 3; they are 13.9% BVAP.

Finally, District 3 takes 1,218 residents from District 6. While it could have pushed even further into District 1 on the barrier island, leaving this substantial Black population for District 6, it takes 1,218 residents who are 72.5% BVAP. The previous District 3 boundary adhered closely to the racial lines of division in Daytona Beach; it now seems indifferent to the boundary lines. Overall, the district is much more square-like than in the past.

Figure 10: Enacted (black) and Benchmark Plan (blue) boundaries, District 3



We next turn to the final district on the barrier island, District 1.

Figure 11: Enacted (black) and Benchmark Plan (blue) boundaries, District 1



© OpenStreetMap contributors

District 1 was marginally underpopulated. However, it gave up population to District 3, in order to help District 3 gain population. It gives up an area along the barrier island, as well as a population just west of the river to District 3. The population totals 1,766 and is 13.9% BVAP. It gives up an unpopulated block to District 6, and a small population on the western edge of the district (623 residents) near the airport to District 4, which is 28.5% BVAP. It then adds 3,345 residents from District 4, which needed to shed population, along the southern edge of the district. It retains a core of 9,035 residents, with a BVAP of 17.5%. Overall, there is no particular rhyme or reason

to how racial groups are moved into or out of the district.

The new boundaries mostly conform to major roadways. The southern edge of the district follows the irregular southern boundary of the district. The portion of the district sent to District 4 did not follow any roadway for a stretch; eliminating that places the district boundary along Beville Rd. (Fla. 400) and S. Clyde Morris Blvd. The portion placed into District 3 is bounded by a railway running along the Dayton Beach Golf Club, Wilder Blvd. and S. Beach St.

Next is District 4.

Figure 12: Enacted (black) and Benchmark Plan (blue) boundaries, District 4



© OpenStreetMap contributors

As noted above, District 4 needed to shed substantial population. In addition to the portion of District 1 described above, it takes a census block, along with two blocks it envelops, from District 5. It has 506 residents and a BVAP of 39.1%. At the same time, it donates 1,531 residents to District 5; these residents are 32.2% BVAP. The district

boundary here now runs along I-95, for the most part.

The last two districts have mostly been dealt with in other places; we can be brief. District 5 needed to give up population, but first it needed to take on additional population from 4 (so 4 could shed population).

Figure 13: Enacted (black) and Benchmark Plan (blue) boundaries, District 5



© OpenStreetMap contributors

It had already given a small amount of population to District 2, but that district's

population center was far away; donating more would greatly reduce the compactness of the district. That left only District 6 as a neighboring district to dump population to. It does so mostly along Mason Ave., adding 2,125 residents who were 62.4% BVAP to District 6. In other words, District 5 takes on a substantial White population, while giving up substantial Black population. These are not the typical actions of a racial gerrymanderer.

Finally, District 6 is mostly a rob-Peter-to-pay-Paul district. It gains a substantial Black population from District 5, because it must. It then gives up a substantial Black population to District 3, because District 3 needed to gain population. As described above, the districts needed to shift further westward; that happened on balance here.

Figure 14: Enacted (black) and Benchmark Plan (blue) boundaries, District 6



© OpenStreetMap contributors

## 4.2   Compactness

I was asked to assess the compactness of the districts. Compactness is a difficult concept to define, because there is no agreed-upon "best" metric for measuring it and no agreed-upon threshold for when a district becomes non-compact. I've employed three commonly utilized measures of compactness: Reock, Polsby-Popper, and Convex Hull. The Reock score measures how distended a district is – stretched out districts perform poorly here. The Polsby-Popper score measures how disfigured the boundaries of the district are – a district with "arms" and "inlets" will score poorly here. Convex Hull combines the two, punishing distended districts with many "arms" and "inlets."

The following table shows the Reock, Polsby-Popper, and Convex Hull scores for the Benchmark and Enacted Plans. The scores run from 0 to 1. Higher means more compact.

