# The City of Daytona Beach
# AGENDA SUMMARY
April 2, 2025 - City Commission



---

**TITLE:**          City Attorney's Office - Approval of Redistricting Services Contract
**DEPARTMENT:**     City Attorney
**STAFF CONTACT:**  Benjamin Gross, City Attorney
**ACTION:**         Resolution

## REQUEST:

**Resolution** approving a redistricting services contract with Kurt Spitzer and Associates, Inc., for a fixed fee of $25,000 to provide the City Commission with redistricting consulting services to assist in developing a new redistricting plan designating City Commissioner zone boundaries.

## CONSIDERATION/BACKGROUND:

Article 2, Section 2(c) of Subpart A of the City Charter provides for redesignation of Commissioner zone boundaries after each decennial census conducted by the United States government. Following the 2020 census, the Commission adopted Ordinance No. 2023-268, redesignating zone boundaries. The American Civil Liberties Union then filed a civil lawsuit in state circuit court against the City, challenging the legal validity of Ordinance No. 2023-268. The Commission then adopted Ordinance No. 2025-16, repealing Ordinance No. 2023-268, and declaring its intention to adopt a new redistricting plan prior to the next 2026 municipal election.

Based on recommendations received from other attorneys, including from the Florida League of Cities' general counsel, the Legal Department has negotiated a contract with Kurt Spitzer and Associates, Inc., for Commission review and approval. Note that in addition to being recommended by sources within the legal profession, Mr. Spitzer was previously part of the consulting team that assisted the City Commission in developing the redistricting plan that was adopted following the 2010 Census.

## RECOMMENDATION:

City Attorney recommends approval.

## FUNDING:

PROF SERV- OTHER GL Acct. 001-140100-514-531900-000000

## ATTACHMENTS:

KSA DRAFT CONTRACT
ORDINANCE - 2025-16
SOF - Redistricting Services Contract

Benjamin Gross, City Attorney                    Approved - Mar 25 2025

Kathleen Rosado, Assistant City Clerk  Approved - Mar 25 2025
Abigail Brock, Purchasing Agent  Approved - Mar 26 2025
Deric C. Feacher, City Manager  Approved - Mar 27 2025

# REDISTRICTING SERVICES CONTRACT
## (CONTRACT 2541)

**THE PARTIES TO THIS CONTRACT** are the City of Daytona Beach, a Florida municipal corporation (the "CITY"), and Kurt Spitzer and Associates, Inc., a Florida corporation ("CONTRACTOR" or "KSA"). City and KSA may also be referred to herein individually as a "Party" or collectively as the "Parties."

In consideration of the mutual covenants herein contained, the Parties agree as follows:

**Section 1.     Scope of Services.** KSA will provide redistricting services for the CITY.  KSA's services are intended to result in KSA's creation of a city commissioner zone boundary map that, if agreeable to the Daytona Beach City Commission, may be legally adopted so as to be in effect for the November 3, 2026 general election. KSA's services, including a proposed timeline, are further described in KSA's written proposal, attached hereto as **Exhibit A**; and KSA will perform these services in accordance with the standards attached hereto as **Exhibit B**.

**Section 2.     Compensation and Payments; Limitations.**

(a)     KSA will be paid a fixed fee of $25,000.00 for the services referenced above, in accordance with **Exhibit A**.  Except as provided below, the fixed fee is full compensation for KSA's costs and expenses in performing the services referenced.

(b) If City requires KSA to perform services that are deemed "out of scope" as referenced in **Exhibit A**, KSA will be paid on the basis of the rates and fees set forth in **Exhibit A** for such services.

(c)     Except for those expenses specifically required to be reimbursed by City in the Exhibits, KSA will be solely responsible for all of costs KSA incurs in meeting its obligations herein.

**Section 4.     Billing; Manner of Payment**. In addition to requirements for payment established by applicable federal, state, or local law including the City Code, payment terms are as follows:

(a)     No payment will be due for services performed until CONTRACTOR submits a proper invoice.  CONTRACTOR will submit invoices only for services provided and accepted in accordance with the requirements of this Contract.  CONTRACTOR may invoice the CITY no more frequently than monthly.

(b)     In order to be considered proper, the invoice must include all information and documentation that the CITY may need to verify the accuracy of the invoice and the amount of payment due based on the specific requirements of this Contract.  Where payment is for the cost incurred for certain reimbursables (such as for subcontractors or air travel), the invoice must include proof that CONTRACTOR has paid such costs.

(c)     The CITY will within 30 days after receipt of an invoice notify the CONTRACTOR that the invoice is improper or pay CONTRACTOR the amount due.

**Section 4.     Standard of Performance.**  CONTRACTOR's services will at a minimum meet the level care and skill ordinarily used by members of CONTRACTOR's profession performing the type of services provided herein within the State of Florida.

**Section 5.     Relationship between Parties.**  This Contract does not create an employee-employer relationship between the CITY and CONTRACTOR.  CONTRACTOR is an independent contractor of the CITY and will be in control of the means and the method in which the requested work is performed.  As an independent contractor, CONTRACTOR will be solely responsible for payment of all federal, state and local income tax, and self-employment taxes, arising from this Contract; and CONTRACTOR agrees to indemnify and hold harmless the CITY from any obligations relating to such taxes.  The CITY will not make deductions from payments due, for such taxes, or for social security, unemployment insurance, worker's compensation,

or other employment or payroll taxes. CONTRACTOR will also be responsible for the performance of CONTRACTOR's subcontractors.

**Section 6.     Documents.**

(a)     All reports, estimates, logs, original drawings, and other materials furnished, prepared or executed by CONTRACTOR during the term of and in accordance with the provisions of this Contract will be the property of the CITY and delivered to the CITY upon demand or, if no demand has previously been made, upon completion of the particular task for which such materials were prepared, executed, or otherwise required, or upon termination or expiration of this Contract.

(b)     CONTRACTOR understands and agrees that City will have the right to reuse any plans and specifications, final and draft maps, including any data and electronic files, that Contractor is required to provide to City pursuant to this Contract without having to obtain further approvals from or providing additional compensation to KSA.  City understands and agrees that KSA will not be liable for City's use of such plans and specifications other than for the purposes intended by this Contract.

