

*Via Electronic Mail*

# MEMORANDUM

**To:**     Honorable Members of the City Commission
City of Daytona Beach

**From:**   Kurt Spitzer

**Date:**   May 28, 2025

**Re:**     Common Redistricting Criteria

The purpose of this Memorandum is to discuss some of the criteria that are typically used in the redistricting process at the local government level, and to transmit an initial map of the existing zone boundaries overlayed on the 2020 census data.

Additional information on redistricting may be found at www.KSAnet.net and in two webinars that KSA presented for the Florida League of Cities: Redrawing Council Districts (January 2021) and "Redistricting - Keeping Representation at the Core" (May 12, 2025) although a recording of this webinar has not yet been published on the League's website.

**General Information**

The zones or districts of local governments in Florida are required by the US Constitution, Florida Statutes, case law, and (in some cases) the Florida Constitution and city or county charters, to be "nearly equal in proportion to population as practicable." Redistricting is the process by which differences in the population of Commission zones or districts are equalized by adjusting district boundaries, and furthers the principal of "one person, one vote." The legislative body of the jurisdiction (in this case, the City Commission of the City of Daytona Beach) is the entity designated by law to adjust district boundaries of the jurisdiction.

Commission boundaries are typically adjusted during the first or second odd-numbered year after the decennial census. The decennial census is initiated in January of each 10-year cycle (e.g.,

Daytona Beach City Commission
May 28, 2025
Page two

January of 2020 or 2030) with final data being made available for use by state and local governments during the month of December of the year that the census was initiated.[1]

**Common Redistricting Criteria**

There are several criteria used in the redistricting process. They are considered in total and balanced with each other. However, the dominant criterion is population.

1. Equal (almost) in Population. Individual districts should be nearly equal in population as is possible or practicable. "Population" refers to residents, not registered voters. "Nearly equal" means that the population of individual districts should be as close to the average or ideal district size as is possible.

    Generally, redistricting plans where the district populations are less than 3% over or under the average size are acceptable goals to pursue. Plans where the difference between the largest and smallest districts is greater than 10 percentage points (e.g., the largest district population is 7% over the ideal and smallest is 5% under, resulting in a "spread" of 12 points) may raise a "red flag" with the Courts, although there can be exceptions to this rule.

2. Do not Dilute Minority Voting Strength. If there is a location where a significant number of minority residents reside, their ability to vote as a block should not be diluted by either dividing that population into two or more districts (termed "cracking") or, if there is a significant minority population in two districts, moving that population into a single district (termed "packing"). Note that this policy issue has been the subject of numerous lawsuits over the past few years, some of which have not yet been resolved.

3. Do not "Favor or Disfavor" an Incumbent or Candidate
   Legislation (HB 411) was passed during the 2023 Session, adding two redistricting criteria for cities (see Section 166.0321, FS) and all other local governments.

    - First, redistricting plans may not be adopted less than 270 days before the next regular general election for the local government.

    - Second, districts may not be drawn with the intent to favor or disfavor a candidate for member of the governing body or an incumbent member of the governing body based on the candidate's or incumbent's residential address.

---

[1] Primarily due to the COVID pandemic (which began in January 2020) the 2020 census data was released late. Initial data was released on August 12, 2021, and then re-released in a more user-friendly format in September of 2021.

Daytona Beach City Commission
May 28, 2025
Page three

    This second criteria may seem similar to language that was added to the Florida Constitution in 2010, which governs the Florida Legislature when they redraw the districting plans for themselves and members of Florida's Congressional delegation. However, a significant difference is the phrase relating to the "residential address" of a candidate or incumbent (included in HB 411) was not included in amendment added to the Florida Constitution.

    How this criterion affects or interacts with other traditional, historically-approved criteria has not yet been determined by the courts.

4. <u>Use Census Blocks.</u> Data from the US Bureau of the Census is updated every 10 years by surveying the population of the United States. The smallest unit within which that information is tabulated and made available is "blocks." Within each block there exists numerous pieces of statistical information, including total number of people, their racial and ethnic composition, whether they are of voting age, etc. Census data is presumed to be correct.

   Although not a criteria *per se*, the use of census blocks and data is universally accepted by both practitioners and the courts, and all software used in the redistricting process can easily integrate the data contained in census blocks.

5. <u>Compact and Contiguous.</u> Districts should be relatively compact and contiguous. Unusual, serpentine or "bizarre" district shapes that are created without furthering a valid underlying public policy purpose must be avoided. Contiguity may be maintained by crossing a waterbody.

6. <u>Significant Natural and Man-made Boundaries.</u> District boundaries should follow easily recognized or understood boundaries, like major roads, waterbodies or parklands. Doing so creates plans and districts that are easier to understand by the electorate, and district boundaries that are usually co-terminus with the boundaries of census blocks and voter precincts.

7. <u>Retain Existing District Boundaries.</u> New districting plans may seek to retain the boundaries of the existing districts' boundaries and to protect the core of existing districts to the extent possible. As is the case with following significant natural and man-made boundaries (above), recognizing existing district boundaries creates plans and districts that are easier to understand by the electorate, and boundaries that are usually co-terminus with the boundaries of census blocks and voter precincts.

8. <u>Avoid Splitting Communities of Interest.</u> District boundaries should seek to avoid splitting communities (e.g., neighborhoods, HOAs or redevelopment zones) that have similar interests, where possible.

Daytona Beach City Commission
May 28, 2025
Page four

9. <u>Party Affiliation.</u>  While the party affiliation of registered voters may be considered in the redistricting process, it is commonly not used at the local level – especially in jurisdictions where the governing body is elected without regard to party affiliation.

**Existing Zone Map**

Attached please find a map of the existing districts or zones, using the 2020 Census data.  The largest district (Zone 4) is 28.4% over the "ideal" or average district size.  The smallest district (Zone 3) is 18.5% under the ideal size.  This results in a spread of 46.9 percentage points – well beyond the generally acceptable spread of 10 percentage points; thus, the City must redistrict.

Also attached is a detailed spreadsheet of statistical information.  This spreadsheet adds Voting Age Population (VAP) to the table embedded in the Map provided to you.  VAP is an important statistic when seeking to avoid dilution of minority voting strength per the Voting Rights Act.

Moving forward, all alternative maps and related statistical information will be provided to you in the same format as that of the attached documents.

I look forward to talking with you next week.


Attachments

cc:  Ben Gross