IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

VOTE!, *et al.*,

    *Plaintiffs*,

v.                                                     Case No. 6:25-cv-1980-PGB-RMN

CITY OF DAYTONA BEACH, *et al.*,

    *Defendants*.

_____/

**PLAINTIFFS' REPLY IN SUPPORT OF
PRELIMINARY INJUNCTION MOTION**

The City's Response (ECF No. 35, "Opp.") to Plaintiffs' PI Motion (ECF No. 7) leaves key facts unrebutted, dismisses facts it dislikes, and misunderstands the law. The City's brief makes clear that Plaintiffs are substantially likely to succeed on the merits and otherwise satisfy the requirements for a preliminary injunction.

    **I.**     **Reaching the 50% Black population target was the City's predominant goal for Zones 5 and 6, not merely a "result."**

The City attempts to distract from and explain away the indisputable direct evidence that for Zones 5 and 6, the City "purposefully established a racial target: African Americans should make up than a majority of the [] population." *Cooper v. Harris*, 581 U.S. 285, 299 (2017). No amount of distraction can negate the record, *see* Mot. 6–16. Contrary to the City's arguments, *see* Opp. 5–6, 8–9, 15, Plaintiffs do not need an explicit commissioner quote stating "race is my predominant factor" to establish that the 50% target "was the criterion that, in the [City]'s view, could not be compromised." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)). The City emphasizes that

1

Zone 5's Black voting-age population (BVAP) is under 50%, Opp. 6, but Spitzer and commissioners consistently discussed their desired target for Black *total*—not voting-age—population. *E.g.*, 8/6 Tr. 10:1–10 (Spitzer describing options that "did not remain over 50% African American population" but how he could "try to correct those faults"); *cf. Covington v. North Carolina*, 316 F.R.D. 117, 129 (M.D.N.C. 2016) (racial predominance where "attaining a racial percentage within a given district was nonnegotiable"), *aff'd*, 581 U.S. 1015 (2017) (mem.). And they hit their desired target.

The City further criticizes Plaintiffs because they "provide no alternative plans *of their own*," as the City claims *Alexander* requires. Opp. 15 (citing *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1 (2024)). But "an alternative map is not a substantive requirement of a racial-gerrymandering claim[.]" *Cubanos Pa'lante v. Fla. House of Reps.*, 766 F. Supp. 3d 1204, 1211 n.6 (S.D. Fla. 2025). *Alexander* "concluded that alternative maps are *helpful* 'when the State raises a partisan-gerrymandering defense.' 602 U.S. at 9. In that situation, Plaintiffs' production of an alternative map would 'show[ ] that a rational legislature sincerely driven by its professed partisan goals would have drawn a map with greater racial balance.' *Id.* at 10." *Cubanos*, 766 F. Supp. 3d at 1211 n.6. Unlike in *Alexander*, Plaintiffs rely on a bevy of direct evidence, and the City admits it had <u>no</u> partisan or political goals that Plaintiffs need to "disentangle." Ex. 1 at 2–3 (Response to Interrogatory No. 6); Ex. 2 at 3 (Response to RFA No. 11).

Regardless, Spitzer provided alternative plans, and the City did the disentangling: the Commission rejected those alternatives *because* they failed to

2

maintain Zones 5 and 6 at 50% Black total population.[1] Mot. 7–9, 11–12; *see Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 190 (2017) ("[I]f race for its own sake is the overriding reason for choosing one map over others, race still may predominate."); *cf. GRACE, Inc. v. City of Miami* (*GRACE III*), 730 F. Supp. 3d 1245, 1283 (2024) (rejected alternative plans constitute evidence of predominance); *Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1295 (2022) (finding racial predominance and noting that "even [a] small adjustment that [the City Council's mapmaker] initially proposed, which would have reduced the overall BVAP percentage in [one district] and unified more of the urban core into [another district], was summarily rejected"); *Bethune-Hill v. Virginia State Bd. of Elections* (*Bethune-Hill II*), 326 F. Supp. 3d 128, 156 (E.D. Va. 2018), *appeal dismissed*, 587 U.S. 658 (2019).

