**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

VOTE!, *et al.*,

*Plaintiffs*,

v. Case No. 6:25-cv-1980-PGB-RMN

CITY OF DAYTONA BEACH, *et al.*,

*Defendants*.
______________________________________/

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs in this racial gerrymandering case move for partial summary judgment on a single issue: assuming race predominated in the drawing of Daytona Beach City Commission Zones 5 and 6, then the use of race was not narrowly tailored to any compelling governmental interest—*i.e.*, the City's use of race fails strict scrutiny.

**UNDISPUTED FACTS**

The Daytona Beach City Commission is made up of six commissioners, each elected from a "zone" or district, and a mayor elected citywide. Daytona Beach City Charter § 8. In 2025, the Commission redrew its zone boundaries. Ex. 1 (Ord. 2025-370). The redistricting process included significant discussion among commissioners, their mapping consultant, and the city attorney that Zones 5 and 6 must have a 50% Black population.[1] Indeed, the redistricting ordinance itself noted that "the boundaries

---

[1] *E.g.*, Ex. 2 at 4–5 (mapping consultant Kurt Spitzer's memorandum discussing efforts to reach Black population targets in draft maps); Ex. 3 (8/6/25 Commission Meeting Tr.) at 4:17–18, 5:19–22, 9:13–19, 10:9–14, 10:21, 11:15, 11:23–12:1, 15:11–21, 16:11–12 (City Attorney Gross advising that "preserving majority-minority voting district[s]" is "one of the more traditionally more important

. . . preserve Commissioner Zones 5 and 6 as majority minority districts." Ex. 1 at 3.

Plaintiffs—the organization VOTE! and three Daytona Beach voters—allege that race predominated in the City's drawing of Zones 5 and 6, and that therefore the City's use of race must be narrowly tailored to a compelling interest.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FRCP 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

In the racial gerrymandering context, summary judgment can be granted on the issue of strict scrutiny. *E.g., Walen v. Burgum*, 700 F. Supp. 3d 759, 775 (D.N.D. 2023) (three-judge court) (finding that, assuming race predominated in the challenged

---

criteria for redistricting"), 16:19–23, 18:2–7, 22:2–14, 22:17–21, 23:15–16, 24:13–16, 29:7–8, 29:16–18; Ex. 4 (8/20/25 Commission Meeting Tr.) at 7:7–10 (Mayor Henry commenting "my main thing is minority voting. . . . That's my number one thing," and Commissioners Henry and Reed agreeing), 7:17–8:2; Ex. 5 (9/3/25 Commission Meeting Tr.) at 7:2–4 (Commissioner Reed advocating for change that "still kept our major African American zones with that move"), 9:7–8, 11:15–12:3, 11:18–19, 12:14–15, 12:22–13:1, 14:7–12; Ex. 6 (10/1/25 Commission Meeting Tr.) at 11:1–4, 11:13–17 (City Attorney Gross: "we're actually required by law to preserve the majority-minority status").

districts, the state's use of race survived strict scrutiny), *aff'd in relevant part, appeal dismissed in part*, 145 S. Ct. 1041 (2025) (mem.).

## ARGUMENT

Racial gerrymandering claims involve "a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). First, plaintiffs must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," and "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292.

There is no genuine dispute of material fact as to whether the City's use of race in drawing Zones 5 and 6 was narrowly tailored to a compelling interest. It was not. The only relevant compelling interest here is compliance with Section 2 of the Voting Rights Act. *See Cooper*, 581 U.S. at 292. To make out a Section 2 vote-dilution claim, a racial minority group must satisfy three preconditions: (1) the group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the group "is politically cohesive," and (3) the "majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v.*

*Gingles*, 478 U.S. 30, 50–51 (1986) (cleaned up).[2] If the minority group satisfies the *Gingles* preconditions, the group "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Gingles*, 478 U.S. at 45–46). Section 2 then requires the creation of a district in which minority voters have an equal "opportunity . . . to elect representatives of their choice." 52 U.S.C. § 10301(b). The protected group need not necessarily form a majority of the population in a Section 2 remedial district, as long as protected-group "voters otherwise have an opportunity to elect a representative of their choice" there. *Caster v. Merrill*, No. 2:21-cv-1536, 2022 WL 264819, at *83 (N.D. Ala. Jan. 24, 2022) (three-judge court), *aff'd sub nom. Milligan*, 599 U.S. 1; *GRACE, Inc. v. City of Miami*, 730 F. Supp. 3d 1245, 1300 (S.D. Fla. 2024) (rejecting as "arbitrary" 50% Black population target for Section 2-protected district).

