# Daytona Beach City Commission
# Redistricting Workshop
# August 6, 2025

Transcript of video recording available at:
https://www.youtube.com/watch?v=7ojhUduJzVs

# City Commission Redistricting Workshop – Aug. 6, 2025

**Mayor Henry:** Good afternoon, ladies and gentlemen, and welcome to our commission workshop. We'd like to turn the meeting over to our City Attorney, Mr. Gross, to allow him to frame the meeting.

**City Attorney Gross:** Thank you, mayor and members of the City Commission. When the Commission adopted Ordinance 2025-16 earlier this year, we repealed the redistricting ordinance that we had adopted in 2023. And in that repeal, we also committed – the Commission committed to adopting a new redistricting plan complying with all applicable legal requirements to go into effect for the next regular municipal election in 2026.

I want to pass out to you a timeline that I prepared to help you all understand the requirements that apply. The general election is on November 3, 2026, and if you work backward from that, the first important thing to note is that under 166.0321 of the Florida Statutes, which is the same provision that was the basis for the lawsuit, that prohibits municipalities and counties from redistricting for the purpose of benefiting or disadvantaging incumbents or challengers, that same statutory provision requires any redistricting ordinance to go into effect at least 270 days before the general election. So you see on the timeline that the statutory deadline that we have to comply with, our commitment, is February 6.

Just to the left of that on the timeline, you'll see that I've marked out the date of December 8, 2025. That is significant because that would be the last day that somebody could claim residency and be a registered voter in a particular zone in time to qualify for the 2026 election in Daytona Beach. Now, the new statute that prohibits redistricting for the purpose of advantaging or disadvantaging an incumbent or a challenger can be pretty tricky. One of the objectives that I think we should try to meet in your adoption of the ordinance is to adopt the ordinance as soon as possible, but delay the effective date for as long as possible, with the specific purpose of giving

everybody notice, all comers, whoever might want to take advantage of trying to run for the election, that if you want to move to a zone to run for the election, we're going to give some time between the date of the adoption of the ordinance and the effective date. So you'll see that if, as we've tentatively planned, you were to adopt an ordinance on September 17, 2025, that would give anybody who might be affected by the redistricting 82 days to try to get to that zone. And I think that's not necessary in order to comply with the statute, but it will help establish compliance with that statute. And, of course, the other thing that will establish compliance with the statute is that we, in fact, do not want to redistrict for the purpose of advantaging or disadvantaging any of our seated commissioners or their potential challengers. So I wanted to lay out that deadline. Technically, you have until February 6 to adopt. But, again, my advice has been, and we've talked about this in other public meetings, you want to adopt sooner rather than later.

So we've hired a consultant, Mr. Kurt Spitzer, who was recommended to me by the general counsel of the Florida League of Cities, who's a former chair of the Association of Counties, who has a lot of experience redistricting in the state, and who actually was the speaker recently for the Florida League of Cities' *Quality Cities* webinar on charter amendments and redistricting. So with that, I'd like to introduce Mr. Spitzer and let him discuss with you where we are and how we've gotten there.

**Kurt Spitzer:** Thank you. Make sure that everybody can hear me twice. Glad to be here. Just a little bit about myself. I was not chair of the Association of Counties, I was executive director for a number of years. And the consulting firm has been around since 1989. And I think we've done maybe 35 or 40 redistricting efforts in Florida local governments, cities, counties, school districts. Some of them we've done more than once, but, so we have some good experience with them. So what I want to do today is to talk a little bit about the redistricting criteria and the process,

and then we can jump over to these draft maps that have been prepared for your consideration. And if you have questions from the commission, please feel free to ask any time.

So redistricting is the process by which you adjust boundaries of the districts or the zones so as to equalize or try to equalize the population within those districts. They need to be as nearly equal in population as is practicable, is the term of art. It's not reapportionment. Reapportionment is when, after the decennial census, when Congress determines what the population is of all the different states, and some states might gain a couple of congressional seats, some states might lose some. That's reapportionment, not redistricting. It favors the principal of one person, one vote from the Fourteenth Amendment; the Fifteenth Amendment, the right to vote; the Voting Rights Act, which by the way, today is the sixtieth anniversary of the adoption of the Voting Rights Act by Congress.

So there are some general guidelines, and I'll go through these. The first one is equal population. That's the dominant criteria in any redistricting plan. For the state, in congressional seats and state legislative seats, they must be almost literally equal in population. For local governments, there's more leeway in local governments, and we'll talk about the spread that's an option for local governments to take advantage of.

We don't dilute minority voting strength. If there's a minority-majority district or two in the jurisdiction, we'll adopt a plan that seeks to preserve that criteria.

We don't favor or disfavor. This is what the city attorney just referenced. There was a law that was passed in 2023 that, among other things, stated that a local government, a legislative body for a city, county, or school board, or special district, may not adopt a plan where the intent is to favor or disfavor an incumbent or a candidate based on residential address. Residential address. Key thing here, and that's my understanding of what your basis was of your lawsuit that you had

brought against you some time ago.

We use census blocks. Census blocks are not technically a criteria, but this data is readily available, it's easily dumped into redistricting software in your computer, and it's very easy to move lines around and change population numbers for different district boundaries. And census data is presumed to be correct by the courts, so that's a key factor to remember.

We follow significant boundaries, major roads, arterial roads, interstates, water bodies, parks, things like that, that make it easier to understand for the voters as to where the boundaries are. Generally speaking, major boundaries are also coterminous with voter precincts as well, so there's some good reasons to do that.

