# Daytona Beach City Commission Meeting
# September 3, 2025

Transcript of video recording available at:
https://www.youtube.com/watch?v=Xmhlw0HmvYY

# City Commission Meeting – Sep. 3, 2025

[41:47]

**Clerk LaMagna:** Okay. We're going to move on to item 9D. It's a city attorney's office redistricting ordinance. This is an ordinance on second reading, public hearing. An ordinance amending Subpart A, Article 2, Section 2 of the City Charter; amending the boundaries of the existing City Commission members' districts within the City of Daytona Beach, Volusia County, Florida; establishing new commission member district boundaries in accordance with the Florida Constitution, Florida Statutes, Article 2, Section 2 of the City Charter, and other legal requirements; repealing all ordinances or parts of ordinances in conflict herewith; and providing an effective date.

**Commissioner Cantu:** So move.

**Commissioner May:** Second.

**Mayor Henry:** We have a motion and a second. We'll take it from Commissioner Cantu and second from Commissioner May.

**Clerk LaMagna:** And then staff –

**City Attorney Gross:** Yeah. Thank you.

**Clerk LaMagna:** – wanted to –

**City Attorney Gross:** Thank you Letitia. So mayor, city commissioners, I do want to make sure that we discuss what is in the record and what's in front of you. You know, this process started when you all repealed the redistricting ordinance that was adopted in 2023 with an intent to adopt a new redistricting ordinance based on the 2020 census in time for the next general election, which is scheduled for November of 2026. And so, with that intent stated, you then hired Spitzer and Associates, a consultant, consulting group out of Tallahassee, who generated the data, prepared some maps. We had a workshop, as you recall, to discuss the various maps, and also in which Mr.

Spitzer gave you an overview of basic redistricting principles. And of the eight or so maps that Mr. Spitzer presented and discussed at that workshop, what we have in front of us is what's known as the Alternate 1 map. Which is what appeared to be the consensus of the Commission to use that map at the workshop. I've got – we have Mr. Spitzer here remotely. I hope Mr. Spitzer, are you, are you on the line?

**Kurt Spitzer:** I am, yes.

**City Attorney Gross:** Yeah. And I do want to make sure that you're aware that the ordinance would adopt the Alternate 1 map. It would include findings, and basically the findings would be inclusive of the final report Mr. Spitzer has generated. That final report is very similar, it's a distilled version of the general memo that he previously provided you, and which was discussed at the workshop. The exhibits would also include a legal description of the revised boundaries, as well as a spreadsheet showing all of the census tracks corresponding to the individual commissioner zones. I think it's important to lay a good record if we're going to proceed forward with this ordinance.

Now, I also know that there was a brief discussion on first reading about whether you all might want to consider some slight variations to the Alternate 1 map. And if you recall at the workshop, Mr. Spitzer presented three closely related maps. One was labeled Alternate 1, one was labeled 1A, and one was labeled 1B. You do not have 1A and 1B for you for approval tonight. But somebody, one of the commissioners did request, I believe, at the last meeting, that Mr. Spitzer provide a summary of the differences of those maps in case you were interested.

What you've also discussed and what is not included in the map that you have in front of you tonight, was a relocation of the common boundary on the Beachside between Zones 2 and 3. There was some discussion at the workshop. All three of the Alternate 1 maps, 1, 1A and 1B, had

Main Street as the common boundary. There was a consensus at the workshop that you might prefer to move that boundary southward if it was feasible. Mr. Spitzer has provided you a memo saying it would be feasible, but he hasn't done any work on that because there hasn't been a decision to move forward.

If you all were to decide at tonight's meeting that you wanted to do a different map, whether it's 1A, 1B, neither of those, but moving Main Street or a completely different map, we would need to go back and give you a revised ordinance with a revised map, a revised legal description, a revised final report that relates to that map, as well as a revised spreadsheet containing all of the census blocks. So keep that in mind as we move forward. And with that, if you'd like an overview from Mr. Spitzer, he's here. And if you have any questions or comments for me, I'd be happy to address them with you.

