# Daytona Beach City Commission Meeting
# October 1, 2025

Transcript of video recording available at:
https://www.youtube.com/watch?v=VyX0ouZx21o&

# City Commission Meeting – Oct. 1, 2025

[27:38]

**Clerk LaMagna:** Okay, we're going to move on to item number nine, which is our public hearings and quasi-judicial hearings. Item 9A is the city attorney's office redistricting ordinance. This is an ordinance on second reading, public hearing. An ordinance amending Subpart A, Article 2, Section 2 of the City Charter; amending the boundaries of the existing City Commission members' district within the City of Daytona Beach, Volusia County, Florida; establishing new commission member district boundaries in accordance with the Florida Constitution, Florida Statutes, Article 2, Section 2 of the City Charter, and other legal requirements; repealing ordinances or parts of ordinances in conflict herewith; and providing an effective date.

**Commissioner Cantu:** So move.

**Commissioner Henry:** Second.

**Mayor Henry:** Okay, we have a motion and a second. We have speakers?

**Clerk LaMagna:** I do, Mr. Mayor. Our first speaker is John Nicholson. And on deck is Nick Sakhnovsky.

**City Attorney Gross:** Mayor and members, while we're waiting for the speakers, I do want to point out there has been one small change to the ordinance to approve the redistricting map that's been on your agenda. During the process of creating the legal description, which, as you know, was the delay in getting to where we are now, there was a technical issue along the common boundary of Zones 2 and 5, where they meet along Nova Road, beginning from Mason to Brentwood. Up until that point, as you traveled northward, the boundary was on the east side of Nova Road, literally the east side of the northbound lane of Nova. For some reason, the older map had it jumping over to the west side of Nova Road southbound. We just evened it up so that it continues up Nova Road on the eastbound side the whole way up to Brentwood. It doesn't affect

any population. Obviously, there's no population in Nova Road, but it did change because the census tract changed. We wanted to make the legal descriptions and map consistent. That is the only change from the last version that you had discussed with the consultant.

**Mayor Henry:** Excellent. Excellent. Okay. Mr. Nicholson?

**John Nicholson:** Yes. John Nicholson, 413 North Grandview Avenue. I've been fighting this for 30 years. This past redistricting, supposedly there were eight maps. I only saw six, you only discussed three, and within seconds you settled on one. I don't believe the lawsuit that we had from ACLU was met. Alright. The zones were basically not changed. So if the zones are the same from 2000 and you don't change it at all, basically those commissioners living in those zones that we were sued for are still in those same zones. So if you don't change it, they can come back, I believe, and sue us again because it wasn't enough change to warrant the solving of the lawsuit. Secondly, in the year 2000, Charles Cherry hijacked the political system of Daytona Beach. It was legal back then to gerrymander in favor of race. We spent three and a half hours moving Black people from one location to another. I specifically recall Scarlett-Golden saying, "Oh, well, there's a new Black family moved over on Seneca. I'd like them in my district, but I don't want any of the white people in between." That's race. So everything we talked about for two and a half hours – three and a half hours, was about race. This last discussion, we did two hours of nothing but race. Well this is the percentage of race in your district. This is a percentage of race in your district. Monica wanted a park. Well that changes your race. Paula wanted a park. Well there's 212 people, that'll change your racial makeup. Who cares? It's a Black district, she gets 200 more Blacks. Who cares? But it was discussed. It was all about race. I believe that if somebody wanted to sue us, which I hope somebody does, and then we will have to end up with a real redistricting. Right now, with – you never discussed, we grew by 50%. That's huge. From 2010 to today, we grew by 50%.

## City Commission Meeting – Oct. 1, 2025

Our zones should have been changed drastically. The way you've done it, you've never discussed – and I know you don't agree with me that Margaritaville is going to be built. But there's going to be a Margaritaville, there's going to be Mosaic. There are going to be apartments out there. It will change the number of people. That area grew by 30,000 people. And we still have half the city in one zone. So that zone, Zone 4, will probably end up with 25,000 people, and everybody else gets 11. Thank you.