Table 2: Compactness, Benchmark and Enacted Maps

| District | Bench. Reock | En. Reock | Bench. PP | En. PP | Bench. CHull | En. CHull |
|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 1 | 0.273 | 0.269 | 0.126 | 0.121 | 0.512 | 0.502 |
| 2 | 0.269 | 0.341 | 0.234 | 0.236 | 0.54 | 0.566 |
| 3 | 0.474 | 0.416 | 0.355 | 0.368 | 0.772 | 0.792 |
| 4 | 0.373 | 0.359 | 0.08 | 0.08 | 0.583 | 0.557 |
| 5 | 0.268 | 0.437 | 0.14 | 0.202 | 0.651 | 0.782 |
| 6 | 0.485 | 0.388 | 0.509 | 0.425 | 0.839 | 0.789 |
| Avg. | 0.357 | 0.368 | 0.241 | 0.239 | 0.65 | 0.665 |

As noted above, Daytona Beach has an odd shape; no map is going to score well across all of the various measures for all districts. This is particularly true for District 4, which fits within the badly distorted western portion of the city limits. Regardless, we

can see that the Enacted Map is, in general, roughly as compact as the Benchmark Map. District boundaries were not distorted. On average, the Reock and Convex Hull scores improve, while the Polsby-Popper score declines.

This is of a piece with what we note above: the Enacted Map districts are not visually "ugly," except to the extent that they are required to conform to the contours of Daytona Beach's boundaries. Many of the boundaries follow major roadways or geographic features. This is ultimately a question for the Court to decide, but to my eye, compactness does not seem to have been subordinated to racial concerns.

## 4.3  Core retention

Finally, I was asked to calculate core retention scores for the Enacted Plan. This table is a bit counterintuitive at first, so it needs to be explained carefully. The first two columns label the Districts we are discussing. The fourth column is the population of the Benchmark District. The third column is the number of residents from the Benchmark District (first column) placed in the Enacted District (second column). The final column is the percentage of the benchmark population this represents.

Case 6:25-cv-01980-PGB-RMN    Document 35-1    Filed 12/12/25    Page 27 of 43 PageID
364
Analysis of the Enacted Map — 24

| Bench. | Enacted | Pop. | Original Pop. | Core% |
|--------|---------|------|---------------|-------|
| District 6 | District 6 | 10,424 | 11,642 | 90% |
| District 2 | District 2 | 8,641 | 9,958 | 87% |
| District 1 | District 1 | 9,035 | 11,424 | 79% |
| District 5 | District 5 | 10,179 | 13,442 | 76% |
| District 3 | District 3 | 7,281 | 9,708 | 75% |
| District 4 | District 4 | 10,428 | 15,304 | 68% |
| District 3 | District 2 | 2,427 | 9,708 | 25% |
| District 4 | District 1 | 3,345 | 15,304 | 22% |
| District 5 | District 6 | 2,125 | 13,442 | 16% |
| District 1 | District 3 | 1,766 | 11,424 | 15% |
| District 2 | District 3 | 1,317 | 9,958 | 13% |
| District 4 | District 5 | 1,531 | 15,304 | 10% |
| District 6 | District 3 | 1,218 | 11,642 | 10% |
| District 1 | District 4 | 623 | 11,424 | 5% |
| District 5 | District 2 | 632 | 13,442 | 5% |
| District 5 | District 4 | 506 | 13,442 | 4% |
| District 1 | District 6 | 0 | 11,424 | 0% |
| District 2 | District 6 | 0 | 9,958 | 0% |

To see better what this means, let's look at the row that is third from the bottom. The first two columns define the Benchmark District as 5 and the Enacted District as 4. We then see the number 506. What this means is that 506 people who were in District 5 in the Benchmark Plan are now in District 4 in the Enacted Plan. Since the Benchmark District 5 had a population of 13,442, that means that 3.8% of its population was sent to District 4.

The "core retention" information is provided in the first six rows. We know this

because the Benchmark and Enacted districts are the same. So 10,424 residents from the Benchmark District 6 were placed in the Enacted District 6. That means District 6 retained 89.5% of its core. District 2 retained 86.8% of its core. Overall, these districts do seem to have retained a high degree of their cores, and there does not seem to be any pattern with respect to districts 5 and 6.