**Section 7.     Public Records.**

(a)     To the extent applicable, CONTRACTOR will comply with the requirements of Florida Statutes Section 119.0701, which include the following:

(1)     Keeping and maintaining public records that the CITY requires for performance of the service provided herein.

(2)     Upon the request of the City Clerk of the CITY, (i) providing the City Clerk with a copy of requested public records or (ii) allowing inspection or copying of the records, within a reasonable time after receipt of the City Clerk's request, at a cost that does not exceed the cost provided in Ch. 119, Florida Statutes, or as otherwise provided by law.

(3)     Ensuring that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law until completion of this Contract, and following such completion if CONTRACTOR fails to transfer such records to the CITY.

(4)     Upon completion of this Contract, keep and maintain public records required by the CITY to perform the service.  CONTRACTOR will meet all applicable requirements for retaining public records.  All records stored electronically must be provided to the CITY upon request from the City Clerk, in a format that is compatible with the CITY's information technology systems.

IF CONTRACTOR HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE CONTRACTOR'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS CONTRACT, CONTRACTOR MUST CONTACT THE CITY CLERK, WHOSE CONTACT INFORMATION IS AS FOLLOWS:

| | |
|---|---|
| (Phone) | 386 671-8023 |
| (Email) | clerk@codb.us |
| (Address) | 301 S. Ridgewood Avenue |
| | Daytona Beach, FL 32114 |

(b)     Nothing herein will be deemed to waive CONTRACTOR's obligation to comply with Section 119.0701(3)(a), Florida Statutes, as amended by Chapter 2016-20, Laws of Florida (2016).

**Section 8.  Effective Date and Term.**  The Effective Date of this Contract is the date on which the last Party signs it.  The Contract is for a 1-year term, commencing on the effective date; provided, however, that the Term shall be deemed to be extended as necessary should KSA be called upon to technical assistance to the City in relation to legal action ensuring from the redistricting plans developed with CONTRACTOR's assistance or otherwise relating to the redistricting process.  The fees for such services are set forth in **Exhibit A**.

**Section 9.    Termination of Contract.**

(a)    The CITY may by written notice to CONTRACTOR terminate this Contract, in whole or in part, at any time, either for the CITY's convenience or because of the failure of the CONTRACTOR to fulfill its contractual obligations.

(1)    Before terminating for convenience, CITY must provide CONTRACTOR at least 30 day's advance notice of termination.  This Contract will terminate automatically and without need for further notice upon the expiration of the notice period.

(2)    Except as provided in Section 10(a)(3), before terminating due to CONTRACTOR's material breach of its contractual obligations, CITY must provide CONTRACTOR prior written notice, specifying the breach and demanding CONTRACTOR remedy the breach within 10 days of the notice, or within such longer period as may be reasonably required if the nature of the breach is that it cannot be remedied within 10 days of notice.  This Contract will terminate automatically and without need for further notice if CONTRACTOR fails to remedy the material breach within the period described in the CITY's notice of breach.

(3)    The CITY may terminate this Contract upon CONTRACTOR's breach without providing CONTRACTOR an opportunity to remedy the breach as referenced immediately above, if CONTRACTOR or any of CONTRACTOR'S personnel, in connection with the services or rights provided herein, commit a criminal act or engage in activity that poses a material risk of injury to persons or damage to property.  Such termination will be effective immediately upon providing CONTRACTOR written notice.

(b)    If the termination is for convenience, CONTRACTOR will be paid compensation for authorized services performed to the date of termination, as jointly determined by CITY and CONTRACTOR.    If termination is due to CONTRACTOR's material breach, the CITY reserves all rights and remedies it may have under law due to such breach.  Among other things, the CITY may take over the work and prosecute the same to completion by other agreements or otherwise; and in such case, the CONTRACTOR will be liable to the CITY for all reasonable additional costs occasioned to the CITY thereby.

(c)    If after notice of termination for the CONTRACTOR's failure to fulfill contractual obligations it is judicially determined by a court of law that the CONTRACTOR had not so failed, the termination will be conclusively deemed to have been effected for the CITY's convenience.  In such event, adjustment in payment to CONTRACTOR will be made as provided in Section 10(b) for a termination for convenience.

(d)    The rights and remedies of CITY provided for in this Section are in addition and supplemental to any and all other rights and remedies provided by law or under this Contract.

**Section 10.    Suspension of Services.** The CITY may suspend CONTRACTOR's services if the notice of material breach provided pursuant to Section 9(a)(2) so directs.    The CITY may also suspend CONTRACTOR's services in lieu of termination, under the conditions set forth in Section 9(a)(3), by providing CONTRACTOR with written notice of suspension.    CONTRACTOR will suspend activities immediately upon receipt thereof; and in such instance CONTRACTOR's rights to provide services referenced herein will also automatically be suspended for the period of such suspension.

**Section 11.    Indemnification.** CONTRACTOR will indemnify and hold harmless the CITY, including the CITY's officers, employees, and agents, from liabilities, damages, losses, and costs, including, but not limited to, reasonable attorneys' fees, to the extent caused by the negligence, recklessness, or intentionally

CONTRACT-Redist. Services-2025 FIN                                                                Page **3** of 8

5 of 29

wrongful conduct of CONTRACTOR, or CONTRACTOR's officers, employees, or agents, including subcontractors and other persons employed or used by CONTRACTOR in the performance of this Contract. This indemnification agreement is separate and apart from, and in no way limited by, any insurance provided pursuant to this Contract or otherwise.

**Section 12.  Insurance.** CONTRACTOR will provide and maintain at CONTRACTOR's own expense, insurance of the kinds of coverage and in the amounts set forth in this Section.  All such insurance will be primary and non-contributory with the CITY's own insurance.  The City shall be exempt from, and in no way liable for, any sums of money that may represent a deductible in any insurance policy.  The payment of such deductible shall be the sole responsibility of the Contractor or sub-contractor providing such insurance.   In the event any request for the performance of services presents exposures to the CITY not covered by the requirements set forth below, the CITY reserves the right to add insurance requirements that will cover such exposure.