Likewise, it matters not whether districts are noncompact or "strangely irregular." Opp. 15. "[A] conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement . . . to establish a claim of racial gerrymandering." *Bethune-Hill I*, 580 U.S. at 190; *see also GRACE, Inc. v, City of Miami* (*GRACE I*), 674 F. Supp. 3d 1141, 1210 (2023) (racial predominance despite districts not being "facially non-compact" "given the shape of the geographic borders of the City"); *Bethune-Hill II*, 326 F. Supp. 3d at 165, 171 (racial predominance despite "consistencies with traditional districting criteria" like compactness). Nor does it

---

[1] These facts render entirely unconvincing Dr. Sean Trende's "analysis" that "the natural effect" of the City's Black population distribution "will be to draw multiple Black majority districts[.]" Opp. 35; *see also* Ex. 3 at 6–19 (report of Dr. Christopher Kenny explaining Trende's misuse of algorithmic simulations).

3

matter that the Commission weighed other considerations besides race. "The fact that other considerations may have played a role in the [City's] redistricting does not mean that race did not predominate." *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002); *see also Hunt*, 517 U.S. at 907 (holding race may predominate even if non-racial criteria were "actively at work in the districting process").

In any event, most of the "other considerations" the City holds up either have nothing to do with Zones 5 and 6, or are too minute to alter the "holistic analysis" of "the design of the district as a whole." *Bethune-Hill I*, 580 U.S. at 191–92 (faulting district court for "giv[ing] insufficient weight to the [legislature's] 55% BVAP target"). That a park stayed in Zone 1 or Main Street moved from Zone 3 to 2 is irrelevant to whether "race was improperly used in the drawing of the boundaries of [the] specific electoral districts" Plaintiffs challenge,[2] since racial-gerrymandering claims apply "district-by-district," not to a city "as an undifferentiated 'whole.'" *Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 262 (2015); *contra* Opp. 11 (arguing no racial predominance "in the City's decision to draw its plan as a whole"). A desire to equalize populations also fails to rebut racial predominance, because population equality "is part of the redistricting background, taken as a given[.]" *ALBC*, 575 U.S. at 272.

## II. Core preservation cannot immunize a racial gerrymander from scrutiny.

The City attempts to justify its map on the grounds that it maintains prior

---

[2] *See, e.g.*, Opp. 8–10 (discussing Main Street along Zone 2/3 border, Bethune Point Park along Zone 1/3 border, one city block with Cypress Park and Cherry Center kept in Zone 6, and one city block with Scarlett-Golden Center kept in Zone 5).

4

districts. Opp. 5–6, 15. But "core preservation" cannot immunize racial gerrymanders from scrutiny, even where prior districts were never found constitutionally suspect. *Clark*, 293 F.3d at 1267 n.16, 1271–72 (racial gerrymander where previous plan was "preserved as much as possible"); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1065 (M.D. Ala. 2017) (striking down district that "maintained . . . core" of previous one); *Navajo Nation v. San Juan Cnty.*, 162 F. Supp. 3d 1162, 1177 (D. Utah 2016) (striking down district where "the overriding consideration . . . was to preserve [it] without any modification"), *aff'd*, 929 F.3d 1270 (10th Cir. 2019).

And here, the record shows that the City maintained Zone 5 and 6 *because* of the race of their residents and commissioners.[3] Against this backdrop, the fact that the City preserved Zones 5 and 6 at over 50% Black *helps* Plaintiffs. The Commission's decision to intentionally perpetuate that existing racial quota renders each new zone race-based as well—"not just at its edges, but at its core." *Jacksonville*, 635 F. Supp. 3d at 1286 (quoting *Easley v. Cromartie*, 532 U.S. 234, 265 n.7 (Thomas, J., dissenting)).

In any event, a closer look at how the City maintained (or rather, failed to maintain) prior map *bolsters* the case for racial predominance. Rebutting Trende's analysis, Kenny observes how the City disrupted the preexisting districts

---

[3] *E.g.*, 8/6 Tr. 10:21, 15:20–21 (Cantu: "Zone 5, ever since I was a kid, has always been a minority district. . . . I don't think any residents will want to see Zone 5 disappear."), 16:1–5 (Gross: "[G]oing back to at least 2002 . . . , Zones 5 and 6 have consistently selected African American officials. . . . And this is somewhat important . . . ."), 16:19–23 (Gross: "[W]e do have a history in our community of having Zones 5 and 6 as majority-minority zoning districts, benefited by – " Cantu: "Well I'm aware of that, that's why I asked." Gross: "By that composition, which gives us continued support . . . ."), 18:3–6 (Gross referencing "the fact that two of the three zones adjacent to [Zone 4] are historically majority-minority zones" and explaining "[t]here's only so many different way that you're going to be able to redraw your map to preserve those majority-minority voting districts").

5

unnecessarily, inconsistent with a goal of maintaining them. Kenny Rep. at 19–21.