It is indisputable that the third *Gingles* precondition—white bloc voting—is absent in Daytona Beach. Ex. 7 (Moy Rep.) at 1, 34. Political scientist Bryant J. Moy, Ph.D., examined past election data to determine whether white bloc voting is sufficient

---

[2] Although *Louisiana v. Callais* "updated" the *Gingles* framework, 146 S. Ct. 1131, 1161 (2026), to gauge whether the government's use of race was narrowly tailored to a compelling interest, the Court must look to the law in place at the time the districts were enacted. *See, e.g.*, *Bethune-Hill*, 580 U.S. at 193–96 (assessing whether Virginia's use of race was narrowly tailored to complying with Section 5 of the VRA, rendered inoperable after redistricting in *Shelby County v. Holder*, 570 U.S. 529 (2013)); *id.* at 197 (Alito, J., concurring) ("The districting plan at issue here was adopted prior to our decision in *Shelby County* . . . , and therefore it is appropriate to apply the body of law in effect at that time."); *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 264–65 (2016) (rejecting arguments that Arizona's attempts to comply with the VRA could not have been a legitimate state interest because the relevant VRA provisions were later held unconstitutional). *Callais* therefore has no bearing on whether the City's use of race satisfies the already "extraordinarily onerous" strict-scrutiny standard. *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 11 (2024).

to defeat Black-preferred candidates in the City. Studying 31 contests from 2016 to 2025, Dr. Moy found voting was racially polarized between Black and white voters in 25 of those contests, but that the Black-preferred candidate *won* in Daytona Beach in 18 of those 25 races. Moy Rep. at 1. Far from "regularly caus[ing] the candidate preferred by black voters to lose," *Wright v. Sumter Cnty Bd. of Elections*, 979 F.3d 1282, 1304 (11th Cir. 2020) (emphasis in original), enough white voters regularly *support* Black voters' preferred candidate so that person usually *wins*. Moy Rep. at 34. White bloc voting was sufficient to defeat the Black-preferred candidate in less than a quarter of the contests studied (7 of 31).

"If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Cooper*, 581 U.S. at 302 (citations omitted). The City had no good reason to think the third *Gingles* precondition was met; Black electoral success citywide is an obvious fact in Daytona Beach. *See* Moy Rep. at 34 (listing 20 elections in the last 10 years where Black-preferred candidate won citywide, including four-term incumbent Mayor Henry). If the Commission was ignorant of this fact, that ignorance was willful. Before the Commission adopted its redistricting plan, VOTE! expressed concerns about racial packing and noted "the robust and commendable electoral success of Black candidates in our city," which "suggests concentrating Black voters into zones as the proposed plan does is unjustified and counterproductive to fair representation." Ex. 8 (9/2/25 VOTE! Letter).

Thus, not only did the Commission lack "good reasons" or a "strong basis in

evidence" to conclude the VRA required redistricting along racial lines, *Cooper*, 581 U.S. at 292; it had "good reasons" to know the *opposite*. There is no genuine dispute that the Commission's use of race to draw Zones 5 and 6, therefore, was not narrowly tailored to achieve a compelling interest.

## CONCLUSION

For the reasons explained above, the Court should grant partial summary judgment for Plaintiffs on strict scrutiny.

Respectfully submitted September 23, 2026,

*/s/ Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Nastassia Janvier (FBN 1072670)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
njanvier@aclufl.org
dtilley@aclufl.org

*Counsel for Plaintiffs*