They must be contiguous. You can attain contiguity by crossing a water body, but they have to be contiguous. They should be compact, as compact as possible. We try to preserve communities of interest. And we follow existing boundaries and preserve the core of existing districts to the extent possible. To the extent possible.

It's difficult, often, to attain all of these criteria at the same time. In fact, there isn't a plan in existence now that attains all of these criteria at 100% for each criteria. It's just impossible to do that. So I'm going to go through these criteria in a little bit greater detail now, if my computer will help me out.

**City Attorney Gross:** While Mr. Spitzer is trying to advance his PowerPoint, I do want to mention that when you look at the bullet point list of criteria, legally speaking, the first three listed are, in my view, the most important criteria. And to the extent that sometimes the application of the criteria to specific circumstances in a local jurisdiction create conflicts, the criteria that you want to give preference to are the first three of them.

**Kurt Spitzer:** Alright, here we go. Now we're going. Absolute population equality is

impossible to attain. We try to get what's called the deviations from the mean, from the average population size, as close to zero as is possible. It's typically very difficult to do that when you're balancing all of the other criteria as well. But generally speaking, if you can keep the criteria no more than 3 or 4% over, or 3 or 4% under, that's a good plan, that's a good goal to try to attain. Population is not registered voters. It's total population as reported to the census. And if you have two districts with differences of more than 10 points, that creates a red flag for local governments with the courts.

Here's an example where in this jurisdiction, this was Jefferson County several years ago, the largest district was 5.45% over. The smallest was 7.4% under. That's a spread of 12.8 points, and that's not acceptable, unless there is a rational public policy as to why you're doing that. But generally speaking, if you're over 10 points, that's a problem. You need to adjust the boundaries so that it's under 10 points.

We avoid diluting minority voting strength. The two most common ways of doing that is by packing and cracking. Packing is when you locate most of the minority population into a single district, thereby lessening their influence in other districts. Cracking is by splitting the minority population amongst two or more districts, so again, it dilutes influence in all districts.

Here's an example of that. In this particular hypothetical example, we have a jurisdiction with two minority districts, which are 50% minority and 40%. In the plan on the left, we see where most of this population has been packed into one district. And the plan on the right shows where the population has been cracked into four districts. Either way, it dilutes minority voting strength, and we seek to avoid that.

This is House Bill 411 from the 2023 legislative session in Florida. It basically did two things, and the city attorney has mentioned these already. One, it set a common deadline by which all local

governments must adopt a new redistricting plan, and basically it's 270 days from the upcoming general election. And then, the most important one for Daytona Beach is that, and this is literally out of the statute, districts may not be drawn with the intent to favor or disfavor a candidate for a member of the governing body – or an incumbent member of the governing body based on the candidate's or incumbent's residential address. The voters of Florida adopted something that applied to the Legislature in 2010, and it sounds kind of similar to this, but the key difference is it did not have the term residential address. It had favor or disfavor, but not the residential address.

We use census blocks. They're readily available. The data is presumed to be correct. You can alter or supplement the census data, but there must be valid reasons why you need to do that, and there must be a valid methodology by which you're doing that. A couple of little anecdotes here. We've redistricted jurisdictions as late as one year from the next census using the previous decennial census. So, we've redistricted jurisdictions, for example, in 2019 that used the 2010 census. On the other hand, we've also redistricted jurisdictions that asked that the data be updated, and we used the University of Florida Bureau of Economic and Business Research to do that. That's the gold standard for the state of Florida. The state of Florida uses BEBR for all of its data that it collects, and it affects school funding, local government revenue sharing, health policy, all these different policies. But there are a couple of different problems with this methodology, and one of which was the methodology applied modified the last census data, but it could not modify race. So, we had different methodologies to update each census block, but it could not say, well, there's instead of 50 African Americans living in Census Block 1001. there are now 100. It couldn't do that. It could say that there's maybe 70 people living there now, but it didn't know what their race was. So, there are problems with doing that, and especially why would we do that if the data is presumed to be correct anyway.

So, we follow significant boundaries, either natural or man-made, easier to understand for voters. Usually coterminous with voter precincts, and it's usually, I would say almost always, coterminous with census block boundaries.

Districts must be contiguous. You can maintain contiguity by crossing a water body. You have three districts now that do that. But we try to keep communities of interest together. We try not to split communities of interest up, and we avoid districts with what are called bizarre shapes.

We've all heard the gerrymandering term from Governor Gerry of Massachusetts a long time ago. And this shape here, which I'm sorry you can't see, but this shape there, as the story goes, someone said, "well, that looks like a salamander," and someone else said, "no, it's a gerrymander." So, that's how that term came about. Here's a more modern-day look at a gerrymanderer. This is a congressional district in North Carolina maybe 20 years ago or 25 years ago or so, and that's what it looks like there. And this resulted in a Supreme Court case that found that race could not be the dominant criteria of a redistricting plan. It could be a criteria, but not the dominant criteria.

So, in summary, these are the criteria that we follow. And by the way, in terms of the favor or disfavor, in this particular process that we've gone through now, I have no idea where any of the commissioners live. I do not have an address in my database. I don't know where they live. We avoided that possible problem to the greatest extent possible that we could. So, it's impossible to draw a plan with 100% compliance with all of the criteria, so you balance these criteria against each other, with population always being the dominant criteria.