**Mayor Henry:** Commissioner Strickland.

**Commissioner Strickland:** I was the one that suggested moving the line from the middle of the street to the backside of the businesses on the south side of the street so that we could keep the Main Street group together. And since that time, in fact, earlier this evening, I spoke with the supervisor of elections, who is present here, Lisa Lewis, and she expressed to me that we should move it, if we move it, move it south to Harvey, because it's quite a bit of trouble to draw the line behind businesses and properties that are different sizes. So I would like to amend my request to move the boundary south to Harvey, if that's possible. It seems to be it was okay two weeks ago when we talked about it with most everybody. Nobody said no, no, no. So if we could move it south to Harvey, I think that would be good.

**Commissioner Reed:** But would Harvey be just one block south, further south?

**Commissioner Strickland:** Yes.

**Commissioner Reed:** Okay.

**Commissioner Strickland:** Because it gives it –

**Commissioner Reed:** A straight line.

**Commissioner Strickland:** A straight line. Yeah.

**City Attorney Gross:** We should just let Mr. Spitzer address that question. I know that in the memo that he sent you, one of the reasons why the relocation just to the back end of the south side of the block of Main Street was that there weren't a lot of residences involved. And there may be more work involved, and of course he could do that, but I want to let Mr. Spitzer address that directly, that suggestion.

**Commissioner Strickland:** Thank you.

**Kurt Spitzer:** Thank you, Mr. Gross. We – certainly, you could do – I hope you're seeing this, this is Harvey Avenue here. You could move this boundary south. The original intent, as I recall, was to just keep the commercial buildings that abut, that directly abut Main Street, to keep them in Zone 2. So the way that we drew that line, we don't think that that affected any residential areas, residential homes, and so therefore it shouldn't affect the population. I – off the top of my head, I don't know how many people live in this area here. It might be insignificant. It might not have a significant effect on population, but it's just something that we would have to look at, you know, and we really can't do that right now, but it's something that we could examine, if that's what you want to do.

**Commissioner Strickland:** I would like to do that. Is anybody against that sitting up here?

**Commissioner Paris:** I'm okay with that.

**Commissioner Reed:** So am I. I'm sure he'll tell us how it affects the other zone, if it does with other houses.

**City Attorney Gross:** Well, it sounds like –

**Kurt Spitzer:** You might be – you might be able to just do that by itself without making any other changes. I don't know. But I'd like to be able to look at it in a thoughtful manner before I say yes or no.

**City Attorney Gross:** So it sounds like the direction would be for Mr. Spitzer to move that line, see how it affects the – not only the population numbers, but also, you know, some of the other numbers that go along with that. And I think we'd have to come back to you, you know, with a slightly different version of the final ordinance, you know, for second reading at a later meeting. We've got plenty of time to do that and comply with the statutory requirement that we have an ordinance in place 270 days prior to the next general election. I had suggested a timeline that I thought would help be protective of a redo of the lawsuit that was based on the statutory provision that says you can't redistrict with an intent to favor or disfavor an incumbent or challenger. But that's, you know, there are other considerations here.

You know, before we send Mr. Spitzer back to the drawing board, it might be helpful to understand whether you want to entertain any of the changes that were proposed from Alternate 1 to Alternates 1A and 1B. Do you want to allow Mr. Spitzer to summarize what those differences were? He had provided you a map showing those changes as well as a narrative description?

**Mayor Henry:** I do. I'd like to hear the differences because I thought towards the end of the meeting, I was more in favor of one of the other maps other than the alternate map.

**City Attorney Gross:** Okay.

**Mayor Henry:** And I thought it was 1A, if I recall correctly, but I think –

**Commissioner Reed:** So was I. And for me it was 1B, and that was because for Zone 6, the Cherry Center has a historical and sentimental value. When Commissioner May and I have

moved to name that after Charles Cherry, who sat in my seat, that – neighborhood watch meets there. It's been very significant for that zone. And I don't know how much it affected 5, but I think we still kept our major African American zones with that move.

**Mayor Henry:** Yeah, minority-majority –

**Commissioner Reed:** So I would – I'd like for us to look at that and see how that affects us.

**Commissioner May:** And then does that, does that impact Zone 3 in that it would move more, it would move more south?

**City Attorney Gross:** Are you talking about the difference between Alternate 1 and 1A and 1B? Or are you talking about moving –

**Commissioner May:** The proposed change. Yes.

**City Attorney Gross:** – the line on Main Street, which of those?

**Commissioner May:** The line on Main Street.

**City Attorney Gross:** Well, that is the common boundary between your two proposed revised zones. It would move from Main Street to Harvey.