**Mayor Henry:** While we wait –

**Commissioner Cantu:** Mayor?

**Mayor Henry:** On the next speaker –

**Commissioner Cantu:** Oh, Mayor?

**Mayor Henry:** I just want to make sure that I say that a lot of that, almost all of it, is just not accurate. Okay.

**Commissioner Cantu:** Mayor?

**Mayor Henry:** Yes, ma'am.

**Commissioner Cantu:** Can I speak for a second, please?

**Mayor Henry:** Yes.

**Commissioner Cantu:** Mr. Gross, could you answer a question? By law, are we supposed to go by the 2020 census, not 2010?

**City Attorney Gross:** Yeah, the law is that we use the 2020 census. The question is whether you can use other data sources than the 2020 census. And Mr. Spitzer, who I think is online and available to speak tonight, can address this as well. But as you may recall from the workshop and our prior discussions, to try to support the use of things other than census data in court would put us in a difficult spot because the courts generally will allow us to use census data as a safe harbor.

They won't question census data as long as we're within 10% of the census data margins. But once we go away from that, then it becomes increasingly difficult to defend the use of that data in a lawsuit. And given that we were in a lawsuit once and that most likely producing that data would have required a special study and cost and time, I think it's fair to say that it was the decision of this commission to rely on the 2020 census.

**Commissioner Cantu:** Okay. And thank you. And I do have another question as well. As it's been made aware a few times up here and which I know is actually not true, all those maps – Do I have half of the city after we rezone?

**City Attorney Gross:** You have, according to the census data, I think Mr. Spitzer could probably give you those numbers better than I could, if you want him to answer that question.

**Commissioner Cantu:** Well, I actually can answer it as well. I mean, I do not have half the city. Actually, I think I have less residents than most of the commissioners after we redistrict, even if we use whatever map it is. Actually, I think the zone – commissioner rezone will have the most if we go by this. When we were in our workshop, we all discussed one that we liked, and then all of a sudden we were discussing other ones, and we're not going with the one we discussed. So that wasn't accurate as well.

**City Attorney Gross:** So based on the 2020 census data, the gold standard, if all of the numbers were the same, based on the data, would be 11,913.

**Commissioner Cantu:** Okay.

**City Attorney Gross:** And based on that same data, you would have 11,557. And I don't think anybody in this room would disagree with the fact that today's numbers would be different. But courts, like I said, are not going to allow us to easily use today's numbers. And Mr. Spitzer, who could go through this again with you, could explain some of the problems with those

alternative source numbers, as he did previously. For example, the BEBR numbers that University of Florida produces.

**Commissioner Cantu:** Actually, I don't need to be – I don't need it. I think we've all actually heard it quite a bit. I just wanted that put out to the public. And I can tell you, in Zone 4 on west of 95, west LPGA off 95, most of my development is already done. Margaritaville, I know there's a few Margaritaville in here right now, is totally, I mean, built out. So, I mean, yes, there might be development that's been approved, like Avalon. I think that was done in 2017. But we know how many years it actually takes before you see development after it's approved. And I'm sure we'll be back again. Even – I might probably won't be up here, but we'll be back again, redistricting again. So I just want to say that most of my community out there is already built out. I know there's a number out there in Margaritaville, but I can tell you, a lot of snowbirds are out there as well. And actually, in all my community, even in Pelican Bay, there's a lot of snowbirds. So. But thank you.

**Mayor Henry:** Thank you. Yes, sir.

**Clerk LaMagna:** And after Mr. Sakhnovsky, we have Doyle Lewis.

**Nick Sakhnovsky:** Good evening, Mayor, Commissioners. Thank you for the opportunity to speak. I'm here this evening – well, Nick Sakhnovsky, 1130 Fins Up Court, Daytona Beach. I'm here representing VOTE!, which is a Volusia nonpartisan political organization – political committee with a chair, treasurer, and members, organized back in 2022 with the purpose of educating voters and supporting or opposing local candidates or issues. We, of course, soon became aware of the post-census redistricting 2022, which is when the rest of the county did it. And we've had ongoing member interest and reports at meetings continuing over the last three years. In particular, the last time the public actually had an opportunity to speak to y'all was on July 5, 2023,