# 5   Simulation Analysis

## 5.1   Technique

As a final check, we can run a simulation or "ensemble" analysis. This is a simulation technique I've used since *Harkenrider v. Hochul*. 38 N.Y.3d 494, 506, 519–20 (2022). This simulation approach to redistricting has been accepted in multiple courts, including state courts in New Mexico, *Republican Party of N.M. v. Oliver*, No. S-1-SC-40146, 2023 WL 8182964 (N.M. Nov. 27, 2023); *Republican Party of N.M. v. Oliver*, No. D-506-CV-202200041 (N.M. 5th Dist. Oct. 6, 2023), in Maryland, *Szeliga v. Lamone*, No. C-02-CV-21-001816 (Md. Cir. Ct., Anne Arundel Cnty. 2022), Ohio, *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 195 N.E.3d 974 (Ohio 2022) and other places. I employ a broadly accepted "package" in R called "redist," which generates a representative sample of districts. *See, e.g.*, Benjamin Fifeld, et al.,*Automated Redistricting Simulation using Markov Chain Monte Carlo*, 29 Jrnl. Computational and Graphical Statistics 715 (2020); Cory McCartan & Kosuke Imai, *Sequential Monte Carlo for Sampling Balanced and Compact Redistricting Plans*, 17 Annals of Applied Statistics 3300-3323 (2023).

All simulation approaches proceed from the same basic principle: precincts are aggregated together in a random fashion, potentially subject to a variety of parameters, to form districts in hundreds or thousands of maps. This creates an "ensemble" of maps that reflect what we would expect in a state if maps were drawn without respect to partisan criteria. If the map is drawn without partisan intent, its partisan features

should match those that appear in the ensemble. The more the map deviates from what we observed in the ensemble, the more likely it becomes that partisan considerations played a heavy role.

To better understand how this works, imagine the following cluster of seven hexagons as a cluster of precincts, with each hexagon representing an individual precinct. The precincts are connected when they share adjacent sides. Those adjacencies are reflected in the image below by the lines that connect the hexagons. It is possible, however, to instruct a computer to ignore specific adjacencies. We can visualize this by removing one of these lines. One can continue to do so until there is only one path from any precinct to any other precinct. This is called a "spanning tree," and it lies at the heart of the redistricting algorithm here. For most sets of more than two precincts, there will be multiple spanning trees, but the number of such trees is finite. I have illustrated two such trees for our cluster of seven hexagons.

Figure 15: Example of two potential spanning trees in 7-precinct set




Once you have reduced the number of connections between precincts to a minimum, removing one additional connection will create two distinct clusters of precincts.

This is exactly what a district is: a collection of contiguous (adjacent) precincts that is separated from other precincts on the map. In the following illustration I have removed the connection between the center hexagon and the lower right hexagon, and then illustrated the two districts this creates in the right panel.

Figure 16: 7-precinct set with one additional spanning tree removed (left), resulting "districts" (right)




This, then, is a microcosm of the approach that the SMC simulation technique found in the redist package takes. To simplify greatly, by sampling spanning trees of Daytona Beach's precincts and then removing 5 connections, the software produces 6 randomly drawn districts. While the math is quite complicated, this approach produces a random sample of maps that mirrors the overall distribution of available maps, much as a high-quality poll will produce a random sample of respondents that reflects the overall population. It can be run on a laptop computer. Indeed, these simulations were run at home on a Dell desktop computer using a free, widely employed computer programming language (R version 4.3.2).

Importantly, these maps are drawn without providing the software with any political information. In other words, these maps help inform an analyst what maps would

tend to look like in Daytona Beach if they were drawn without respect for politics. Of course, other features, such as respect for county lines, compactness, or respect for geographic features could play a role in the drawing of district lines as well; these traditional redistricting criteria are almost always viewed as valid considerations by courts. To account for this, when removing the connections that create districts, the algorithm can be instructed to favor the removal of connections that will result in districts that remain within specified parameters when deciding which connections to remove. It can be instructed to remove connections in such a way that equally populated districts will be created, or to prefer breaks that will create compact districts, or will respect county boundaries, or any number of other factors.