    (a)    **Coverage and Amounts.**

        (1)    **Workers Compensation Insurance** as required by Florida Statutes, Chapter 440, Workers' Compensation Insurance, for all employees of CONTRACTOR, employed at the site of the service or in any way connected with the work, which is the subject of this service.  The insurance required by this provision will comply fully with the Florida Workers' Compensation Law and include Employers' Liability Insurance with limits of not less than $500,000 per occurrence.  Any associated or subsidiary company involved in the service must be named in the Workers' Compensation coverage.

        (2)    **Liability Insurance**, including (i) **Commercial General Liability coverage** for operations, independent contractors, products-completed operations, broad form property damage, and personal injury on an "occurrence" basis insuring CONTRACTOR and any other interests, including but not limited to any associated or subsidiary companies involved in the work; and (ii) **Automobile Liability Insurance**, which will insure claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance or use of any motor vehicle used by the CONTRACTOR in the performance of this Contract.

        The limit of liability for each policy will be a combined single limit for bodily injury and property damage of no less than $1,000,000 per occurrence.  If insurance is provided with a general aggregate, then the aggregate will be in an amount of no less than $2,000,000.  The Risk Manager may authorize lower liability limits for the automobile policy only, at the Risk Manager's sole discretion

        THE COMMERCIAL GENERAL LIABILITY INSURANCE POLICY WILL NAME THE CITY AS AN ADDITIONAL INSURED.  CONTRACTOR'S Commercial General Liability insurance policy shall provide coverage to CONTRACTOR, and CITY when required to be named as an additional insured either by endorsement or pursuant to a blanket additional insured endorsement, for those sources of liability which would be covered by the latest edition of the standard Commercial General Liability Coverage Form (ISO Form CG 00 01) without the attachment of any endorsements excluding or limiting coverage for Products/Completed Operations, Independent Contractors, Property of CITY in Contractor's Care, Custody or Control or Property of CITY on which contracted operations are being performed, Explosion, Collapse or Underground hazards (XCU Coverage, Contractual Liability or Separation of Insureds).  When CITY is added as additional insured by endorsement, ISO Endorsements CG 20 10 and CG 20 37 or their equivalent shall be used to provide such Additional Insured status.

Unless specifically waived hereafter in writing by the Risk Manager, CONTRACTOR agrees that the Insurer will waive its rights of subrogation, if any, against the CITY on each of the types of required insurance coverage listed in Section 12.

    (b)    **Proof of Insurance.**  CONTRACTOR will furnish proof of insurance acceptable to the CITY prior to or at the time of execution of this Contract.  CONTRACTOR will not commence work until all proof of such insurance has been filed with and approved by the CITY.  CONTRACTOR will furnish evidence of

all required insurance in the form of certificates of insurance which will clearly outline all hazards covered as itemized above, the amounts of insurance applicable to each hazard, and the expiration dates.

If requested by the CITY, CONTRACTOR will furnish copies of the insurance contracts to support the certificates of insurance and the copies of said insurance must be acceptable to the CITY.

(c)    **Cancellation; Replacement Required.**  CONTRACTOR will file replacement certificates 30 days prior to expiration or termination of the required insurance occurring prior to the acceptance of the work by the CITY. If a required policy is canceled without CONTRACTOR's prior knowledge CONTRACTOR will immediately notify the CITY immediately upon becoming aware that a required insurance coverage has been canceled for any reason, and promptly replace the canceled policy.  The CITY reserves the right to replace the canceled policy at CONTRACTOR's expense if CONTRACTOR fails to do so.

(d)    **Termination of Insurance.**  CONTRACTOR may not cancel the insurance required by this Contract until the work is completed, accepted by the CITY and CONTRACTOR has received written notification from the Risk Manager that CONTRACTOR may cancel the insurance required by this Contract and the date upon which the insurance may be canceled.  The Risk Management Division of the CITY will provide such written notification at the request of CONTRACTOR if the request is made no earlier than two weeks before the work is completed.

(e)    **Liabilities Unaffected**.  CONTRACTOR's liabilities under this Contract will survive and not be terminated, reduced or otherwise limited by any expiration or termination of insurance coverages. Similarly, CONTRACTOR's liabilities under this Contract will not be limited to the extent of the existence of any exclusions or limitations in insurance coverages, or by CONTRACTOR's failure to obtain insurance coverage.

CONTRACTOR will not be relieved from responsibility to provide required insurance by any failure of the CITY to demand such coverage, or by CITY's approval of a policy submitted by CONTRACTOR that does not meet the requirements of this Contract.

(f)    **Risk Manager**.  All references to the Risk Manager will be deemed to include the Risk Manager's designee.

**Section 13.    Notice.**    Unless otherwise expressly agreed herein, all notices, requests, and demands to or upon the Parties will be delivered by hand, delivered by a courier service, provided to a nationally recognized delivery service for overnight delivery transmitted to a receiving fax machine followed by hard copy within two days, or by U.S. mail, postage prepaid by registered or certified mail, return receipt requested, to the addresses set forth herein:

To the CITY:                                    To CONTRACTOR:

Deric C. Feacher, City Manager          Kurt Spitzer, President
The City of Daytona Beach                Kurt Spitzer and Associates
301 S. Ridgewood Avenue                 5744 Braveheart Way
Daytona Beach, FL 32114                  Tallahassee, FL 32317
FeacherD@codb.us                        Email: kurtspitzer@ksanet.net
Phone: 386.671.8040                     Phone:  850-228-6212

provided, however, that either Party may change the person or address designated for receipt of the Party's notices, by providing written notice to the other Party.

**Section 14.    Personnel.**

(a)  CONTRACTOR represents that Kurt Spitzer, President, will perform or supervise the work to be performed herein.  CONTRACTOR has or will secure at CONTRACTOR's own expense, all personnel

required in performing the services under this Contract. Such personnel will not be employees of or have any contractual relationship with the CITY.

All personnel engaged in the work will be fully qualified and will be authorized under state and local law to perform such services.