### III. The "same decision" defense is inapplicable.

The City briefly contends that even "where animus has been proven," "it would have made the same decision anyway, without regard to the animus." Opp. 19. The same-decision defense is inapplicable, however, because racial-gerrymandering claims do not involve animus. The constitutionally cognizable harm of a racial gerrymander under *Shaw v. Reno* is the racial classification itself. 509 U.S. 630, 657–58 (1993); *GRACE III*, 730 F. Supp. 3d at 1254 ("In a racial gerrymandering case, an injury in fact exists when an individual is classified based on their race."). A *Shaw* racial-gerrymandering claim is distinct from an intentional race-discrimination claim (referred to in the redistricting context as a "vote dilution" claim).

> That Plaintiffs pursue a racial-gerrymandering claim rather than a vote-dilution claim is critical. A Fourteenth Amendment racial-gerrymandering claim is "analytically distinct from a vote dilution claim." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (cleaned up). "[A] vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Id.* (cleaned up).

*Nord Hodges v. Passidomo*, No. 8:24-cv-879, 2024 WL 2155684, at *2 (M.D. Fla. May 14, 2024); *see also Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1329–30, 1366 (N.D. Fla. 2024); *GRACE I*, 674 F. Supp. 3d at 1157 ("[L]egally, a Fourteenth Amendment claim involves whether race was the predominate factor in drawing district lines, not whether vote dilution occurred.").

Thus, a racial-gerrymandering claim *cannot* be rebutted by the claim that the

government would have made the same choices absent discriminatory animus. A plaintiff need not prove the government acted with discriminatory animus at all, just that race was the predominant factor in the district's design. *Covington*, 316 F.R.D. at 129 ("[A] finding that race was the predominant motive in drawing a district . . . does [not] signify that the legislature acted in bad faith or with discriminatory intent . . . ."). The City cannot defend its racial quota by asserting that the districts would have the same racial composition absent racial animus Plaintiffs do not allege, or even if race was not the predominant factor. *See GRACE, Inc. v. City of Miami*, No. 1:22-cv-24066, 2023 WL 8856325, at *7–8 (S.D. Fla. Dec. 21, 2023) ("Plaintiffs' injury will be redressed when they are no longer subject to a racial classification. . . . [S]o long as the potential remedial districts are not-race based, or otherwise satisfy strict scrutiny, they could have any range of district-level demographics." (quotation omitted)).

### IV. The City lacked a "strong basis" for its Black population target.

Plaintiffs presented virtually unrebutted analysis from Dr. Bryant Moy that the third *Gingles* precondition—white bloc voting sufficient for white voters *usually* to defeat Black voters' preferred candidates—is absent in Daytona Beach. Mot. 17–19. Without it, the City cannot have a strong basis for its racial target. The third *Gingles* precondition requires "not only that whites vote as a bloc, but also that white bloc voting *regularly causes* the candidate preferred by black voters to lose; in addition, plaintiffs must show not only that blacks and whites sometimes prefer different candidates, but that blacks and whites *consistently* prefer different candidates." *Johnson v. Hamrick*, 196 F.3d 1216, 1221 (11th Cir. 1999). "If a State has good reason to think

7

that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Cooper*, 581 U.S. at 302 (citations omitted). "Absent a strong basis in evidence for the three factors, Defendants would have had no reason to anticipate a potential Section 2 violation and therefore no reason to believe the race-based districting was necessary to comply with Section 2." *Covington*, 316 F.R.D. at 167.

In two sentences, the City waives away Moy's analysis by claiming he found "white voters have recently voted against the black candidate of choice—in six of the last eleven elections beginning in 2022." Opp. 18. The City misstates the data. Moy analyzed 14 contests since 2022; white bloc voting was sufficient to defeat Black voters' choice in just six (42.9%). In the remaining three, voting was not racially polarized at all (*i.e.*, both the second *and* third *Gingles* preconditions were absent). ECF No. 7-12 (Moy Rep.) at 34; Ex. 4 (Moy Rebuttal) at 2–3. Even the City has to admit that 43% of the time (6 of 14 elections) is not "usually." *See Johnson v. Hamrick*, 155 F.Supp.2d 1355, 1376–77 (N.D. Ga. 2001) (finding insufficient white bloc voting where Black-preferred candidates *won* 45.5% of the time), *aff'd*, 296 F.3d 1065 (11th Cir. 2002). Moy's rebuttal further explains why focusing on only the last three years is inappropriate, and why Trende's other critiques are unsound.[4]

---

[4] For example, Trende critiques Moy for examining past City Commission ("endogenous") races. But "the most probative elections are the [] endogenous [] elections[.]" *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1310 (11th Cir. 2020); *see also Hamrick*, 196 F.3d at 1222 ("Although the district court examined some exogenous elections, it did seem to focus on endogenous elections and found the endogenous elections to be more probative. Not only does that make sense, but it also is the law of this Circuit." (quotation omitted)). White bloc voting was insufficient in *every* endogenous race. Moy Rep. at 34.