So, this is the existing zones in this map here. And remember that there's generally a 10-point spread between the smallest and the largest district that's acceptable in the courts. Well, here, it's almost a 47% spread there. So, that's way out of whack. But also, I might just note here that there are two minority-majority districts, and there's another district which has an African American

population of a little bit over 30%. So, just keep that in the back of your head.

We developed eight plans, and these are all on the wall there. We began with Alternative 1, and then we went to 2, 3, and so forth. Then we came back, circled back to Alternative 1, and we came up with 1A and 1B. But 1, 1A, and 1B all split the barrier island with three districts. They spill over into the mainland, but the current practice of splitting the barrier island amongst three districts is maintained in those policies. The other five, 2 through 3B1, split the barrier island amongst two districts. And so, we just wanted to show some alternatives to see what was possible.

So here, Alternative 1 has a spread of 6.5 points, so it's well within the 10-point criteria. It maintains two minority-majority districts and creates a minority-influence district in District 3. And we'll go into these maps in a second.

1A has the same effect. It's a little bit of a different shape, but only slightly. But it still maintains the two minority-majority districts and creates a minority-influence district.

**City Attorney Gross:** I'm sorry, Mr. Spitzer. The numbers might be hard to see, but if you're comparing 1 and 1A, is it fair to say that 1A increases slightly the majority-minority percentages in the two majority-minority districts? I think that's what the data show. Compared to 1. 1A versus 1. There's a slight improvement, it looks like, in the majority-minority percentages in 5, 6.

**Kurt Spitzer:** I'm not sure if I would say that. It does for Zone 5, but it's essentially the same for Zone 6.

**City Attorney Gross:** And it looks like it's a little bit higher also in Zone 3 in creating –

**Kurt Spitzer:** A little bit higher.

**City Attorney Gross:** Yeah.

**Kurt Spitzer:** And here's 1B. Again, maintains the two minority-majority districts and creates a minority-influence district. And has an acceptable spread of 8.33 points.

Then we move on to the alternatives that split the barrier island amongst just two districts. And we tried to create plans that were, in our opinion, legally acceptable. And one came close, but most of them were not. And so in Alternative 2, you lose the minority-majority in both Districts 5 and 6. It does create very much of a minority-majority district and maybe, some would say, packing, in Zone 3.

So then in Alternative 3, again, it was difficult to maintain both Zone 5 and 6 as minority-majority districts, with Zone 5 dropping down to a little bit under 49%.

And then 3B1. Zone 5 was close, but still did not remain over 50% African American population. So, now, if your direction is to try to work on one of these plans, to try to correct these faults, we can try to do that.

I'll just give you some of the criteria here. We've talked about acceptable spread. All of them have an acceptable spread, except for 3B. That has a spread of greater than 10 points. Some – the 1, 1A, 1B – all preserve the minority-majority districts, whereas the other plans – 2 and the series beginning with 3 – do not. They all create a minority-influence district. And 1, 1A, 1B, and 2 are better in terms of compactness. There are formulas that you can use that compare the shape of the district to a perfect circle. A circle is the perfect shape in terms of compactness, and it has a value of 1. None of these plans had a value of 1, and I've never seen a plan that has a value of 1. But plans 1, 1A, 1B, and 2 were better, noticeably, than the other plans, in terms of compactness. So if there's any questions that you might have, I'm happy to answer them, if you have any now.

**Commissioner Cantu:** I do. Mic on? Okay. Looking at Alternative 1, I guess you're calling that 1A. Zone 5, ever since I was a kid, has always been a minority district. Where is that cutting actually off?

**City Attorney Gross:** Are you talking about the western boundary of 5?

**Commissioner Cantu:** Correct.

**Kurt Spitzer:** I'm sorry, say again?

**Commissioner Cantu:** Could you tell me where that actually cuts off on Zone 5?

**Kurt Spitzer:** Let me jump to the software here that might be –

**Commissioner Cantu:** Because we're not actually seeing any streets.

**Kurt Spitzer:** Yeah, I know.

**Commissioner Cantu:** Okay.

**Kurt Spitzer:** Okay. So this is the – I'll get to your question but let me just –

**Commissioner Cantu:** Okay.

**Kurt Spitzer:** This is the city, and the shaded areas are the existing districts. And so when – I'll pop in a line here. These lines are the suggested boundaries for, in this case, Alternative 1, okay. And this pattern is – this symbology is the same with all the plans. The shaded areas are the existing districts. The lines, whether they're black, red, or blue, are where the proposal is. So, and we can zoom in. And I'm sorry, the question was –

**Commissioner Cantu:** Okay, so Zone 5 has always been a minority district. And with all the growth growing on the west side, I'm actually wondering, where is that cutting off?

**Kurt Spitzer:** Well, it cuts on I-95, that's the western boundary.

**Commissioner Cantu:** Okay, 95.

**Kurt Spitzer:** The current western boundary of 5 –

**Commissioner Cantu:** I see what the current – I know what the current is.

**Kurt Spitzer:** Went west –

**Commissioner Cantu:** Okay.

**Kurt Spitzer:** Like that, and 5 lost some of this area under this plan, but it maintains minority-

majority districts in both 5 and 6.

**Commissioner Cantu:** So all the way up to 95.

**Kurt Spitzer:** Right.

**Commissioner Cantu:** Okay.

**Kurt Spitzer:** So, since we're –

**Commissioner Cantu:** And then how far in?

**Kurt Spitzer:** Well, 5 and, as I recall off the top of my head, 5 and 4, your district, had to lose population. Your district had to lose a lot.