**Commissioner May:** Okay. And so it would have to move me away too, though. I'd be moving further south. Because I'm losing.

**City Attorney Gross:** You're losing, you're – yes.

**Commissioner May:** If I'm losing part of Main Street.

**City Attorney Gross:** Zone 3 loses, loses that part. Yeah.

**Commissioner May:** And so would I be moving southward?

**Kurt Spitzer:** But, excuse me, the really, the question is, would – and I can do a rough estimate of this fairly quickly if there's an opportune time to do so. But the real question is whether

or not that population within this area here between Main Street and Harvey Avenue is significant enough to necessitate some other changes. It might not be. It might just add population to Zone 2 and take some away from Zone 3, but doesn't throw the plan out of balance.

**Commissioner May:** Okay.

**Kurt Spitzer:** But I don't know right now.

**Commissioner May:** Okay.

**Kurt Spitzer:** In any event I can go through these different alternatives. Let me just talk a little bit about the symbology here. This is, these are the current zones in this shaded area here. The black lines show where the new boundaries would be between the different zones. So the – here's Main Street here, and these are the – this would be – Zone 1 would pick up Georgetown, would lose some of this area here. This is Zone 3, Zone 2, Zone 6, 5, and 4. And remember that using the 2020 data and putting that on top of the 2012 boundaries, in other words, these boundaries here, you have a spread between the largest and the smallest district of about 46 or 47 points. Generally speaking, the acceptable threshold is 10 points. And so Zone 5 and Zone 4 had to lose population, especially Zone 4. And so the boundary from in between Zone 4 and 5 was moved to I-95, an easily understood boundary. There are some other changes made, but I think most significantly, Georgetown was moved out of 4 into 1. And as we've said many times before, when you start moving these lines around, it's sort of like pushing in the side of a balloon. You push in one side and the other side comes out. So it's not simply a matter of, you know, equalizing the population of Zone 4 and then everything else is fine. It requires changes all over the whole map, the whole plan for the city. So that's – this is Alternative 1 as currently stands right now.

This is 1A. And we've talked about this before. 1A moves Bethune Point Park from proposed Zone 3 back into Zone 1. And then it also moves this census block here, which is an area

occupied by Harbor Freight, Holly Hill Plaza, ALDI grocery store, from proposed Zone 2 back into where it is now, into Zone 5. So those are the only two changes between 1 and 1A.

1B keeps both of these changes, but adds two other changes. One, it moves Cypress Park and some adjacent properties from Zone 3 back into where it exists now in Zone 6. And then secondly, it moves this area here, which is bounded by Fairview, Railway Street, North Street, and US 1, from Zone 3 back into Zone 2. And so those are the only changes between 1A and 1B.

All of the plans are well within the 10 point threshold. All of the plans maintain minority-majority districts in 5 and 6. And although this wasn't a goal that was set, it just sort of occurred this way, all of the plans create a minority influence district in Zone 3. And all of the plans, you know, assuming that the numbers work out, could be modified by moving Harvey – making Harvey Avenue the southern boundary here between Zone 2 and Zone 3. I'll say this, just since we're talking about this area here right now. Right here, this is one census block and you know, it follows the river boundaries here, but it does not follow Harvey Avenue. So I'm assuming we would say keep Harvey Avenue here and then go north. I believe this is Halifax Avenue up to Main Street. So if you wanted to do this, this would become the boundary there.

**Mayor Henry:** Yeah. Yeah.

**Kurt Spitzer:** And not only if you want to do it, but if we're able to do it. I think you probably can, but I'd like to have a moment just to crunch some numbers first.

**Commissioner Reed:** So did I understand you to say that 1B does not affect Zone 5? It was a move of 2 and 3?

**Commissioner Cantu:** No, it moves –

**Commissioner Reed:** I asked – let him answer. He's supposed to be our expert. We paid him for this.

**Kurt Spitzer:** 1B does not affect Zone 5.

**Commissioner Reed:** Thank you.

**Kurt Spitzer:** 1A does affect Zone 5. And remember that all of the changes – I mean, this is up – these are policy decisions, but the way that the maps are drawn now, you begin with Alternative 1, you go on to 1A, and then 1B. 1B contains the changes that were made in 1A. And 1A does affect Zone 5 with this change here.