more than two years ago. And that was again the second reading of the redistricting ordinance at that time. And the input, which was done at that time, which included a presentation of some maps, at least one alternative map with a request to postpone the vote until the Commission could include that alternative, was not agreed to. And that left very few options because of the decision of the Commission not just take a little bit of time to consider something else. Following the litigation that did result, the Commission rescinded the map and began this redistricting process again and we've continued to monitor it. And we note with dismay that you're worried about costs, but the costs of actually doing a proper study would have probably been less than the expenses that you paid out in the legal fees from the last lawsuit, which was over $99,000, by the way. So now we're here on not only the rescheduling of the meeting from the 17th – it really was scheduled for the 2nd, I mean, the 3rd of September. And on the 2nd of September, which I'm reading from now, I sent all of you a letter, which some of you acknowledged, and asking for some more opportunity for the public speak, but nothing. Because the public workshop that was mentioned in the whereas clause was not public in the sense of public participation. There was no opportunity given by the Commission to participate by the public, to ask questions, to present anything. And now that you're about to enact something from the people of Daytona Beach, we do want to express our disappointment that the public has only had in the last two years and three months, just the July 5th public hearing and this public hearing to actually present in a public forum an alternative. So oddly as it may seem, it still would make sense from our perspective that you would give it more time to consider options and actually to do this. We're now actually closer to the next census than we are from the last one. And even though Margaritaville may be built out now in 2025, it was not built out in 2020.

**Clerk LaMagna:** Thank you, thank you, sir, your time has expired. Our next speaker is

Doyle Lewis.

**Doyle Lewis:** I like your new speakers. You don't have to pull them around. My name is DW this year. I've been watching the LGPA, the ISB, and south and north in Flagler for years around 95, especially west of 95. When Margaritaville came through here, I did not expect them to be sold out that quickly. I just don't think you made a mistake. I really don't. I just think you did it a little too quick for the public. So I'm not blaming nobody for the quickness, because sometimes you have to move quickly to make things happen. Because if you move too slow, you lose it. If you lose it, you ain't got it. What I'm trying to say is find out the actual numbers at the time of the study. It's going to be like four and a half years, and then we're going to have the 2023 – I mean, 2030 census. Now, what I've seen after all this build out of this residential is all this other money coming in with all the commercial that's being put in right now, on top of all that, residential. I don't know what you're scared of. Y'all got money on top of money coming in. I've been counting it. I've been looking at the buildings. I'm a builder, commercial and residential. But they gotta be closed out to be taxed out. I know these things. So just do a good study, do it quickly. Be on top of your game. I know it's Florida, but stop retiring and do your job. It's just that simple. I mean, I lay on the beach all day long, I get arrested. I can do that.

**Mayor Henry:** Alright.

**Doyle Lewis:** And I've been doing that. Put me to work and I'll start. Stop talking here. Thank you. My name is DW. Homeless, Daytona Beach, Volusia County.

**Clerk LaMagna:** That was my final speaker, Mr. Mayor.

**Mayor Henry:** All right, do we have a motion and a second?

**Clerk LaMagna:** We do.

**Mayor Henry:** Do we have any additional dialogue?

**City Attorney Gross:** I do want to point out to the members of the City Commission that this is a continued public hearing that began a while back. All of the things that Mr. Spitzer stated as of record are still as of record. However, since it's been a minute since then, if you'd like Mr. Spitzer to make his presentation over again, he is available tonight to do that or to address any questions that you may have.

**Commissioner Cantu:** And has those maps I saw out there been out there for a while? I thought they have.

**City Attorney Gross:** Yes.

**Commissioner Cantu:** 'Cause usually I go to the back. That's the way I thought. Okay.

**Mayor Henry:** Okay. No, I don't. Okay, go ahead.

**Commissioner Paris:** I just want to say I'm a little disappointed that Beachside had to be broken up and communities of interest weren't kept together. But I will make do with what I have and represent the best I can.

**Mayor Henry:** Okay. Alright. We have a motion. We have a second. All those in favor let it be noted by saying aye.

**All:** Aye.

**Mayor Henry:** Those opposed, same sign. Motion carries 6-0.

[44:42]

[1:43:05]

**Clerk LaMagna:** Our next speaker is John Nicholson and on deck is Thomas Russell.

**John Nicholson:** John Nicholson, 413 North Grandview Avenue. A gentleman was passing these out in the lobby. *The Observer*, it now has a Daytona Beach edition. There's always been an Ormond edition, Ormond and Flagler. So now we have our own as well. It's out in the lobby, and

it'll be in the Publix and other areas throughout the city. Secondly, I'm guessing and I hope Chief Young was in the DROP program. Is he going to stay – because he's in the DROP program. So the way we now extended it, has he decided to stay, hopefully, rather than leave?