## 5.2   Results

I first ran five sets of 10,000 districts, for a total of 50,000 maps. The base unit is census blocks. These maps are drawn without any racial or political data made available to the computer. To evaluate the data, I typically use dotplots such as the one below:

Figure 17: Dotplots, base simulations



Reading these can be tricky at first, but once you get the hang of it, they become more intuitive. After the 50,000 maps are created, the computer looks at the first map and plugs the racial data in. It calculates the Black share of the population for the districts in that map, orders them from most- to least-heavily Black, and plots a dot for each of those districts. So the left-most column would receive a dot for the least-heavily Black district, the second-left-most column would receive a dot for the second-least-heavily Black district, and so forth. After doing that for every map, you are effectively provided with ranges for what a map-drawer drawing without respect to race would produce for the least-Black district, the second-least district and so forth. The final step is to plot the Enacted Map. This is done with a red dot.

As you can see, in the Enacted Map, the racial makeup of the districts falls within the expected range for a race-neutral map at every step. This has two implications. First, it suggests that whatever statements were made, the map drawer did not rely heavily upon racial data. Second, it suggests that if, at a remedial phase, a map drawer were employed to draw maps without respect to race, they would likely produce a map that looks like the Enacted Map.

We can also see this with the following histogram, which counts the number of Black majority districts produced in a map. As you can see, the most common outcome is two Black majority districts, just like the Enacted Map produces.

Figure 18: Number of Black Majority Districts, Base Simulations



Of course, this allows the districts to be drawn unconstrained, save for a slight compactness constraint (these maps are generally slightly less compact than the Enacted Map, though there are some that are more compact).

We might also look to see if the result changes under different constraints. For example, we might add a light constraint for precinct boundaries (the Enacted Map does not strictly conform to precinct boundaries, but it does seem to provide some level of constraint). This set has lower plan diversity than I would like to see, but in light of the other results, that is less of a concern than I might otherwise have. Doing so does not change the answer:

Figure 19: Dotplots, vtd constraint



Figure 20: Dotplots, vtd constraint



We might also add a constraint for core retention, forcing the simulations to respect

district cores. This too fails to change anything:

Figure 21: Dotplots, vtd constraint



Figure 22: Dotplots, vtd constraint



The simple fact is that because the Black population in Daytona Beach is concentrated in a "chokepoint" in the map, the natural effect will be to draw multiple Black majority districts, even when drawing without respect to race.

# 6  *Gingles II & III* Analysis

Finally, a few lines are in order to respond to the report of Dr. Moy. Since I have not yet received his underlying data or computer code, I have not been able to evaluate fully his report. Taking the report at face value, it is unclear why Dr. Moy relies upon ecological regression for his analysis, when ecological inference is the more modernized technique.

Regardless, even from the report there are a few flaws. First, it is unclear why Dr. Moy employs a 60% cutoff for cohesion. There may be a legal angle to this, but in my experience the question is simply whether Black voters tend to vote for the same candidates. In Dr. Moy's report there is little doubt that this is the case; even with the more restrictive 60% cutoff, Black voters tend to vote for the same candidate (usually the Democrat    ).

The more interesting question is that of whether the White population votes sufficiently as a bloc to defeat the Black candidate of choice. He notes that in 22 of 29 races, the Black candidate of choice has won, demonstrating insufficient White bloc voting. First, I would not examine the previous commission districts. The reason is straightforward: Some of those districts no longer exist, and tell us little about how voting in the jurisdiction as a whole operates. Moreover, Dr. Moy is (necessarily) drawing inferences off of as few as three precincts, which is too few for reliable inferences off of a regression analysis.

Second, however, when we look at more recent elections, the track record is much less compelling. Black candidates of choice win just six of 11 elections beginning in 2022. More importantly, some jurisdictions emphasize analyses not just of minority candidates of choice, but also of minority candidates. Here, the 2022 Senate candidate,

2022 Agriculture Commission candidate, and 2022 Attorney General candidate were all minority candidates; all lost. With this context, it seems much more likely that white voters vote sufficiently as a bloc to defeat the minority candidate of choice.

I declare under penalty of perjury under the laws of the State of Ohio that the foregoing is true and correct to the best of my knowledge and belief. Executed on December 7, 2025 in Delaware, Ohio.

*Sean P Trende*

---

Sean P. Trende

# 7   Exhibit 1 – Sean Trende C.V.

# SEAN P. TRENDE

1146 Elderberry Loop

Delaware, OH 43015

strende@realclearpolitics.com

## EDUCATION

Ph.D., The Ohio State University, Political Science, 2023. Dissertation titled *Application of Spatial Analysis to Contemporary Problems in Political Science*, September 2023.