(b)    **E-Verify.** - Contractor (and its subcontractors) have an obligation to utilize the U.S. Department of Homeland Security's (DHS) E-Verify system for all newly hired employees. By executing this Contract, the Contractor certifies that it is registered with, and uses, the E-Verify system for all newly hired employees. The Contractor must obtain an affidavit from its subcontractors in accordance with paragraph (2)(b) of section 448.095, F.S., and maintain a copy of such affidavit for the duration of the Contract.

This section serves as notice to Contractor regarding the requirements of section 448.095, F.S., specifically sub-paragraph (2)(c)1, and the City's obligation to terminate the Contract if it has a good faith belief that the Contractor has knowingly violated section 448.09(1), F.S. If terminated for such reason, the Contractor will not be eligible for award of a public contract for at least one year after the date of such termination. The City reserves the right to order the immediate termination of any contract between the Contractor and a subcontractor performing work on its behalf should the City develop a good faith belief that the subcontractor has knowingly violated section 448.095(1), F.S.

**Section 15.    CITY's Responsibilities.** The CITY agrees to make available for review and use by the CONTRACTOR, reports, studies, shape files and other data relating to the services required.  The CITY will establish a project manager to meet periodically with the CONTRACTOR to facilitate coordination and expeditious delivery of data and any other information requested by the CONTRACTOR from the CITY, and to ensure expeditious review of work product.

**Section 16.    Limitation on Waivers.**  Neither the CITY's review, approval, or acceptance of, or payment for, any of the services provided by CONTRACTOR, will be construed to operate as a waiver of the CITY's rights under this Contract.  CONTRACTOR will be and always remain liable to the CITY in accordance with applicable law for any and all damages to the CITY caused by the CONTRACTOR's negligent or wrongful provision of any of the services furnished under this Contract.

Failure of the CITY to exercise any right or option arising out of a breach of this Contract will not be deemed a waiver of any right or option with respect to any subsequent or different breach, or the continuance of any existing breach.  Furthermore, the failure of the CITY at any time to insist upon strict performance of any condition, promise, agreement or understanding set forth herein will not be construed as a waiver or relinquishment of the CITY's right to insist upon strict performance of the same condition, promise, agreement or understanding at a future time.

**Section 17.  Dispute Resolution.**  If a dispute exists concerning this Contract, the Parties agree to use the following procedure prior to pursuing any judicial remedies.

(a)    **Negotiations.** A Party will request in writing that a meeting be held between representatives of each Party within 14 calendar days of the request or such later date that the Parties may agree to.  Each Party will attend and will include, at a minimum, a senior level decision maker (an owner, officer, or employee of each organization) empowered to negotiate on behalf of their organization.  The purpose of this meeting is to negotiate in the matters constituting the dispute in good faith.  The Parties may mutually agree in writing to waive this step and proceed directly to mediation as described below.

(b)    **Non-Binding Mediation.**  Mediation is a forum in which an impartial person, the mediator, facilitates communication between parties to promote reconciliation, settlement, or understanding among them.  Within 30 days after the procedure described in Subsection (a) proves unsuccessful or the Parties mutually waive the subsection (a) procedure, the Parties will submit to a non-binding mediation.   The mediation, at a minimum, will provide for (i) conducting an on-site investigation, if appropriate, by the mediator for fact gathering purposes, (ii) a meeting of all Parties for the exchange of points of view and (iii) separate meetings between the mediator and each Party to the dispute for the formulation of resolution

CONTRACT-Redist. Services-2025 FIN                                                                    Page **6** of 8

8 of 29

alternatives. The Parties will select a mediator trained in mediation skills and certified to mediate by the Florida Bar, to assist with resolution of the dispute. The Parties will act in good faith in the selection of the mediator and give consideration to qualified individuals nominated to act as mediator. Nothing in this Contract prevents the Parties from relying on the skills of a person who also is trained in the subject matter of the dispute or a contract interpretation expert. Each Party will attend and will include, at a minimum, a senior level decision maker (an owner, officer, or employee of each organization) empowered to negotiate on behalf of their organization.

If the Parties fail to reach a resolution of the dispute through mediation, then the Parties are released to pursue any judicial remedies available to them.

**Section 18.    General Terms and Conditions.**

(a)    **Amendments.**    Except as otherwise provided herein, no change or modification of this Contract will be valid unless the same is in writing and signed by both Parties**.**

(b)    **Assignments and Subcontracting.    After initial approval of this Contract, no** assignment or subcontracting will be permitted without the CITY's written approval

(c)    **Compliance with Laws and Regulations.**    In providing all services pursuant to this Contract, CONTRACTOR will abide by all statutes, ordinances, rules, and regulations pertaining to, or regulating the provisions of, such services including those now in effect and hereafter adopted. Any violation of said statutes, ordinances, rules, or regulations will constitute a material breach of this Contract and will entitle the CITY to terminate this Contract immediately upon delivery of written notice of termination to the CONTRACTOR.

(d)    **Truth in Negotiations Certificate.**    CONTRACTOR hereby certifies that the wages and other factual unit costs supporting the compensation herein are accurate, complete, and current at the time of this Contract.

(e)    **No Third-Party Beneficiaries.**    There are no third-party beneficiaries of CONTRACTOR's services under this Contract.

(f)    **Contingency Fee.**    CONTRACTOR warrants that it has not employed or retained any company or person, other than a bona fide employee working solely for CONTRACTOR, to solicit or secure this Contract and that it has not paid or agreed to pay any person, company, corporation, individual or firm, other than a bona fide employee working solely for CONTRACTOR, any fee, commission, percentage, gift, or any other consideration, contingent upon or resulting from the award or making of this Contract.

(g)    **Nondiscrimination.** CONTRACTOR will not discriminate against any employee or applicant for employment because of race, color, sex, or national origin. CONTRACTOR will take affirmative action to ensure that applicants are employed and the employees are treated during employment without regard to their sex, race, creed, color, or national origin. Further, CONTRACTOR agrees to comply with all local, state, and federal laws and ordinances regarding discrimination in employment against any individual on the basis of race, color, religion, sex, national origin, physical or mental impairment, or age. In particular, CONTRACTOR agrees to comply with the provisions of Title 7 of the Civil Rights Act of 1964, as amended, and applicable executive orders including, but not limited to, Executive Order No. 11246.