8

The City claims "there was some assessment" of white bloc voting, Opp. 17–18, but relies solely on Spitzer's description of changes to Zones 5 and 6 as "nominal":

> Under Alternative 1B-1, the African American Population of Zone 5 is 51.8% (VAP 47.3%). For Zone 6, the African American population is 55.1% (VAP 50.4%). Thus, when comparing the statistics for the existing plan with that of Alternative 1B-1, the changes in the African American populations of Zones 5 and 6 are nominal.

ECF No. 35-4 at 2–3; Opp. at 7.

Spitzer merely noted that Zones 5 and 6's Black populations stayed roughly the same. That is far from the "strong showing of a pre-enactment analysis with justifiable conclusions" that can supply the necessary "strong basis in evidence." *Abbott v. Perez*, 585 U.S. 579, 621 (2018).[5] It appears the City did *no* study of white bloc voting, or even knew it was required. *Cf. Covington*, 316 F.R.D. at 168 ("[T]o have a strong basis in evidence for the third *Gingles* precondition, a legislature must give consideration to the actual and potential effect of bloc voting on electoral outcomes.").

Instead, the City assumed the VRA required it to draw Zones 5 and 6 as majority-Black simply because they had elected Black candidates in the past.[6] "To

---

[5]  *Cf. GRACE I*, 674 F. Supp. 3d at 1215–16 (noting "City's determination of a minority population percentage for VRA compliance must [] be well-supported," finding city's 50% BVAP target unsupported where it failed to offer evidence "memorializing any pre-enactment analysis that was presented or provided to the Commissioners regarding the BVAP or BCVAP proportions that would facilitate Section 2 compliance," and noting as insufficient the "presentations and reports discuss[ing] BVAP proportions throughout the redistricting process [that] provided summary-level, race-focused Voting Age Population breakdowns for the Commission Districts under different proposed plan configurations").

[6]  Mot. at 10; 8/6 Tr. at 16:11–23 (Gross advising that "preserving majority-minority voting district[s]" is "one of the more traditionally more important criteria for redistricting" and explaining that since "we do have a history in our community of having Zones 5 and 6 as majority-minority zoning districts, benefited by [] that composition," the City had "continued support in spite of the recent Florida Supreme Court decision").

9

have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions—including effective white bloc-voting—in a new district created without those measures." *Cooper*, 581 U.S. at 304. "Rather than carefully evaluating evidence at the district level, the [City] improperly relied on generalizations to reach the conclusion that the preconditions were satisfied." *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404, (2022). The City's 50% Black target was thus "just the sort of uncritical majority-minority district maximization that [the Supreme Court] ha[s] expressly rejected." *Id.* at 403. "Strict scrutiny requires much more." *Id.* Indeed, the City all but admits it fails strict scrutiny when by arguing that "[u]ndoing the two existing majority-minority districts *might* have [] diluted black voting strength." Opp. 1 (emphasis added). It is not enough for a state "to conclude only that the VRA *might* support race-based districting;" the government must have a strong basis in evidence "that the statute required" and "*demanded*" those steps. *Wis. Legislature*, 595 U.S. at 403–04 (emphases in original; quotation omitted).

V. **The other stay factors favor an injunction.**

Lastly, the City's argument that it will suffer irreparable harm is erroneous. "This would matter a great deal had the [City] made a strong showing on the merits. But because [its] success is quite uncertain, this particular harm is less relevant." *Fla. Imm. Coal. v. Att'y Gen. of Fla.*, No. 25-11469, 2025 WL 1625385, at *5 (11th Cir. June 6, 2025). Since "[t]he public has no interest in enforcing an unconstitutional law," the final three stay factors weigh in Plaintiffs' favor. *Greene v. Sec'y of State of Ga.*, 52 F.4th

10

907, 916 (11th Cir. 2022) (quotation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their Motion for Preliminary Injunction.

Respectfully submitted December 22, 2025,

/s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
dtilley@aclufl.org

*Counsel for Plaintiffs*