**Commissioner Cantu:** Correct.

**Kurt Spitzer:** But 5 also had to lose population. So the areas that were cut out of 5, this is where 5 is now, are these areas here and here, alright. And let me mention this. These little gray lines are the boundaries for census blocks. And as you can see, sometimes they're block-shaped, but a lot of times they're not. They could be a polygon that's anything but a square. And sometimes they're census blocks inside of other blocks. And so here, this is Block 3006, and it has a total population of 285 people, African American population of 265 Hispanic and white.

Let me, I should have mentioned this earlier. All of these maps, here shows the actual deviation from the average in terms of numbers. It shows the percent deviation. In this case, this is the existing. But these tables, the methodology is the same for all of the maps. So if you add up the largest district with the smallest one, and that's how you get to this 46-point spread. Then we have white, Black, other, Hispanic.

For the last couple of census tabulations, there were six or seven different categories of race that people could choose from. And not only were there six or seven, they could choose one race, two, three, five, multiple combinations of race. And so when we say population Black and percent

Black, these are people who said, I'm either of one race or two races, but one of which is Black, right. So I'm either 100% African American or I'm African American plus Native American, or I'm African American plus white, or I'm African American plus Pacific Islander, things like that. Then "other," this category, is everything else. Every other single-race, Pacific Islander, Native American, or people who have identified themselves as being more than two or three races. And you also have the option, I might add, to write in your race. We were involved with a project in Lake City, and we were talking about this topic with the city council, and one of the members said, "you know, I've always taught my children that race doesn't matter," and he was an African American man. But what he put in on his form was "human race." So he got put into the other categories is where he ended up. Then Hispanic is an ethnicity, it's not a race. So somebody might say, I'm white, but I have a Hispanic ethnicity. So if you were to add up white, Black, and other, you'd get the total population for each zone and the total population of the city. If you added Hispanic into that, you'd get a population that is greater than what's really here. We look at Hispanic because people of Hispanic ethnicities enjoy some of the protections as races do, some races, under the Voting Rights Act. But in the case of Daytona Beach, that's really not a possibility.

**Commissioner Cantu:** Can you pull up Zone 6 for me?

**Kurt Spitzer:** Sure, under Alternative 1?

**Commissioner Cantu:** Correct. Is it 1 or 1A?

**Kurt Spitzer:** Well, what we're looking at is 1.

**Commissioner Cantu:** 1, correct. Okay.

**Kurt Spitzer:** And so Zone 6 – remember the green is the existing boundaries and the black line here is the new boundary for Zone 6 under Plan 1. 1A is a little bit –

**Commissioner Cantu:** And how far is that going out west?

**Kurt Spitzer:** Out west, you mean here?

**Commissioner Cantu:** At Zone 6.

**Kurt Spitzer:** Right. This goes to –

**Commissioner Cantu:** That's not 6.

**Kurt Spitzer:** Yeah, this is 6 here.

**Commissioner Cantu:** Oh, it is. Jimmy Ann.

**Kurt Spitzer:** Jimmy Ann Drive.

**Commissioner Cantu:** And then how far does it go in?

**Kurt Spitzer:** On the east side?

**Commissioner Cantu:** Yes.

**Kurt Spitzer:** I believe this is Martin Luther King.

**Commissioner Cantu:** Okay.

**Kurt Spitzer:** I think. No, it's Nova.

**Commissioner Cantu:** It's what?

**Kurt Spitzer:** Nova Road.

**Commissioner Cantu:** Nova, okay.

**Kurt Spitzer:** Nova Road, North Nova Road.

**Commissioner Cantu:** Okay. Now, pull up Zone 1.

**Kurt Spitzer:** So this is – remember, the blue is the existing boundaries of Zone 1, okay. What – this is the new boundaries of Zone 1 under this plan. It picks up – it loses some of the northern end of Zone 1 in the beach, but picks up, I believe this neighborhood here is Georgetowne, I think.

**Commissioner Cantu:** And on Map 1, how many commissioners on the Beachside?

**Kurt Spitzer:** Three. 1, 1A, and 1B all have –

**Commissioner Cantu:** And where do they split?

**Kurt Spitzer:** These lines right here is where the split is. And this is – this is the pier, Main Street. Widmer Circle.

**Commissioner Cantu:** And Zone 2, how far west do they go?

**Kurt Spitzer:** Zone 2, under Plan 1, goes to Vine Street.

**City Attorney Gross:** Mr. Spitzer, could you zoom out just a little bit so you can show the entire map? So, remember that one of the most important conditions that needs to be met is, as nearly as practical, one person, one vote. And since most of the increase in population has happened in Zone 4 –

**Commissioner Cantu:** Correct.

**City Attorney Gross:** You have to underpopulate Zone 4. And so we have a little bit of a situation where you have to compare the geometry of the city versus where we have minority voters. If you look on the eastern edge of Zone 4 as it currently exists, it's adjacent to three zones, 5, 6, and 1.

**Kurt Spitzer:** Right.

**City Attorney Gross:** And of those two – of those three, excuse me, 5 and 6 are majority-minority zones. And so as you expand them westward – and this is what I think Mr. Spitzer found out in drafting his maps, you lose that concentration. So your choices can be somewhat limited in attempting to reach two objectives that are equally important from a legal basis.

**Commissioner Cantu:** And that's why I brought up Zone 5. I grew up in Zone 5. I don't think any residents will want to see Zone 5 disappear. So.