**Commissioner Henry:** Remind me again of how that affects Zone 5.

**Kurt Spitzer:** It moves this block here, which in Alternative 1 was planned to be in Zone 2, it moves this census block back into Zone 5.

**Mayor Henry:** What block is that?

**Kurt Spitzer:** This is the area that is occupied by Harbor Freight, Holly Hill Plaza, the ALDI grocery store. There's about 170 people in that particular block. And I can give you a better illustration of that, I believe.

**Mayor Henry:** It's a traditional – J.M. Fields, west of Nova.

**Commissioner Henry:** Is that – oh, on the other side over there. On the other side of –

**Mayor Henry:** It was on this side, it's west of Nova.

**Kurt Spitzer:** So now you're looking at a static PDF map that illustrates what these changes are. 1A moves this area that we just talked about, and 1A also moves Bethune Point back into Zone 1. Then 1B also moves Cypress Street Park and also moves the area bounded by North Street and Railroad Street, that particular area, into Zone 2.

**Commissioner Cantu:** Okay. Explain about 1B, because you explained last time that 1B moves something back into 5. And the parks.

**Kurt Spitzer:** Well, to the extent that 1A moves something back into 5, 1B does also,

because 1B contains all of the revisions that 1A had. And so the area that gets moved back into 5 is this area, this census block right here. There's about 170 people that reside in that particular block.

**Commissioner Cantu:** I'm sorry, how many?

**Kurt Spitzer:** 170.

**Commissioner Henry:** What streets are those? The actual streets, a couple of them. So I can get a better idea.

**Commissioner Reed:** Let him enlarge it.

**Kurt Spitzer:** This is Brentwood, Nova, Mason, and I believe this is Vine.

**Commissioner Cantu:** And then the parks?

**Mayor Henry:** So, if it's Vine, then that means that Scarlett-Golden Center would still be in there. And you want Scarlett-Golden should be connected to Derbyshire.

**Commissioner Henry:** Derbyshire Park.

**Mayor Henry:** That should all be in the Zone 5. I prefer that.

**City Attorney Gross:** And I think as Mr. Spitzer explained during the workshop, there would be an incremental increase in the majority-minority population in Zone 5 if that block that we're talking about right now stays in Zone 5.

**Mayor Henry:** Yeah. Yeah.

**Kurt Spitzer:** That's right.

**City Attorney Gross:** It's a very minor increase, but it would be an increase. And Mr. Spitzer, I think what you said during the workshop is from the standpoint of preserving majority-minority member districts, which we have to do because we have had those as majority-minority districts and they have impacted the voting that those districts have consistently elected minority

commissioners. So from the standpoint of preserving that majority-minority influence, all three of 1, 1A, and 1B, do that. 1A and 1B, because they move a small amount of people back into 5, increase that percentage. And I think you said it was a very slight amount, Mr. Spitzer?

**Commissioner Henry:** Which one of those again keeps YSG in Zone 5, that's –

**City Attorney Gross:** All three of them have YSG in Zone 5.

**Commissioner Henry:** Okay. Alright.

**Kurt Spitzer:** Well, all two, right?

**Mayor Henry:** Two.

**Commissioner Cantu:** Two.

**Commissioner Henry:** Two.

**City Attorney Gross:** I'm sorry, I'm sorry. All – both of 1A and 1B.

**Mayor Henry:** 1A and 1B.

**Commissioner Henry:** 1A –

**Kurt Spitzer:** 1A and 1B, move this back into 5. And the difference is, it increases the voting-age African American population of Zone 5 by something around one percentage point.

**City Attorney Gross:** But when I say all three – Alternate 1 – I mean, YSG's on the west side of Vine and it's north of that area that we're talking about. And that would remain in 5 regardless, in any of those maps. 1, 1A, or 1B.

**Kurt Spitzer:** These black lines are Plan 1. Then here we layer 1A on top of it. So this is the area that gets moved from what would be Zone 2 into Zone 5.

**Commissioner Reed:** I'm proposing we consider 1B.

**Mayor Henry:** And I can't second that, but I will say that the rationale for me is it increases the minority-majority district, ever how slightly. That is perhaps, you know, one of the most

important factors that we should be considering. In addition to preserving the history of important parks being located in the districts that they have traditionally represented. That is a auxiliary or an additional benefit to those maps. So do we have a second?