**Chief Young:** He's going to stay, John.

**John Nicholson:** Okay, thank you. I discussed this with him before and I was hoping he would stay. That was quick. Secondly, the TIF funds are running out, they are actually not going to extend it. So we have about ten years left. I'm hoping we start doing something, especially on Beachside. There are a lot of large parcels that we can have request for proposals to have development up there. I'm hoping that we will do – use it. It's a lot of money, it's a lot of development, and when the TIF funds end, that's millions of dollars that the city is not going to get if don't have those buildings.

Last, there's supposed to be a code going out to Clyde Morris Landing. I was just talking to somebody last night about he drives past it and sees cop cars there every night. Talked to the sheriff's office, they keep saying they're there every night. We need to take a look at whatever happened to Clyde Morris Landing so that it doesn't happen again. Because you're pushing for more affordable housing. If we did something wrong, we don't want to continue making the same mistake.

And lastly, I mentioned it several times. The map of our zones, the map – not the people – is one half of the city is in Zone 4. Of the map, not the population. Secondly, the mayor keeps – and again I heard it outside, so this is gaslighting – when I speak, everything I say is true. He was not at the meeting, I sat for three and a half hours, so I know what they discussed, and I talked to George Burton, who was on the Commission, and he confirmed exactly what I said. All of you listened to the meetings that we had for this rezoning. No other city has race, percentage of Blacks,

in their zones. We're the only one. Why? Why do we continue to have to have everything based on race? We've got to stop that. Thank you.

**Mayor Henry:** Because we don't – we follow the state requirements, and what the state encourages us to do, which is protect minority-majority districts. That's what we did.

**Clerk LaMagna:** No, sit down.

**Mayor Henry:** [inaudible 1:46:24]

**Clerk LaMagna:** Our next speaker is –

**City Attorney Gross:** Mayor, I'm sorry, I've got to add something for the record just to be clear. The process started with using the zoning districts pre-redistricting and adding and subtracting to them as necessary to achieve goals in the order of priorities that the consultant explained. And when you start from that proposition – and we've talked about this before, there's a tension between the Equal Protection Clause of the Constitution and the Voting Rights Act, and the way that you reconcile those two is where you have a district that is historically majority-minority, and where that historical status has benefitted minorities in terms of their vote, as we have, and the district is not in that sort of salamander shape that our consultant discussed, then under those circumstances, in my view, we're actually required by law to preserve the majority-minority status. Now, different facts could lead to different results, but we don't have those facts in front of us. Thank you.

**Mayor Henry:** So, you use the term 'gaslighting' and bring it up every time and keep bringing up race. You're the one that's gaslighting. And I wish that you would stop. Because we followed exactly as the attorney just described, which was presented to us by our consultant. And that's what we followed. You may not like it, but that's what we did.

[1:47:58]

Vanan Online Services, Inc.
Think Service Think Vanan

# Certificate of Transcription

**Transcription of "City-Commission-Oct-01-2025.mp4".**

We, Vanan Online Services, Inc. a professional transcription company, hereby certify that the above-mentioned audio/video(s) has/have been transcribed by our qualified and experienced transcriber(s) is/are accurate and true transcription of the original audio/video(s).

This is to certify the correctness of the transcription only. Our transcriber is in no way related, by immediate family ties or marriage, to any parties related to the materials transcript. Transcription was done in the regular course of business.

A copy of the transcription is attached to this certification.

Saravanan Nagaraj, CEO

VANAN ONLINE SERVICES INC

Date: 3rd day of October 2025.

Vanan Online Services, Inc.
ATA Member #101387
ISO 9001:2015

Vanan Online Services, Inc.
10711 Spotsylvania Ave., Suite A
Fredericksburg VA 22408
Office: (888) 535-5668 | Email: support@vananservices.com