M.A.S. (Master of Applied Statistics), The Ohio State University, 2019.

J.D., Duke University School of Law, *cum laude*, 2001; Duke Law Journal, Research Editor.

M.A., Duke University, *cum laude*, Political Science, 2001. Thesis titled *The Making of an Ideological Court: Application of Non-parametric Scaling Techniques to Explain Supreme Court Voting Patterns from 1900-1941*, June 2001.

B.A., Yale University, with distinction, History and Political Science, 1995.

## PROFESSIONAL EXPERIENCE

Law Clerk, Hon. Deanell R. Tacha, U.S. Court of Appeals for the Tenth Circuit, 2001-02.

Associate, Kirkland & Ellis, LLP, Washington, DC, 2002-05.

Associate, Hunton & Williams, LLP, Richmond, Virginia, 2005-09.

Associate, David, Kamp & Frank, P.C., Newport News, Virginia, 2009-10.

Senior Elections Analyst, RealClearPolitics, 2010-present.

Columnist, Center for Politics Crystal Ball, 2014-17.

Visiting Scholar, American Enterprise Institute, 2018-present.

## BOOKS AND BOOK CHAPTERS

Larry J. Sabato, ed., *The Red Ripple*, Ch. 15 (2023).

Larry J. Sabato, ed., *A Return to Normalcy?: The 2020 Election that (Almost) Broke America* Ch. 13 (2021).

Larry J. Sabato, ed., *The Blue Wave*, Ch. 14 (2019).

Larry J. Sabato, ed., *Trumped: The 2016 Election that Broke all the Rules* (2017).

Larry J. Sabato, ed., *The Surge:2014's Big GOP Win and What It Means for the Next Presidential Election*, Ch. 12 (2015).

Larry J. Sabato, ed., *Barack Obama and the New America*, Ch. 12 (2013).

Barone, Kraushaar, McCutcheon & Trende, *The Almanac of American Politics* 2014 (2013).

*The Lost Majority: Why the Future of Government is up for Grabs – And Who Will Take It* (2012).

## PREVIOUS EXPERT TESTIMONY AND/OR DEPOSITIONS

*Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super. Ct., Wake County) (racial gerrymandering).

*Covington v. North Carolina*, No. 1:15-CV-00399 (M.D.N.C.) (racial gerrymandering).

*NAACP v. McCrory*, No. 1:13CV658 (M.D.N.C.) (early voting).

*NAACP v. Husted*, No. 2:14-cv-404 (S.D. Ohio) (early voting).

*Ohio Democratic Party v. Husted*, Case 15-cv-01802 (S.D. Ohio) (early voting).

*Lee v. Virginia Bd. of Elections*, No. 3:15-cv-357 (E.D. Va.) (early voting).

*Feldman v. Arizona*, No. CV-16-1065-PHX-DLR (D. Ariz.) (absentee voting).

*A. Philip Randolph Institute v. Smith*, No. 1:18-cv-00357-TSB (S.D. Ohio) (political
gerrymandering).

*Whitford v. Nichol*, No. 15-cv-421-bbc (W.D. Wisc.) (political gerrymandering).

*Common Cause v. Rucho*, No. 1:16-CV-1026-WO-JEP (M.D.N.C.) (political gerryman-
dering).

*Mecinas v. Hobbs*, No. CV-19-05547-PHX-DJH (D. Ariz.) (ballot order effect).

*Fair Fight Action v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga.) (statistical anal-
ysis).

*Pascua Yaqui Tribe v. Rodriguez*, No. 4:20-CV-00432-TUC-JAS (D. Ariz.) (early voting).

*Ohio Organizing Collaborative, et al v. Ohio Redistricting Commission, et al*, No. 2021-
1210 (Ohio) (political gerrymandering).

*NCLCV v. Hall*, No. 21-CVS-15426 (N.C. Sup. Ct.) (political gerrymandering).

*Szeliga v. Lamone*, Case No. C-02-CV-21-001816 (Md. Cir. Ct.) (political gerryman-
dering).

*In the Matter of 2022 Legislative Districting of the State* , Misc. No. 25 (Md. Ct. App.)
(political gerrymandering)

*Montana Democratic Party v. Jacobsen*, DV-56-2021-451 (Mont. Dist. Ct.) (early vot-
ing; ballot collection).