(h)    **Principles in Construing Contract.**    This Contract will be governed by and construed in accordance with the laws of the State of Florida. Captions and paragraph headings used herein are for convenience only, are not a part of this Contract and will not be deemed to limit or alter any provisions hereof or to be relevant in construing this Contract. The use of any gender herein will be deemed to be or include the other genders, and the use of the singular herein will be deemed to be or include the plural (and vice versa), wherever appropriate. If any word, phrase, clause, sentence or provision of the Contract, or the application of same to any person or set of circumstances is for any reason held to be unconstitutional, invalid or unenforceable, that finding will only effect such word, phrase, clause, sentence or provision, and

CONTRACT-Redist. Services-2025 FIN                                                                                     Page 7 of 8

9 of 29

such finding will not affect the remaining portions of this Contract; this being the intent of the Parties in entering into the Contract; and all provisions of the Contract are declared to be severable for this purpose.

    (i)    **Venue.**   The exclusive venue for any litigation arising out of this Contract will be Volusia County, Florida if in state court, or the U.S. District Court, Middle District of Florida if in federal court.

    (j)    **Litigation Costs.**  Except where specifically provided herein, in case of litigation between the Parties concerning this Contract, each party will bear all of its litigation costs, including attorney's fees.

    (k)    **Force Majeure**.  A force majeure event is an act of God or of the public enemy, riots, civil commotion, war, acts of government or government immobility (whether federal, state, or local) fire, flood, epidemic, quarantine restriction, strike, freight embargo, or unusually severe weather; provided, however, that no event or occurrence will be deemed to be a force majeure event unless the failure to perform is beyond the control and without any fault or negligence of the Party charged with performing or that Party's officers, employees, or agents.  Whenever this Contract imposes a deadline for performing upon a Party, the deadline will be extended by one day for each day that a Force Majeure event prevents the Party from performing; provided, however, that the Party charged with performing and claiming delay due to a Force Majeure event will promptly notify the other Party of the Event and will use its best efforts to minimize any resulting delay.

    (l)    **Jury Trial Waived.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS CONTRACT, OR ANY DEALINGS BETWEEN THE PARTIES.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY DISPUTES BETWEEN THE PARTIES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.

    (m)    **Integration.**  This Contract represents the entire agreement of the parties with respect to the subject matter hereof.  No representations, warranties, inducements or oral agreements have been made by either Party except as expressly set forth herein, or in other contemporaneous written agreements.

IN WITNESS WHEREOF, the Parties through their undersigned representatives have caused this Contract to be executed in duplicate original.

**THE CITY**                            **CONTRACTOR**

By: _____      By: _____
     Derrick L. Henry, Mayor             Kurt Spitzer, President

Date: _____    Date: ____3 – 12 – 25_____

Attest: _____
     Letitia LaMagna, City Clerk

Approved as to legal form:

By: _____
     Ben Gross, City Attorney

CONTRACT-Redist. Services-2025 FIN            Page 8 of 8

10 of 29

**EXHIBIT A**

*Proposal to Provide*

# Redistricting Services

*for the*

# City of Daytona Beach

*submitted by*

Kurt Spitzer and Associates, Inc.

www.ksanet.net

(850) 228-6212

February 26, 2025

## Executive Summary

This Proposal is to provide professional redistricting services for the City of Daytona Beach, Florida.

The US Census Bureau is required to conduct an "actual enumeration" of "all persons" in the United States every 10 years, meaning that their duty is to count the "whole number of persons in each State." The census conducted in 2020 was the twenty-fourth time such a count has taken place.

Congress uses the census data to reapportion the number of congressional seats allocated to each state. State Legislatures use the information to realign state and congressional district boundaries in furtherance of the principal of "one person, one vote." For similar reasons, local governments use the data to realign the district boundaries used to elect the members of their governing bodies. Counties in Florida are specifically required to examine the need to redistrict during the first odd-numbered year after each census is completed; cities look to the provisions of their charters for direction on redistricting.

Kurt Spitzer (owner of Kurt Spitzer and Associates or "KSA") has served as the redistricting consultant and facilitator for more than 35 local redistricting projects in Florida. He has collaborated with Florida local governments for well over 40 years and will serve as Project Manager and primary point of contact for the Project.

Assisting KSA with data collection and mapping will be Bertram Melix. Dr. Melix holds a PhD in Geography from Florida State University. He is a Lecturer on geographic information systems at FSU's Department of Geography and is highly skilled in data collection and manipulation, and in the use of the software needed in the redistricting process.

**Curriculum Vitae**

**Kurt Spitzer**

Kurt Spitzer is President and owner of Kurt Spitzer and Associates (KSA) a Tallahassee-based local government consulting firm.  Prior to incorporating KSA in 1989, Mr. Spitzer was employed by the Florida Association of Counties for more than 10 years and by the Florida House of Representatives prior to that time.  He has represented the interests of local governments in front of the Legislative and Executive branches of Florida government for more than 40 years.

Mr. Spitzer has served as the consultant in over 35 local government redistricting projects in Florida, ranging in size from the City of Quincy (population 7,900) to Pinellas County (population 975,000).  He has served as the consultant to numerous county charter study and charter review commissions, ranging in size from Wakulla to Broward counties.  KSA was the lead consultant on local government matters to Florida's first Taxation and Budget Reform Commission and its second Local Government Study Commission.

Mr. Spitzer founded the Florida Stormwater Association and has been intimately involved in the development of Florida surface water policy on behalf of local governments for 30 years.

Mr. Spitzer received his Bachelor of Arts degree (biology and political science) from the University of South Florida and his Master of Science in Public Administration from Florida State University.

**Bertram Melix**

Assisting in the Project for mapping and data manipulation services is Bertram Melix.  Dr.
Melix is a lecturer at Florida State University's Department of Geography, where he
obtained his PhD in Geography.  He holds a Master of Science in Geographic Information
Systems (also from FSU) and has extensive experience in the use of ESRI products and
software, which is the most commonly used software for redistricting and many other
functions in state and local governments.