**Commissioner Reed:** [inaudible 50:00]

**Commissioner Cantu:** Correct.

## City Commission Redistricting Workshop – Aug. 6, 2025

**City Attorney Gross:** And just anecdotally, I went back and looked at the elections going back to at least 2002. And during that period, Zones 5 and 6 have consistently selected African American officials.

**Commissioner Cantu:** Right.

**City Attorney Gross:** And this is somewhat important because the Florida Supreme Court just came out with a case in the last two weeks regarding Congressman Lawson's district.

**Kurt Spitzer:** Right, litigation over, I think it was, Congressional District 5.

**City Attorney Gross:** Right.

**Kurt Spitzer:** Still going on.

**City Attorney Gross:** A longstanding case that could, in some communities, affect what had been seen, and what we've said tonight is a traditional – and one of the more traditionally more important criteria for redistricting, which is preserving majority-minority voting district. And depending upon the community, it may be harder to justify having that kind of priority. What essentially the Florida Supreme Court said is, there has to be a showing that the majority-minority district you're seeking to protect has historically been benefited by being a majority-minority district. What's been the voting history? If you can't show that that's had an impact on the voting, you may end up having to look at that versus the Equal Protection Clause, including the reverse discrimination provisions of the Equal Protection Clause. So the reason why I'm bringing that up for you at this workshop is we do have a history in our community of having Zones 5 and 6 as majority-minority zoning districts, benefited by –

**Commissioner Cantu:** Well I'm aware of that, that's why I asked.

**City Attorney Gross:** By that composition, which gives us continued support in spite of the recent Florida Supreme Court decision.

**Commissioner Cantu:** Now, I know this answer, but I hear it at a commission meeting a lot. Our redistricting needs to go according to our 2020 census, correct?

**Kurt Spitzer:** It does, right.

**Commissioner Cantu:** Okay, I just want that on record. If you can explain that. Even though I know there's more growth going on.

**Kurt Spitzer:** In full disclosure, I mean, it's possible to alter those numbers, but it's an order of magnitude of extra work, it's more difficult. I guarantee that somebody will question that data, that methodology. And we've redistricted, as I think I mentioned, cities in the ninth year of the decennial cycle using the data from the previous census, and that was never challenged and was upheld.

And before I forget, I might say this too. In 1, 1A, and 1B, this preserves the practice of having the beach split by three districts. And in some jurisdictions that we've been involved with, it's sort of a policy there that the beach is a community-wide asset and that it should be represented by as many people as is possible, and that's what this does.

**Commissioner Cantu:** And I'm sure [inaudible 53:38] Beachside [inaudible 53:40] had more than one [inaudible 53:41] as far as I can remember. Have you looked?

**City Attorney Gross:** I think it's had three since at least 2000, when I first arrived –

**Commissioner Cantu:** Yeah, cuz, I mean, I grew up here, so I'm familiar with that as well.

**City Attorney Gross:** But the other thing to keep in mind is that, you know, arguments about whether you have the Beachside as one, two, or three zones are arguments about what your community of interest is –

**Commissioner Cantu:** Correct, and the community interest is totally different in a lot of sections on Beachside.

**City Attorney Gross:** Well, one, you may not all agree on just what a community of interest is, but in addition, while that's an important consideration, you have to weigh that against the need to underpopulate Zone 4, because that's where the growth has been; the fact that two of the three zones adjacent to that are historically majority-minority zones. There's only so many different ways that you're going to be able to redraw your map to preserve those majority-minority voting districts.

**Kurt Spitzer:** Right. And in full disclosure, my understanding is Zone 4 is growing by leaps and bounds. You know, we're not able to underpopulate 4 by leaps and bounds. Unless there's an extraordinary circumstance, you need to stay within the 10-point spread. And so, you know, in all of these plans –

**Commissioner Cantu:** Can you explain why?

**Kurt Spitzer:** It's an equal protection thing.

**City Attorney Gross:** So the courts will – If there's a lawsuit involving that margin under the equal protection, 10% or less is a safe harbor. You go into court with 10%, the courts will presume it's correct. If it's more than 10%, there will be litigation, evidence, expert witnesses challenging the basis for the data. It makes litigation extraordinarily more complicated. And as Mr. Spitzer pointed out a little bit ago, for example, the BEBR data, if you were to use something that was updated from the census, they don't actually allow you to track minority numbers in those later years. And I think, Mr. Spitzer, you explained to me that some of the BEBR numbers can be projections based on things like utility bills.

**Kurt Spitzer:** Well, BEBR, it's the Bureau of Economic and Business Research at the University of Florida. They've been around for 75 years. And they are excellent at what they do. And their – one of their primary methodologies is over time, based on a household's electric

consumption, they know how many people live there. And that's not the only thing, but that's one of the main things that they use.

**Commissioner Cantu:** Well, actually, I know Zone 4 – That we can only do 10%, is that right? But I can tell you, there's a lot of snowbirds in Zone 4. But I know you have to go by the numbers.

**Kurt Spitzer:** Have to go by the numbers, and they should complete the census up north or here, but not –

**Commissioner Cantu:** Correct. There's a lot of snowbirds that actually don't vote.

**Kurt Spitzer:** So this is Plan 1. There's an Alternative 1A. And you can see it brings in just a couple of minor adjustments. This park comes back into Zone 1 where it was currently. And then this area here goes back into Zone 1.