**Commissioner Reed:** Do you need a motion?

**Mayor Henry:** Yes.

**Commissioner Reed:** I move that we amend our redistricting map to accept zone – Alternative B, map Alternative B.

**City Attorney Gross:** If I can, I guess the motion would be to amend it to 1B, but also with the addition of moving the common boundary between 2 and 3 on the Beachside to Harvey.

**Commissioner Reed:** We need that as well.

**City Attorney Gross:** Yeah.

**Commissioner Reed:** I amend it to say what the lawyer just said.

**Mayor Henry:** Okay.

**Commissioner Reed:** Can I get a second?

**Mayor Henry:** Alright. We have a motion. Do we have a second?

**Commissioner Henry:** I second.

**City Attorney Gross:** So before you – I mean and this is a motion to bring the ordinance back, not to – I don't think you can approve it with those changes tonight. It's really a direction to Mr. Spitzer to revise those maps, give you revised report and data. And listen, it's quite possible that when it comes back at the next meeting, he may need to make other changes because of that you push a balloon in one side, it comes out the other, right? Based on the additional changes, you know, from Main Street to Harvey. And you may need to look at that further. But that would be a clear direction to him if you wanted to make that motion.

**Commissioner Reed:** And I have another question talking about letting parks stay where they are. So the moves from 1A remain in 1B with a couple of changes, but does Bethune Point stay in 1?

**Kurt Spitzer:** Yes.

**Commissioner Reed:** Okay.

**Mayor Henry:** Okay. Um –

**City Attorney Gross:** So let me try to reframe the motion. I think the motion would be to continue this to allow the consultant to change the map exhibit to map 1B, plus relocating the boundary south to Harvey. And then when he presents that, he'd also have to report on what the corresponding changes are in population, as well as to make any other related changes that need to be made to stay within the 10 percent margin and to preserve the majority-minority zones of influence.

**Mayor Henry:** Alright.

**Kurt Spitzer:** If I might, commissioners, just very quickly doing some quick calculations here. There are 305 people that live in this area right here, which is on the north, Main Street, on the south, Harvey. And I hesitate to do this quickly, but I believe that you should be able to make that change without any problems at all in terms of your – the numbers between Zone 2 and Zone 3. I don't think you'd have to make any other changes to either Zone 2 or Zone 3. But that's my preliminary assessment. I would like to look at it a little bit further, but it looks as though it'd be okay to do that change.

**Mayor Henry:** Alright. Do we follow the motion?

**Clerk LaMagna:** So the motion will be to continue this item until the September 17, 2025, regular City Commission meeting at six o'clock. And to have Mr. Spitzer amend, what is it? Alt

1B?

**City Attorney Gross:** With the additional change of moving the common boundary on – between Zone 2 and 3 on the Beachside from Main Street to Harvey.

**Clerk LaMagna:** Okay.

**Mayor Henry:** Alright. We have a motion.

**Clerk LaMagna:** So yes, so that was the motion if you want –

**Mayor Henry:** And we have the second.

**Clerk LaMagna:** And the second was Henry.

**Mayor Henry:** Yes. Alright –

**Clerk LaMagna:** So then we'll have a second public hearing for speakers on the 17th.

**Mayor Henry:** Yes.

**Clerk LaMagna:** Okay.

**Mayor Henry:** Ms. Lewis, do you have – come on up. Thank you for joining us.

**Supervisor Lewis:** Thank you mayor, commissioners. Lisa Lewis, supervisor of elections. One thing, I don't know if this needs to go on the record, but I would ask is the effective date be as soon as you pass this ordinance. The reason I'm asking is because we have moved our office and by law I'm supposed to mail voter information cards to everyone to let them know we have moved our office and where we are. I have mailed to everyone with the exception of Daytona, because I know y'all were going through redistricting. But if the effective date stays the same as in December, I've got to go ahead and mail. I can't wait another three months to let people know where – that we have moved. So then that cost then becomes the city's cost for the second mailing of yours. I'm not sure of the reason. I would think because if it was to let anybody who wants to run for office of those that are up next year, they have to live in the zone for at least six months.

The sooner they have a chance to move, the better. That's my thinking. I don't know where these – where your current homes are now, within these maps. I haven't even looked them up. I don't think anybody has. So I don't know that that would affect anybody right now, if you made the effective date as soon as the ordinance was passed, that was just my two cents.