*Carter v. Chapman*, No. 464 M.D. 2021 (Pa.) (map drawing; amicus).

*NAACP v. McMaster*, No. 3:21-cv-03302 (D.S.C.) (racial gerrymandering).

*Alexander v. NAACP*, Case No. 3:21-cv-03302-MBS-TJH-RMG (D.S.C.) (racial gerry-
mandering).

*Graham v. Adams*, No. 22-CI-00047 (Ky. Cir. Ct.) (political gerrymandering).

Exhibit 1 – Sean Trende C.V.   —   39

*Harkenrider v. Hochul*, No. E2022-0116CV (N.Y. Sup. Ct.) (political gerrymandering).

*LULAC v. Abbott*, Case No. 3:21-cv-00259 (W.D. Tex.) (racial/political gerrymandering/VRA).

*Moore et al., v. Lee, et al.*, (Tenn. 20th Dist.) (state constitutional compliance).

*Milligan v. Allen*, Case No. 2:21-cv-01530-AMM (N.D. Ala.) (VRA).

*Nairne v. Ardoin*, NO. 22-178-SDD-SDJ (M.D. La.) (VRA).

*Robinson v. Ardoin*, NO. 22-211-SDD-SDJ (M.D. La.) (VRA).

*Republican Party v. Oliver*, No. D-506-CV-2022-00041 (N.M. Cir. Ct. (Lea County)) (political gerrymandering).

*Palmer v. Hobbs*, Case No. 3:22-CV-5035-RSL (W.D. Wash) (VRA; remedial phase only).

*Clarke v. Evers*, No. 2023AP001399-OA (Wisc.) (Political gerrymandering; remedial phase only).

*Stone v. Allen*, No. 2:21-cv-1531-AMM (N.D. Ala.) (VRA).

*Milligan v. Allen*, No. 2:21-cv-01530-AMM (S.D. Ala.) (VRA).

*Agee et al. v. Benson, et al.*, (W.D. Mich.) (racial gerrymandering/VRA).

*Faatz, et al. v. Ashcroft, et al.*, (Cir. Ct. Mo.) (state constitutional compliance).

*Coca, et al. v. City of Dodge City, et al.*, Case No. 6:22-cv-01274-EFM-RES (D. Kan.) (VRA).

*Pierce v. NC State Board of Elections*, Case No. 4:23-cv-193 (E.D.N.C.) (VRA).

*Williams v. Hall*, Civil Action No. 23 CV 1057 (M.D.N.C.) (VRA, Racial Gerrymandering).

*Hodges v. Passidomo*, Case No. 8:24-cv-879-CEH-TPB-ALB (M.D. Fla.) (Racial Gerrymandering).

*Cubanos Pa'Lante v. Florida House of Representatives*, Case No. 24-cv-21983-JB (S.D. Fla.) (Racial Gerrymandering).

*Coads v. Nassau County*, Index No. 611872/2023 (N.Y. Sup. Ct., Nassau County) (political gerrymandering, racial gerrymandering, NYVRA).

*Harris v. DeSoto County*, Civil No. 3:24-CV-00289-GHD-RP (N.D. Miss.) (VRA).

*League of Women Voters v. Utah State Legislature*, Case No. 22090712 (Utah Dist. Ct.) (Partisan Gerrymandering).

## COURT APPOINTMENTS

Appointed as Voting Rights Act expert by Arizona Independent Redistricting Commission (2020)

Appointed Special Master by the Supreme Court of Virginia to redraw maps for the Virginia House of Delegates, the Senate of Virginia, and for Virginia's delegation to the United States Congress for the 2022 election cycle.

Appointed redistricting expert by the Supreme Court of Belize in Smith v. Perrera, No. 55 of 2019 (one-person-one-vote).

## INTERNATIONAL PRESENTATIONS AND EXPERIENCE

Panel Discussion, European External Action Service, Brussels, Belgium, Likely Outcomes of 2012 American Elections.

Selected by U.S. Embassies in Sweden, Spain, and Italy to discuss 2016 and 2018 elections to think tanks and universities in area (declined Italy due to teaching responsibilities).