## Specific Experience and References
with significant notations included

Redistricting Projects

1. **Brevard County Commission (Citizens Redistricting Committee) - 2001**
   Pursuant to an amendment to the County Charter, Brevard County was the first county in
   Florida to redistrict its Commission district boundaries based on the use of and
   recommendations from a Citizens Redistricting Committee.
   > Reference
   > Anselmo Baldonado, Chairman
   > Brevard Citizen's Redistricting Committee
   > (321) 777-9225

2. **Brevard County School Board – 2001**

3. **City of Bonita Springs - 2022**
   > Reference
   > Carly Sanseverino, Staff Attorney
   > (239) 949-6262
   > carly.sanseverino@cityofbonitasprings.org

4. **City of Daytona Beach - 2011**

5. **City of Ft. Lauderdale – 2002**

6. **City of Ft. Myers - 2005**
   Through a charter amendment, the City of Ft. Myers changed the structure of the Council from
   a "Strong-Mayor" form of government that had an elected executive and five single-member
   districts, to a Council-Manager form of government that included a directly elected Mayor who
   was a member of the City Council and a City Manager who was hired/fired by the Council.
   The Council was increased to a total of six, single-member districts.  At the time KSA was
   engaged by the City, it was a "pre-clearance" jurisdiction under the provisions of Section 5 of
   the Voting Rights Act; no challenges to the adopted plan were filed.
   > Reference
   > Grant Alley, City Attorney
   > (239) 321-7640
   > galley@cityftmyers.com

7. **City of Ft. Pierce – 2021**

> Reference
> Nicolas Mimms, City Manager
> (772) 467-3793
> nmimms@cityoffortpierce.com

8. **City of Lake City – 2023**

> Reference
> Audrey Sikes, MMC, City Clerk
> (386) 719-5756
> SikesA@lcfla.com

9. **City of North Miami - 2022**

10. **City of Pompano Beach – 2011 and 2021**

> Reference
> Earl Bosworth, Assistant City Manager
> (954) 786-4602
> Earl.Bosworth@copbfl.com

11. **City of Quincy - 2020**

The City had not redistricted its boundaries in 45 years, requiring consideration and adoption of significant changes to the existing redistricting plan. The adopted plan was challenged under the provisions of the Voting Rights Act but was upheld in federal court.

> Reference
> Jack L. McLean, Jr., City Manager (former)
> (850) 841-0443
> mccl3690@comcast.net

12. **City of St. Petersburg - 2022**

13. **Columbia County Commission - 2021**

The County Charter provides for a Citizens Redistricting Committee. The Committee adopted a plan that did not count the population of those incarcerated in the County's two prisons and submitted that plan to the County Commission for final approval.

> Reference
> Joel Foreman, County Attorney
> (386) 752-8420
> jforeman@columbiacountyfla.com

14. **Gadsden County Commission and School Board – 2024**

**15. Jefferson County Commission – 2013 and 2016, 2023**

The 2013 redistricting plan was challenged based on whether prison population should be counted (as was the direction of the Florida Attorney General and case law at that time) or excluded. A federal District Court in Tallahassee ruled that the prison population could not be counted. A revised plan was prepared and adopted in 2016 which did not count prison population; the District Court approved that plan. Note that the US Supreme Court has subsequently ruled that the use of total population (including prison) may be an acceptable approach in the redistricting process.

<u>Reference</u>
Buckingham Bird, County Attorney (former)
(850) 997-3503
tbbird@nettally.com

**16. Leon County School Board – 2001**

**17. Levy County Commission and School Board - 2001 and 2011**

**18. Liberty County Commission – 2023**

**19. Madison County Commission and School Board - 2023**

<u>Reference</u>
Tommy Reeves, County Attorney
(850) 973-4186
tomreeves@earthlink.net

**20. Nassau County Commission, School Board and Port Authority – 2001**

**21. Pinellas County Commission – 1999, 2001 and 2021**

KSA assisted the County in redistricting after a charter amendment passed changing the districting system from five commissioners elected on an "at-large" basis to a system of four single-member districts plus three at-large. After the year 2000 census data was released in 2001, KSA adjusted the 1999 district boundaries based on the new demographic information. KSA was also engaged by Pinellas County for redistricting services in 2021, whose charter now provides for a Citizens Redistricting Advisory Board.

<u>Reference</u>
Susan Churuti, County Attorney (former)
(813) 283-8666
susan.churuti@beachdriveretail.com

**22. Pinellas County School Board – 2001**

**23. Sarasota County Commission – 2019 and 2021**

A 2018 amendment to the county charter changed the districting system from five members residing in residence areas but elected by all the voters countywide to five single-member districts, who were elected only by the voters of those districts.  The County Commission thereafter decided to redistrict the Commission districts based on updated population data. KSA subcontracted with the University of Florida's Bureau of Economic and Business Research to update the 2010 data and thereafter redrew the district lines based on that updated data.  The adopted plan was challenged in federal court based on the provisions of the Voting Rights Act; the Court ruled in favor of the County.  KSA was also engaged by Sarasota County for redistricting services in 2021.

Reference
Brad Johnson, Assistant County Administrator
(941) 861-5293
Brad.Johnson@scgov.net

**24. Sarasota County School Board - 2023**

Reference
Patrick Duggan, School District Attorney
(941) 364-2735
pduggan@shumaker.com

**25. Sumter County Commission – 2000**

**26. Suwannee County Commission and School Board – 2023**

**27. Village of Estero - 2022**

<u>Similar Projects</u>

KSA has provided consulting services on charters, local government structure and finance for the entities below.  All projects required in-depth knowledge of local governments, and facilitation and consensus building skills.