**Commissioner Cantu:** And what are we looking at?

**Kurt Spitzer:** This is 1A.

**Commissioner Cantu:** 1A.

**City Attorney Gross:** You said Zone 1, but you meant –

**Kurt Spitzer:** I'm sorry. This goes back into Zone 5. The park went back into Zone 1. Those are the only differences between 1 and 1A. Then –

**Commissioner Paris:** Excuse me? We don't have a copy of 1A.

**Commissioner Cantu:** 1A is 1.

**Kurt Spitzer:** You should have 1, 1A, and 1B.

**Commissioner Paris:** We do not.

**Commissioner Cantu:** We got 1, 2, 3, 3A, 3B, and 3B1.

**Kurt Spitzer:** Well, you're missing 1A and 1B for some reason.

**City Attorney Gross:** We can distribute those after the meeting. But you're going over the

specific differences right now –

**Commissioner Cantu:** Are they up there?

**City Attorney Gross:** They're also up on the wall. On the wall against the doors are all of the "1" maps. So you have Alternative 1 on the left, 1A in the middle, 1B on the right. And as Mr. Spitzer just explained, the only difference between 1, which you do have, and 1A, which you don't, is the reintroduction of a park back into Zone 1. And then the area on the southeast corner of Zone 5. Can you show them where that park is again?

**Kurt Spitzer:** Right here.

**Commissioner Cantu:** And this is 1A?

**City Attorney Gross:** This is 1A.

**Kurt Spitzer:** All of the 1s had this park. I'm sorry. 1A and 1B moved this park back into Zone 1.

**Commissioner May:** So the line that the road in front of it, the Bellevue Avenue, the other side of it, all Zone 3 again. Housing, so all Zone 3 on either side. Okay.

**City Attorney Gross:** Ask on the mic.

**Commissioner Cantu:** On 1, is Amazon on 1?

**City Attorney Gross:** So Amazon –

**Commissioner Cantu:** Which is no –

**City Attorney Gross:** Mr. Spitzer –

**Commissioner Cantu:** There'll never be any development there. It'll all be commercial, probably industrial.

**City Attorney Gross:** I don't think he knows where Amazon is, but we're talking about the north side of Beville Road.

**Commissioner Cantu:** That'll be off 400.

**Kurt Spitzer:** Gotta help me out here. Is it around here somewhere?

**Commissioner Cantu:** It'll be in the west, west side off 400, north, behind the airport.

**Kurt Spitzer:** Okay. So here's the airport.

**Commissioner Cantu:** That goes in Zone 4.

**Kurt Spitzer:** Yes, this is in Zone 4 and remains in Zone 4.

**Commissioner Cantu:** It'll never be developed. It's all county [inaudible 1:00:46].

**City Attorney Gross:** Mr. Spitzer, you were going to explain what the difference was between 1A and 1B?

**Kurt Spitzer:** Right.

**City Attorney Gross:** Okay.

**Kurt Spitzer:** So for the difference between 1A and 1B, we're looking at 1A now. The difference in 1B is that 1B brings in this area, which currently is in Zone 6, back into Zone 6, okay. And this is Cypress Street Park. That currently is in Zone 6, and under 1B, it remains in Zone 6. Okay.

**Commissioner Cantu:** Cypress Park. And that's the only difference in that?

**Kurt Spitzer:** One other matter as well. This area here is in Zone 3 in 1A. I believe it's in Zone 3 right now as well. This is moved into Zone 2. And the reason that that was done is that if you don't do that, the spread in 1B would get over, like, 9.6 points. Probably acceptable, but this gives you a little bit more of a cushion, okay. So, these are all the plans with the beach being split amongst three districts.

Then we move into the other plans, beginning with Alternative 2. And the split, I believe, is on International Speedway. Yes. ISB is the split between the beach. North and south of the beach.

Zone 3 moves entirely onto the mainland. And Zone 5 crosses over across I-95. And I believe this is Margaritaville, is that correct? So it captures that area there. But remember that these plans result in – and especially Alternative 2 – both 5 and 6 are no longer minority-majority districts.

**Commissioner Cantu:** Right.

**Kurt Spitzer:** Not only that, they're diluted significantly. And Zone 3 is, some would argue, packed with minority African American folks.

**Commissioner Cantu:** Correct.

**Kurt Spitzer:** But the attempt here was just to try to see if there's some way to work something out where the beach is split just amongst two zones or districts. So that's Alternative 2. Alternative 3, same split here, but different shapes in the mainland communities of the zones. And so Zone 3 is here. Zone 6 is quite a bit different. Zone 5 still crosses I-95.

**Commissioner Cantu:** So you lose minority zones.

**Kurt Spitzer:** All of the plans that split the beach into only two districts would lose at least one minority-majority district. And this one loses one and increases the African American population in Zone 6 up to almost 60%.

And then 3A, similar as 3, but there are really little, just minor tweaks here just to try to get these numbers better. And this went on with all of the other of the "3" versions. We attempted to get to a plan where you would maintain two minority-majority districts. And we got close in 3B1. And in 3B1, Zone 6 is 58% African American and 49.4% African American in Zone 5. But it still is not a majority, and the African American population in Zone 5 is, some would say, is diluted down. Okay. So those are the plans that we've come up with. Any other questions or suggestions?

**City Attorney Gross:** In an ideal world, commissioners, commission members, Mayor Henry, we would get some feedback. You know, you can't take a vote tonight, but you could give us

feedback for purposes of preparing an ordinance that doesn't have eight maps, it has one map, right? So your comments on those maps would be appreciated. If, on the other hand, the consensus is to go back to the drawing board, while I think that would, to some extent, undermine what I think is a beneficial strategy in trying to get an ordinance adopted quickly with a long lead time on the effective date, we technically do have some additional time to try to work on these things. Although, Mr. Spitzer, I think it would be fair to say that when you start moving these boundaries, it's quite a bit of additional work to then look at the impacts on all of the other issues, such as majority-minority voting and compactness, etc.