**City Attorney Gross:** So I – and just, so look, I had previously suggested that it might be beneficial to do an ordinance that provides a lead time on the effective date to try to help us if we're – if a suit's filed against us again, based on the idea of having an intent to advantage or disadvantage commissioners – incumbent commissioners or challengers based on their residential district. I – look, I mean, I can't tell you we're not goanna be sued. We may be sued regardless. And you have to weigh that against an absolute surety that you're going to spend an additional – what would be the cost of doing the mailing?

**Supervisor Lewis:** Approximately $50,000.

**City Attorney Gross:** $50,000. So is it absolutely necessary that you delay the effective date? No. There is some point to what Supervisor Lewis is saying, that there would still be a long lead time for anybody to move to a district with whatever maps we create. So, right.

**Commissioner Reed:** I don't have a problem with that. Do we need to move on that?

**Mayor Henry:** Okay. Just put it as a part of the ordinance which you bring back. That that will be the effective date. Okay. Thank you.

**Supervisor Lewis:** Thank you.

**Mayor Henry:** And thank you. We appreciate you.

**Clerk LaMagna:** Okay, so we have a motion and a second.

**Mayor Henry:** Do we have any comment? Okay. No other comment. Alright, we have a motion and a second. All those in favor let it be denoted by saying aye.

**Multiple Speakers:** Aye.

**Mayor Henry:** Those who are in opposition, same sign. This motion passes 7-0. We're getting there.

**Clerk LaMagna:** And again, for the record, that is being continued until the September 17, 2025 regular City Commission meeting at six o'clock.

**City Attorney Gross:** And mayor and city commissioners, as soon as we have the revised map and population data, information, etc., etc. from Mr. Spitzer, we'll post the map as well as have maps of the individual boundaries in the lobby for public view as we've had for the Alternate 1 map.

**Mayor Henry:** Alright.

**Clerk LaMagna:** Okay. Item 9D –

**Kurt Spitzer:** Commissioners.

**Clerk LaMagna:** Oh, I'm sorry.

**Mayor Henry:** Oh.

**Kurt Spitzer:** I'm sorry. Very quickly, I've done some recalculations and that change would require a concurrent change that would move some population out of Zone 2 into Zone 3. Because it – without – if you made only the change to go to Harvey Avenue, that would put you slightly over 10 percentage points. And so there would need to be a minor adjustment at some other location along the boundary between 2 and 3 to sort of bring that number under 10 points.

**Commissioner May:** 2 to 3 in favor of Zone 2?

**Mayor Henry:** No. 3 gets more. You need more people.

**Kurt Spitzer:** That's right.

**Commissioner May:** Than 2.

**Mayor Henry:** Okay. I think we'll trust your judgment, you understand sort of what we're trying to accomplish, I think most of that has been accomplished. I don't know that the people – we don't want to get into the nuts and bolts of saying that we're trying to determine where the people are. We're more interested in the big picture of our – the history of our community. Things like, you know, major thoroughfares. Those are the things that – we're not to weigh ourselves on whether I get this block or that block. So we'll allow you to do that.

**Kurt Spitzer:** Yes sir.

**Mayor Henry:** Okay.

**Kurt Spitzer:** Thank you very much.

**Mayor Henry:** Alright, thank you.

[1:17:04]

Vanan Online Services, Inc.
Think Service Think Vanan

## Certificate of Transcription

**Transcription of "City-Commission-Sep-03-2025.mp4"**

We, Vanan Online Services, Inc. a professional transcription company, hereby certify that the above-mentioned document(s) has/have been transcribed by our qualified and experienced transcriber(s) is/are accurate and true transcription of the original document(s).

This is to certify the correctness of the transcription only. Our transcriber is in no way related, by immediate family ties or marriage, to any parties related to the materials transcript.

A copy of the transcription is attached to this certification.

Kayla Vega, Production Manager

Vanan Online Services, Inc. CORPORATE SEAL Virginia 2016

Date:12th September 2025

Vanan Online Services, Inc.
EIN 81-3795675
ATA Member #266532
ISO 9001:2015

**Vanan Online Services, Inc.**
**10711 Spotsylvania Ave., Suite A**
**Fredericksburg VA 22408**
**Office: (888) 535-5668**
**Email: support@vananservices.com**
**Website: www.vananservices.com**