- Broward County Charter Review Commission
- Columbia County Charter Commission
- Columbia County Charter Review Commission (twice)
- Deltona Incorporation Study Commission (municipal incorporation feasibility study)
- Indian River County Commission (BCC proposed charter)
- Lee County Charter Review Advisory Commission (three occasions)
- Leon County Charter Study Committee
- Leon County Charter Review Commission
- Local Government Study Commission II, State of Florida
- Monroe County Commission (BCC proposed charter)
- Okaloosa County Charter Study Commission
- Pasco County Commission (BCC proposed charter)
- Pinellas County Charter Review Commission (three occasions)
- Polk County Charter Commission
- Polk County Charter Review Commission (three occasions)
- Tallahassee-Leon County Consolidation Commission
- Taxation and Budget Reform Commission I, State of Florida
- Wakulla County Commission (BCC proposed charter)

## Suggested Approach and Work Plan

We propose the following (tentative) approach to complete the Project.  A specific schedule will be identified as an attachment to an adopted Agreement with KSA.

| Task | Event |
|------|-------|
| 1 | Consultant engaged. |
| 2 | Consultant acquires necessary shape files from the City and data from the US Bureau of the Census[1] for mapping. |
| 3 | Consultant prepares Existing Districts map and related data, showing whether City is required to redistrict or not; consultant notifies City of same. |
| 4 | Using the Existing Districts map as a base, consultant conducts discussions with individual Commissioners over Zoom concerning their redistricting preferences. |
| 5 | Consultant prepares two alternative redistricting maps based on common redistricting criteria and direction given during meetings held in Task 4. |
| 6 | Consultant conducts workshop presentation via Zoom for City Commission on redistricting process, criteria and practices, anticipated work plan for the Project; demonstrates use of redistricting software; and presents at least three maps: "Existing" plan and two alternative redistricting plans. |
| 7 | Consultant prepares updated alternative redistricting map(s) based on direction given during Task 6 and presents to the Commission. |
| 8 | If recommendation is approved, consultant prepares draft narrative description of new district boundaries and delivers all files, maps and final report to City. |
| 9 | If recommendation is rejected, consultant prepares updated draft alternative map (or maps) and presents revisions to the Commission. |
| 10 | Consultant prepares draft narrative description of new district boundaries and delivers all files, maps and final report to City. |

---

[1] Typically, total population (not registered voters) as determined by the most recent survey of the US Bureau of the Census is used in redistricting efforts, as Census data is presumed to be correct.  Alternative estimating practices may be used in the latter years of a decennial census cycle but must be based on sound demographic principles and well documented as to how and why the alternative approach was taken.

## Price

We propose a fixed price of $25,000 which includes the following services and all time and expenses, except as identified under "Out of Scope."

1. Attendance by Mr. Spitzer at not more than four on-line meetings with the City Commission concerning the Redistricting Project.

2. Preparation by Mr. Spitzer of a draft narrative description of the adopted, final districts' boundaries.

3. Time spent in preparation by Mr. Spitzer and other Team Members for attendance at all meetings and all other tasks identified in "Suggested Approach and Work Plan."

4. Preparation of not more than five districting maps or plans, including the initial "Existing Districts" map.  Minor revisions to alternative plans are not an additional map or plan.

5. All Plans will include the following information (citywide and for each district):  Total Population and Voting Age Population; deviation from the average or ideal district size (actual number and percentage); White, Black and Other racial populations; Hispanic or Latino population; and total point spread between largest and smallest district deviations for each Plan.  All Plans will use 2020 data from the US Bureau of the Census.

6. Preparation of a "Redistricting FAQs" document for use by the City.

7. All costs for necessary software and time spent acquiring necessary data and files.

8. Expenses related to adding Daytona Beach as a named insured to the KSA Liability Insurance policies for the purposes of the Project.

9. Regular, frequent communication on the status of the Project with designated point of contact on City staff.

10. Delivery of final maps and all related files, data and final report to the City of Daytona Beach.

<u>Payment Schedule</u>

We propose the following payment schedule:

- $10,000 due upon acceptance of Agreement by City of Daytona Beach.

- $10,000 due upon completion of Task 6.

- $5,000 due upon completion of Project.

Fees for services provided outside of the scope of work (if any) will be billed in arrears.


<u>Out of Scope</u>

The following services and related expenses are not included in the above price(s):

1. Preparation for and attendance at additional on-line meetings concerning the Project or preparation of additional maps or reports (beyond those identified above) will be billed at the following rates:

    Kurt Spitzer              $300 per hour

    Other Team Members        $175 per hour

2. In-person attendance at meetings within the City requiring an overnight stay will be billed at a fixed price of $5,000, which includes all costs relating to time, travel, lodging and all other expenses.

3. Testimony in Legal Proceedings

    Mr. Spitzer will be paid at a rate of $300 per hour for expert technical assistance to the City in the event any legal action arises relating to the redistricting process or plans developed with KSA's assistance. Mr. Spitzer will provide expert testimony and technical services, if necessary, in state or federal court as it relates to the City's adopted redistricting plan.

    In instances where Mr. Spitzer either does not or cannot qualify as an expert, and where necessary in legal action, then Mr. Spitzer will provide fact testimony relating to the redistricting of plans developed with KSA's assistance. The City will reimburse KSA for expenses incurred and time lost in preparing for and providing the non-expert testimony. KSA will itemize and invoice the City for expenses. The City will compensate Mr. Spitzer for time lost at an hourly rate of $300 per hour with KSA invoicing the City for time lost.

    The City, KSA and Mr. Spitzer understand and agree that payment cannot and will not influence the substance of Mr. Spitzer's testimony.

**EXHIBIT B:  STANDARDS FOR REDISTRICTING SERVICES AND WORK PRODUCT**

KSA will create proposed Commissioner zone maps for review and approval by the City Commission.

The Commissioner zone maps produced by KSA will comply with applicable legal requirements related to redistricting, including but not limited to the following:

1. Constitutional and statutory requirements that districts have substantially equal populations;

2. The antidiscrimination provisions of Section 2 of the Voting Rights Act of 1965, including the requirement that redistricting plans not dilute minority voting; and

3. Fla. Stat. s. 166.0321, as amended by ch. 2023-101, Laws of Florida, including the prohibition on drawing district boundaries with the intent to favor or disfavor a candidate for a member of the governing body or an incumbent member of the governing body based on the candidate's or incumbent's residential address.