**Kurt Spitzer:** Yeah, it's like pushing in the side of a balloon. You push it in, but then it'll come out on the other side. Happy to do that, but I think at the point now, since we've worked on this for a couple of months, we're pretty familiar with the data and where the population centers are.

**Commissioner Reed:** I was just going to say I like Plan 1.

**Commissioner Cantu:** If I was going to vote today, it would be Plan 1, because you would be losing – I mean, from growing up here, I know the zones pretty well. You would lose a lot of minorities [inaudible 01:09:05] very happy.

**Commissioner Paris:** With following significant boundaries and keeping communities of interest together, I don't know if Alternative 1 –

**Commissioner Cantu:** The what now?

**Commissioner Paris:** Keeping communities of interest together. Alternate 1 cuts up the Beachside a lot, and I don't think that's a good idea.

**Commissioner Cantu:** So what map were you looking at?

**Commissioner Paris:** 3B1.

**Commissioner Cantu:** And I would have to disagree. I grew up here, a lot of us have, and there's a lot of different interests on Beachside.

**Mayor Henry:** When you say communities of interest, it's not just the Beachside, a community of interest. What you do with that map is you take – any of those maps at the bottom, and it causes Margaritaville to be carved out and put over in Zone 5. All of the people in Margaritaville are a community of interest. Their interest is the LPGA corridor. It's not the other side. It'll be different. I feel like a big commonality we have, everybody on the LPGA corridor, west side of 95, they've got one interest.

**Commissioner Cantu:** And they're all been going over past 95 to all gated communities, Margaritaville, Pelican Bay.

**Commissioner Paris:** So what would be the difference, if we separate Beachside, so we don't have a say?

**Commissioner Cantu:** Because you would be separating Zone 5.

**Commissioner Reed:** In, you said 3B1?

**Commissioner Cantu:** And actually 6 as well. And those are minority districts, and they've always been minority districts.

**Mayor Henry:** I don't understand when you say that they're being carved up. You've got to carve some of it up because they have to take some more of the base on the other side. [inaudible 1:11:33]

**Commissioner Paris:** Representing on Beachside, you would only have maybe ten blocks on area. That doesn't make sense to me.

**Mayor Henry:** If you're still representing the Beachside, you're representing the interests of the beach.

## City Commission Redistricting Workshop – Aug. 6, 2025

**Commissioner Strickland:** The number 1 here looks to me like that it splits – the southern border of Zone 2 is down Main Street, which splits an area of great interest because we've been working hard to try to unite the people on Main Street and to keep everything going in one direction. If you put a commissioner on one side of the street and one on the other side of the street, it's kind of one of my pet peeves. It doesn't make good sense to do that because then that street, the merchants are split.

**Commissioner Cantu:** Is that split?

**Kurt Spitzer:** You're speaking, I believe –

**Commissioner Cantu:** Main Street.

**Kurt Spitzer:** This is Main Street. Of this area here. Is that correct?

**Commissioner Strickland:** Right.

**Kurt Spitzer:** Well, I mean we'd have to look and see what the population is. I believe this is a commercial area, though, is that correct?

**Commissioner Strickland:** Pretty much.

**Kurt Spitzer:** At least that which abuts Main Street, right? We have split blocks before. And you've got to – we can try that. We'll have to see like how many people are here and using aerial satellite images, if these areas abutting Main Street look like commercial properties or are they residential, right. The areas to the south of these census blocks look more residential to me, but the area up close looks more commercial. So, for example, let's just pick this block here. This block has 88 people that live in it, but if you look at this, these are homes or apartments in the southern half of that block. You could – I believe you could split these blocks so that – your objective is to have folks who abut Main Street be in the same district. Is that correct?

**Commissioner Strickland:** Right. Both sides of the street be in the same district.

**Mayor Henry:** The whole Main Street.

**Commissioner Strickland:** Yeah, both sides of the street.

**Mayor Henry:** Take that whole street, put it on one side.

**Commissioner Strickland:** Whether it goes to Zone 2 or Zone 3, it ought to be in the same zone.

**Commissioner Cantu:** I think I agree.

**Kurt Spitzer:** Well, there are two ways to do that. One is to just move this boundary south to the southern border of these blocks. I don't know how many people that would be, but I bet it would cause the plan to have to – if we take this many people out of this Zone 3, we'd have to find some place to put them back in. Or just do some research and see if the northern tip of these blocks could be carved out and moved into Zone 2.

**Mayor Henry:** Alright. Do we have a consensus that wants to do that? I'm okay with trying to accommodate. I think we have a consensus in terms of we want to be consensus majority. We want to stick with – I heard three people over here, Map 1.

**Commissioner Reed:** Map 1.

**Kurt Spitzer:** Map 1.

**Mayor Henry:** Map 1. But Commissioner Strickland, Commissioner, I understand that, I believe there's benefit for both people representing. And these two can attest to that.

**Commissioner Reed:** Yes, we've had to deal with that for Bethune-Cookman.

**Mayor Henry:** [indistinct 01:16:19]

**Ken Strickland:** I don't think the merchants on Main Street would agree to that but I can't prove that at the moment.

**Mayor Henry:** So what I think is that we have a consensus. We want to stick with Map 1.

And then I think that you can look at what he's proposing.