So as to be  consistent with all applicable legal requirements, the maps produced shall also provide for Commissioner zones that are contiguous and reasonably compact, reasonably preserve communities of interest, reasonably preserving core areas of existing zones, and other traditional redistricting criteria.

ORDINANCE NO. 2025-16

AN ORDINANCE REPEALING ORDINANCE NO. 2023-268;
AMENDING SUB PART A, ARTICLE II, SECTION 2 OF THE
CITY CHARTER, WHICH AMENDED THE BOUNDARIES OF
THE EXISTING CITY COMMISSION MEMBERS' DISTRICTS
WITHIN THE CITY OF DAYTONA BEACH, VOLUSIA
COUNTY, FLORIDA, PREVIOUSLY ESTABLISHED BY
ORDINANCE NO. 12-23; REQUIRING A NEW
REDISTRICTING PLAN TO BE ADOPTED FOR THE NEXT
REGULAR MUNICIPAL ELECTION IN 2026; REPEALING
ALL ORDINANCES OR PARTS OF ORDINANCES IN
CONFLICT HEREWITH; AND PROVIDING AN EFFECTIVE
DATE.

WHEREAS, Sub Part A, Article II, Section 2 of the City Charter provides that The

City of Daytona Beach shall be divided into six zones for the purposes set forth in the Charter,

including for purposes of determining the areas or zones that each of six City Commissioners

represents; and

WHEREAS, City Ordinance No. 12-23 redesignated the above described zones;

and

WHEREAS, more recently the City Commission redesignated the above-described

zones via Ordinance No. 2023-268; and

WHEREAS, four electors of The City of Daytona Beach initiated a civil action

challenging Ordinance No. 2023-268 as void under section 166.0321, Florida Statutes, in *Nicholas

Sakhnovsky, et.al. v. City of Daytona Beach*, Case No. 2024-10140-CICI; and

WHEREAS, Plaintiffs in the above-referenced case have alleged that the

redistricting plan adopted through Ordinance No. 2023-268 was developed with the improper

intent to favor each incumbent commissioner based on his or her residential address; and

WHEREAS, the City has denied and continues to deny any illegal or improper

intent in adopting Ordinance No. 2023-268; and

WHEREAS, the City Commission has determined the issues raised in the above-referenced litigation should nonetheless be resolved in order to avoid the uncertainties, inconveniences, burden and expenses of continuing said litigation; and

WHEREAS, in order to mitigate the City's risk associated with continuing the litigation, including the risk of exposure to a substantial attorney's fee award, the City Commission has determined that Ordinance 2023-268 should be repealed, and a new redistricting plan should be adopted for the next regular municipal election in 2026; and

WHEREAS, because this repeal would otherwise result in the displacement of City Board appointees, the City Commission has determined that such Board appointee should be permitted to serve out their terms; and

WHEREAS, a special election has been called for April 1, 2025, as a result of the resignation of Congressman Michael Waltz; and

WHEREAS, because the repeal would otherwise result in a change in precinct location for certain voters within the City, and associated therewith additional costs to the City associated with providing notice affected votes, the City Commission has determined to set the effective date the day after the above-referenced special election.

NOW, THEREFORE, BE IT ENACTED BY THE PEOPLE OF THE CITY OF DAYTONA BEACH, FLORIDA:

SECTION 1.   Ordinance No. 2023-268, adopting the redistricting plan designating the current boundaries of the City's six zones, is hereby repealed.

SECTION 2.   The City Commission shall adopt a new redistricting plan which complies with all applicable legal requirements to go into effect for the next regular municipal election in 2026.

SECTION 3.   Until such time as a new redistricting plan is adopted, the zone boundaries shall be as established by Ordinance No. 12-23 (and as thereafter amended by City annexation ordinances).

SECTION 4.   It is hereby found that the actions provided herein are taken for the purpose of avoiding the uncertainties, inconveniences, burden and expenses of continuing the litigation referenced in the Recitals.  These actions do not constitute an admission of fact, liability, or fault on behalf of the City and do not constitute precedent in any other matter.

SECTION 5.   To the extent this Ordinance would otherwise result in the displacement of any City Board appointees, such appointees shall be permitted to serve out the current remainder of their term.

SECTION 6.   All ordinances or parts of ordinances in conflict herewith are hereby repealed.

SECTION 7.   This Ordinance shall take effect on April 2, 2025.


_____
DERRICK L. HENRY
Mayor


ATTEST:

_____
KATHY ROSADO
Assistant City Clerk


Passed: December 18, 2024
Adopted: January 8, 2025

# *SUFFICIENCY OF FUNDS CERTIFICATE*

SUFFICIENCY OF FUNDS CERTIFICATE – Ord/Res. No. _____

*(give amount of funds and description of item(s) to be purchased or copy from "text" area on page one)*

Resolution approving a redistricting services contract with Kurt Spitzer and Associates, Inc., for a fixed fee of $25,000.00, to provide the City Commission with redistricting consulting services to assist in developing a new redistricting plan designating City Commissioner zone boundary.

Funds are available in accounts - Fund Name - Dollar Amounts:
(3 digits – 6 digits - 3 digits – 6 digits – 6 digits)

001-140100-514-531900-00000        PROF SER - OTHER          $25,000.00

                                                                Total Dollar Amount:

                                                                $25,000.00

I, Natalia Eckroth, Chief Financial Officer for The City of Daytona Beach, Florida, hereby certify that money required for the authorization approved by the above Ordinance/Resolution is in the treasury (as said phrase "in the treasury" is defined in Section 46-57(c) of the Code of Ordinances of said City) to the credit of the fund from which it is to be drawn and not appropriated for any other purpose:  that I have filed and recorded this Certificate with the City Clerk and that same is executed pursuant to Section 46-57(c) of the Code of Ordinances of said City.

Certified on _____        Recorded on _____

Natalia Eckroth
Digitally signed by Natalia Eckroth
Date: 2025.03.21 13:52:14 -04'00'

_____        _____
Chief Financial Officer or designee              City Clerk or designee