**Kurt Spitzer:** Right.

**City Attorney Gross:** Just a quick question, though. There's very few differences between the 1's. Both 1A and 1B put Bethune Point back in Zone 1. And so I don't know if you want to look at those three differences and decide which of Alternatives 1, 1A, and 1B might be the preferred map between those three. Do you want to go through those differences one more time?

**Kurt Spitzer:** Sure.

**City Attorney Gross:** Just for the benefit of the commissioners, since they didn't actually get 1A and 1B, and that was our office's bad, my apology.

**Kurt Spitzer:** This is Map 1. This is 1A, which brings this park back into Zone 1, where it is already, and brings this area here back into Zone 5, where it is already. That's the difference between 1 and 1A. And then 1B begins with 1A and makes just two changes. It pulls this area, Cypress Street Park, back into Zone 6, where it is now, and it pulls this area out of what would be Zone 3, what is Zone 3 right now, and puts it into Zone 2. And remember, this is necessary if you want to keep that spread. If you want to move Cypress Street Park back into Zone 6, my recommendation would be to move this as well so your spread doesn't get up like to 9.6 or so, which is still acceptable, but it's getting a little bit high up there. If the direction is to see if we could take the northern area of these blocks and move them into Zone 2 in Plan 1, 1A, or 1B, we can do that on all three, it's the same exercise. It wouldn't be that difficult to do.

**Commissioner Cantu:** I'm still okay with 1.

**Kurt Spitzer:** Pardon me?

**Commissioner Cantu:** I'm still okay with 1.

**Mayor Henry:** 1, 1, 1.

**Commissioner Reed:** Good, I'm just thinking that it would strengthen, perhaps, the vote for Main Street by having two voices. Commissioners can come together and have a public meeting and discuss and plan and work it out together, you know? He's smirking.

**Ken Strickland:** I'm keeping my mouth shut at this time.

**Commissioner Reed:** Who was the other commissioner?

**Commissioner May:** I'll speak at the end. I'll wait.

**Commissioner Cantu:** It would be Commissioner May and Strickland for Main Street, correct? She was asking.

**Commissioner Reed:** It's all her now because we went back to the old one.

**Commissioner Cantu:** Right. But if 1, the –

**Commissioner May:** It's split and we would share.

**Commissioner Strickland:** I don't understand what share means.

**Commissioner Cantu:** Or whoever is in the office.

**Commissioner Paris:** Mr. Spitzer, you said 1A and 1B is including Bethune Point Park?

**Kurt Spitzer:** Yes, in Zone 1.

**Commissioner Paris:** I'd be okay if Zone 1 had the park. The Bethune Point Park.

**Kurt Spitzer:** Bethune Park.

**Commissioner Henry:** I didn't hear you.

**Commissioner Paris:** If Zone 1 had the Bethune Point Park.

**Kurt Spitzer:** This area right here.

**City Attorney Gross:** So without having Mr. Spitzer do a whole lot of additional work, if you wanted Bethune Point Park to be in 1, I think you would choose 1B because he's prepared 1B that includes Bethune Point Park in that zone.

**Kurt Spitzer:** The park is included in Zone 1 in 1A and 1B.

**Commissioner Cantu:** The park is included.

**Commissioner Paris:** 1A and 1B, not 1.

**Commissioner Cantu:** Oh 1A and 1B.

**City Attorney Gross:** Only 1A and 1B.

**Commissioner Cantu:** I'm with 1. I just think it looks better.

**Mayor Henry:** The other maps, those other maps that we were considering, they diluted minority interests [inaudible 01:22:45] not able to [inaudible 1:22:48].

**City Attorney Gross:** You're talking about the two-Beachside zone maps?

**Mayor Henry:** Yeah. They diluted it, I don't know why we [inaudible 1:22:55].

**Commissioner Cantu:** I think, those ones would really be after us.

**Kurt Spitzer:** Right. The only one that gets close but still doesn't get there is 3B1.

**City Attorney Gross:** I'm sorry. I think there's enough direction for us to proceed with preparing an ordinance for first reading based on what I'm hearing. Of course, y'all will still discuss and vote on an ordinance. And Mr. Spitzer will look to see if maybe in preparing that Map 1, he can add some properties on the south side of Main Street and still maintain the majority-minority numbers and the margins.

**Kurt Spitzer:** Right, to Alternative 1. Is that correct?

**Commissioner Cantu:** Yes.

**Mayor Henry:** Uno. Okay, any other questions or comments?

Vanan Online Services, Inc.
Think Service Think Vanan

# Certificate of Transcription

## Transcription Of File Names:

## "Redistricting-Workshop-August-6-2025.mp4"

We, Vanan Online Services, Inc. a professional transcription company, hereby certify that the above-mentioned document(s) has/have been transcribed by our qualified and experienced transcriber(s) is/are accurate and true transcription of the original document(s)

This is to certify the correctness of the Transcription only. We cannot guarantee the veracity of the original File. Our Transcriber is in no way related, by immediate family ties or marriage, to any parties related to the materials Transcribed.

A copy of the transcription is attached to this certification.

Kayla Vega, Production Manager

Vanan Online Services, Inc. CORPORATE SEAL Virginia 2016

Date: 13th day of August 2025

Vanan Online Services, Inc.
ATA Member: M-101387
ISO 9001:2015

10711 Spotsylvania Ave., Suite A Fredericksburg VA 22408
Office: (888) 535-5668
Email: support@vananservices.com
Website: www.vananservices.com